CHAVEZ & GERTLER, L.L.P.
Mark A. Chavez (CA SBN 90858)
Nance F. Becker (CA SBN 99292)
Dan Gildor (CA SBN 223027)
42 Miller Avenue
Mill Valley, CA 94941
Tel:      (415) 381-5599
Fax:      (415) 381-5572
E-mail:   mark@chavezgertler.com
          nance@chavezgertler.com
          dgildor@chavezgertler.com

RODDY KLEIN & RYAN
Gary Klein (Admitted Pro Hac Vice)
Shennan Kavanagh
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:      (617) 357-5500, ext. 15
Fax:      (617) 357-5030
E-mail:   klein@roddykleinryan.com

[*Additional counsel listed on signature page*]

Attorneys for Plaintiffs
and the Proposed Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANA RAMIREZ, ISMAEL RAMIREZ and JORGE SALAZAR, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>GREENPOINT MORTGAGE FUNDING, INC.,<br><br>          Defendant. | Case No.  3:08-cv-00369-TEH<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br> **1. Violations of the Equal Credit Opportunity Act; 15 U.S.C. § 1691; and**<br><br> **2. Violations of the Fair Housing Act; 42 U.S.C. § 3601.**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiffs, Ana Ramirez, Ismael Ramirez and Jorge Salazar (collectively, the "Plaintiffs"),

2   on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege as

3   follows:

4                               **INTRODUCTION**

5        1.      This is a class action brought by Plaintiffs, on behalf of themselves and other

6   similarly-situated minority homeowners, against GREENPOINT MORTGAGE FUNDING,

7   INC. ("GREENPOINT") under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.

8   ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 et seq.  Plaintiffs seek remedies for

9   themselves and the Class (defined in ¶ 77, below) for the discriminatory effects of the

10  Defendant's home financing policies and practices.

11       2.      As described below, GREENPOINT has established a specific, identifiable and

12  uniform credit-pricing system, a component of which, referred to herein as the Discretionary

13  Pricing Policy, authorizes an unchecked, subjective surcharge of additional points and fees to an

14  otherwise objective risk-based financing rate.  In other words, after a finance rate acceptable to

15  GREENPOINT is determined by objective criteria (e.g., the individual's credit history, credit

16  score, debt-to-income ratio and loan-to-value ratios), GREENPOINT's credit-pricing policy

17  authorizes additional discretionary financing charges and interest rate mark-ups.  These

18  subjective, additional finance charges have a widespread discriminatory impact on minority

19  applicants for home mortgage loans, in violation of ECOA and the FHA.

20       3.      GREENPOINT has established policies for retail and wholesale access to its loan

21  products that subject minority financing applicants to a significantly higher likelihood of

22  exposure to discretionary points, fees and interest rate mark-ups.  These costs drive up the

23  average cost of a mortgage loan made by GREENPOINT to minority applicants.

24       4.      Plaintiffs seek declaratory and injunctive relief, disgorgement and restitution of

25  monies disparately obtained from minority borrowers.

26                         **JURISDICTION AND VENUE**

27       5.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331,

28  which confers original jurisdiction upon this Court in a civil action arising under federal law.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' and the Class' claims occurred in this District, because Defendant is headquartered in this District, and because Defendant regularly conducts business in this District.

### INTRADISTRICT ASSIGNMENT

7.     Intradistrict assignment pursuant to Local Rule 3-2(c) is proper in the San Francisco Division as this action arises in San Francisco County and the surrounding counties as Defendant regularly conducts business in this District and is headquartered in Sonoma County.

### PARTIES

8.     Plaintiffs Ana and Ismael Ramirez ("the Ramirezes") are minority homeowners who reside at 46 Stellman Road, Roslindale, Massachusetts 02131.

9.     Plaintiff Jorge Salazar ("Salazar") is a minority homeowner who resides at 4172 51st Street, San Diego, California 92105.

10.     Defendant, GREENPOINT MORTGAGE FUNDING, INC. ("GREENPOINT") originated sub-prime mortgage loans for approximately 20 years before closing its residential loan business on August 20, 2007.  GREENPOINT is headquartered at 100 Wood Hollow Drive, Novato, California, 94945.

### FACTS

**I.     MORTGAGE LENDING IN THE UNITED STATES HISTORICALLY HAS DISCRIMINATED AGAINST MINORITIES**

11.     The mortgage lending industry has a long history of racial discrimination, offering minorities products and terms that are drastically worse than those given to their similarly-situated white counterparts.

12.     According to the Joint Center for Housing Studies at Harvard University's 2005 study called "The Dual Mortgage Market:  The Persistence of Discrimination in Mortgage Lending," mortgage lending discrimination today is subtle but pervasive, with minority consumers continuing to have less-than-equal access to loans at the best price and on the best

1    terms than their credit history, income, and other individual financial considerations merit, more

2    than three decades after the enactment of national fair lending legislation.

3        13.    The passage of civil rights legislation and fair lending laws in the 1960s and

4    1970s brought an end to the most virulent forms of overt racial discrimination in the housing

5    markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to

6    discriminate, including maintaining offices only in white neighborhoods and engaging in

7    practices such as redlining (refusing to lend on properties in predominantly minority

8    neighborhoods).

9        14.    After such redlining practices were challenged in the 1990s, mortgage lenders

10   changed tactics once again, making loans to minorities, but charging higher interest rates and

11   loan-related fees than they charged to similarly-situated white borrowers.  Loan data that

12   mortgage lenders must now compile and disclose under the federal Home Mortgage Disclosure

13   Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and

14   similarly-situated white borrowers.

15       15.    The HMDA requires mortgage lenders to report information about the home loans

16   they process each year.  In 2005, lenders reported information on more than 30 million home

17   loan applications pursuant to HMDA.  In 1989, Congress required lenders to begin disclosing

18   information about mortgage borrowers' race and ethnicity.  In 2004, concerned with potential

19   racial discrimination in loan pricing, and recognizing that racial or other types of discrimination

20   can occur when loan officers and mortgage brokers have latitude in setting interest rates, the

21   Federal Reserve Board began requiring lenders to also report information concerning rates,

22   points, and fees, charged to borrowers on high-cost loans.

23       16.    According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that

24   "Blacks and minority borrowers were more likely . . . to have received higher-priced loans than

25   non-minority whites. . . . [which has] increased concern about the fairness of the lending

26   process."  Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home

27   Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18,

28

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No.  3:08-cv-00369-TEH

1    2006) (http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf (last viewed

2    March 5, 2008).)

3        17.    HMDA data for 2004 reveals profound loan pricing disparities between minority

4    borrowers and non-minority whites even after controlling for borrowers' gender, income,

5    property location, and loan amount.  After accounting for those differences in the 2004 HMDA

6    data, minority borrowers were still almost twice as likely to receive a higher-rate home loan as

7    non-minority whites.  (http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf (last

8    viewed March 5, 2008).)  In a speech last year, the Vice-Chairman of the Federal Deposit

9    Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and observed that

10   that data "clearly indicated" that minority borrowers are more likely to receive high-cost home

11   loans than are non-minority whites.  (http://www.fdic.gov/news/news/speeches/archives/

12   2006/chairman/spoct1806.html (last viewed March 5, 2008).)

13       18.    Likewise, HMDA data for 2005 shows that "for conventional home-purchase

14   loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2

15   percent for non-Hispanic whites, a difference of 37.5 percentage points."  Avery, _supra_, at A159.

16   The situation is similar for refinancings, where there is a difference of 28.3 percentage points

17   between blacks and non-minority whites.  Id. at A124, A159.

18       19.    In 2003, the National Community Reinvestment Coalition ("NCRC") released a

19   report on credit discrimination titled, "The Broken System:  Discrimination and Unequal Access

20   to Affordable Loans by Race and Age," that indicated that consumers living in areas with more

21   minority residents are more likely to have mortgages with interest rates higher than the

22   "prevailing and competitive" rates, often because of discrimination in lending.  _Available at_

23   http://ncrc.org/policy/cra/documents/ncrcdiscrimstudy.pdf.

24       20.    Home Mortgage Disclosure Act ("HMDA") Data for 2006 revealed that black and

25   Hispanic borrowers are more likely to obtain higher-priced loans than are white borrowers.  The

26   data indicated that black homeowners who received subprime mortgage loans were much more

27   likely to be issued a higher-rate loan than white borrowers with the same qualifications.

28   _Available at_ http://www.ffiec.gov/hmda. (last viewed February 15, 2008).

-4-

21.    In 2006, the Center for Responsible Lending, a non-profit research organization, uncovered "large and statistically significant" differences between the rates of subprime loans offered to blacks and whites, even when income and credit risk were taken into consideration. Compared to their otherwise similarly-situated white counterparts, blacks were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans. "Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages," *available at* http://www.responsiblelending.org.

22.    The Association of Community Organizations for Reform Now (ACORN) released a report entitled "The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities," dated September 27, 2005, that found that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners."

23.    A growing number of research studies and investigations show that significant racial disparities still exist.  California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007) (http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf (last viewed March 5, 2008); Ross, "The Continuing Practice and Impact of Discrimination" (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R) (http://www.econ.uconn.edu/working/2005-19r.pdf) (last viewed March 5, 2008).

24.    This month, the California Reinvestment Coalition, jointly with several other non-profit and housing advocacy groups, published another report examining the impact of lending by subprime, high-risk lenders in 7 metropolitan areas – Boston, Charlotte, Chicago, Cleveland, Los Angeles, New York City and Rochester, NY.  Among other things, the study showed that subprime high–risk lenders are concentrated in minority neighborhoods.  Data supporting this finding demonstrated that subprime high-risk lenders had 20% of the market share in predominantly minority neighborhoods in these metro areas, compared to a 4% market share in predominantly white neighborhoods.  In addition, over 40% of the loans made by subprime high-

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No.  3:08-cv-00369-TEH

1   risk lenders were in neighborhoods where 80% or more of the residents were minorities.  In stark

2   contrast, less than 10% of subprime high-risk lender loans were in areas where less than 10% of

3   the residents were minorities.

4        25.    In metro Boston, where the Ramirezes reside, the same study shows that

5   subprime, high-risk lenders had 22% of the home loan market in neighborhoods where more than

6   80% of the residents were minorities, while subprime high-risk lenders had only 5% of the

7   market for home loans in neighborhoods where less than 10% of the residents were minorities.

8   In 6 of the 7 metro areas analyzed, the subprime high-risk lender market share in predominantly

9   minority neighborhoods was at least 3 times the subprime high-risk lender market share in

10  predominantly white neighborhoods.  California Reinvestment Coalition, et al., "Paying More

11  for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending"

12  (March 2008) (http://www.nedap.org/resources/reports.html) (last viewed March 12, 2008).

13       26.    Moreover, and importantly, research studies have suggested that borrowers' credit

14  profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost

15  loans.

16       27.    As an example, research by Howell Jackson of Harvard Law School, detailed in

17  the article *Kickbacks or Compensation: The Case of Yield Spread Premiums* (Harvard Univ.), H.

18  Jackson and J. Berry, *available at* http://www.law.harvard.edu/faculty/hjackson/pdfs/

19  january_draft.pdf (last viewed March 5, 2008), concluded that the substantially higher mortgage

20  broker compensation received as the result of yield spread premiums could not fully be explained

21  when controlling for variables associated with creditworthiness.

22       28.    In short, a number of researchers have raised "doubts that risk can adequately

23  explain racial differences" in high-cost loans.  Bradford, Center for Community Change, "Risk

24  or Race? Racial Disparities and the Subprime Refinance Market" (May 2002)

25  (http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf) (last viewed March

26  5, 2008).  In other words, evidence "suggests that weak borrower credit profiles do not fully

27  explain why some borrowers get stuck with higher-cost home loans."  California Reinvestment

28

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No.  3:08-cv-00369-TEH

1  Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost

2  Home Purchase Lending" (March 2007).

3  **II.      GREENPOINT'S DISCRETIONARY PRICING POLICY CONTINUES THE**

4  **PERVASIVE DISCRIMINATION AGAINST MINORITIES IN MORTGAGE**

5  **LENDING**

6        29.     For approximately 20 years, GREENPOINT publicly promoted its home

7  financing expertise by means of nationwide advertising campaigns.  In its advertisements,

8  GREENPOINT solicited persons to apply for financing with GREENPOINT either in one of its

9  offices or through one of the mortgage brokers whom GREENPOINT had authorized to accept

10  applications on its behalf.

11       30.     GREENPOINT made home-mortgage loans directly to consumers through its

12  branches in several markets.

13       31.     GREENPOINT also made home-mortgage loans that were arranged by its

14  network of mortgage brokers.  Those loans were made in reliance on GREENPOINT's credit-

15  granting policies and with GREENPOINT's participation.

16       32.     Due to GREENPOINT's policies as to where to place its offices and how to

17  market its products, minority borrowers were more likely than white borrowers to apply for

18  credit from GREENPOINT by an application made to an authorized broker rather than one made

19  directly to GREENPOINT.

20       33.     Because of the Discretionary Pricing Policy, loans obtained through

21  GREENPOINT's network of brokers are more expensive to minority homeowners, on average,

22  than loans obtained directly from GREENPOINT.

23       34.     A high-APR loan is a loan whose APR is at least three percentage points higher

24  than the interest rate on U.S. Treasury securities of the same maturity, at the time the loan was

25  made.

26       35.     Based on Home Mortgage Disclosure Act ("HMDA") data from the Department

27  of Housing and Urban Development, minorities who borrowed from GREENPOINT between

28

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No.  3:08-cv-00369-TEH

1  2004 and 2006 are almost 50% more likely than white borrowers to have received a high-APR

2  loan to purchase or refinance their home.

3      36.    While credit differences may explain some part of the disparities in rate and

4  terms, GREENPOINT's Discretionary Pricing Policy accounts for a significant portion of the

5  disparity.

6      37.    GREENPOINT's Discretionary Pricing Policy is unrelated to a borrower's

7  objective credit characteristics such as credit history, credit score, debt-to-income ratio and loan-

8  to-value ratios and results in charges that are determined on a purely subjective basis and that

9  adversely affect the rate otherwise available to borrowers.

10      38.    GREENPOINT provided authorized mortgage brokers with substantial

11  information about its loan programs, rates and credit criteria, as well as its policies for

12  compensating mortgage brokers and correspondent lenders who arrange business for it.

13      39.    GREENPOINT authorized mortgage brokers who have signed a contract with it

14  to accept applications on its behalf, quote financing rates and terms for loans from it (within the

15  limitations set by GREENPOINT), inform credit applicants of GREENPOINT's financing

16  options and to originate finance transactions using GREENPOINT's forms, in accordance with

17  its policies.

18      40.    In all of the home mortgage finance transactions at issue, GREENPOINT

19  advanced the funds to make the loans and bears some or all of the risk of default.

20  GREENPOINT provided its loan officers and brokers with credit applications, loan contracts and

21  other required financing forms, as well as instructions on filling out such documents necessary to

22  complete home mortgage transactions.

23      41.    After a customer provided credit information to one of GREENPOINT's loan

24  officers or brokers, GREENPOINT computed a financing rate through an objective credit

25  analysis that, in general, discerned the creditworthiness of the customer.

26      42.    These credit analyses considered numerous risk-related variables of

27  creditworthiness, including credit bureau histories, payment amounts, debt-to-asset ratio,

28  bankruptcies, automobile repossessions, charge-offs, prior foreclosures, payment histories, credit

1    score, debt-to-income ratios, loan-to-value ratios and other risk-related attributes or variables.

2    On information and belief, GREENPOINT used these variables to determine a "mortgage score"

3    for each credit applicant.

4          43.    Based on these objective risk-related variables and the resulting mortgage score,

5    GREENPOINT derived a risk-based financing rate at which it would provide a home mortgage,

6    often called the "Par Rate."  Alternatively, experienced GREENPOINT loan officers, brokers

7    and correspondent lenders could estimate the risk-related Par Rate by referring to the applicant's

8    credit bureau determined credit score.

9          44.    Although GREENPOINT's initial analysis applied objective criteria to calculate

10    this risk-related Par Rate, GREENPOINT then authorized a subjective component in its credit-

11    pricing system—the Discretionary Pricing Policy—to impose additional non-risk-related

12    charges.  On information and belief, GREENPOINT communicated the applicable Par Rates and

13    authorized discretionary charges to its loan officers and brokers via regularly published "rate

14    sheets."  GREENPOINT published such rate sheets via intranet and internet means.

15          45.    The discretionary charges are paid by the customer as a component of the total

16    finance charge (the "Contract APR"), without the homeowner knowing that a portion of their

17    Contract APR was a non-risk-related charge.

18          46.    Loan officers and brokers had discretion, within the limits set by GREENPOINT,

19    to impose discretionary mark-ups as additional points in interest–"a rate mark-up."  When there

20    was a rate mark-up, GREENPOINT shared the additional income, even if a broker originated the

21    loan.

22          47.    GREENPOINT's Discretionary Pricing Policy, by design, causes persons with

23    identical or similar credit scores to pay different amounts for the cost of credit.  As a result of

24    using a subjective pricing component that is designed to charge persons with the same credit

25    profiles different finance charges, the objective qualities of the initial credit analysis used to

26    calculate the Par Rate are undermined and the potential for race bias becomes inherent in the

27    transaction.

28

FIRST AMENDED CLASS ACTION COMPLAINT        Case No.  3:08-cv-00369-TEH

48.     The Discretionary Pricing Policy, although facially neutral (insofar as GREENPOINT uses the same or effectively the same policy for all credit applicants), has a disproportionately adverse effect on minority borrowers compared to similarly-situated whites in that minority borrowers pay disparately more discretionary charges (both in frequency and amount) than similarly-situated whites. Statistical analysis of discretionary charges imposed on minority and white customers of other mortgage companies that use credit-pricing systems structured like that of GREENPOINT has revealed that minority borrowers, after controlling for credit risk, are substantially more likely than similarly-situated whites to pay such charges.

49.     Loan officers and brokers were agents of GREENPOINT for the purpose of setting credit price, which was always set based on GREENPOINT's policy.

50.     The disparate impact suffered by minority borrowers is a direct result of GREENPOINT's Discretionary Pricing Policy in that GREENPOINT designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy, creating the disparate impact.

51.     GREENPOINT has a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally protected classes, such as minority borrowers. Despite having such a non-delegable duty, GREENPOINT has chosen to use a commission-driven, subjective pricing policy that it knows or should have known has a significant and pervasive adverse impact on minority homeowners.

52.     The disparities between the terms of GREENPOINT's transactions involving minority homeowners and the terms involving white homeowners cannot be a product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy.

53.     There are no legitimate business reasons justifying GREENPOINT's discriminatory Discretionary Pricing Policy that could not be achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

54.     Commission-driven, discretionary pricing systems–such as those in the real estate mortgage industry that are structurally similar to the system utilized by GREENPOINT–have

1    been found to produce significant discriminatory effects.  Knowledge concerning the significant

2    and pervasive discriminatory impact of such commission-driven, discretionary credit-pricing

3    systems has been widely circulated throughout the financing industry for several years,

4    particularly since 1994, as a result of numerous high profile actions by the United States

5    Department of Justice and federal regulatory agencies.  GREENPOINT has known or should

6    have known that its credit-pricing system causes minority borrowers to pay the Defendant more

7    for mortgage financing than the amounts paid by white customers with identical or effectively

8    identical credit scores.  The following various regulatory settlements involved discriminatory

9    pricing policies structurally similar to GREENPOINT's pricing policy and were widely reported

10   through the financing industry:

11        United States v. Hispanicpipe State Bank, Civ. Act. No. 93-5115 (D. S.D. filed
          November 16, 1993) (charging American Indians higher interest rates)
12
13        United States v. First National Bank of Vicksburg, No. 5:94 CV 6(B)(N) (S.D. Miss.
          filed Jan. 21, 1994) (charging African-Americans higher interest rates)

14        United States v. Huntington Mortgage Co., No. 1; 95 CV 2211 (N.D. Ohio filed
          October 18, 1995) (charging African-Americans higher fees)
15
16        United States v. Security State Bank of Pecos, No. SA 95 CA 0996 (W.D.Tex. filed
          October 15, 1995) (charging minority borrowers higher interest rates)

17        United States v. First National Bank of Gordon, No. CIV-96-5035 (W.D.S.D. filed
          April 15, 1996) (charging American Indians higher interest rates)
18
19        United States v. Fleet Mortgage Corp., No. 96-2279 (E.D.N.Y. filed May 7, 1996)
          (charging African-Americans and minority borrowers higher interest rates)

20        United States v. Long Beach Mortgage Co., No. CV-96-6159 (C.D. Cal. filed Sept. 5,
          1996) (charging African-Americans, Latinos, women and persons over age 55 higher
21        interest rates)

22   III.    GREENPOINT'S DISCRETIONARY PRICING POLICY DISCRIMATED

23          AGAINST PLAINTIFFS

24   **Facts Relating to the Ramirezes**

25          55.    Plaintiffs Ana Ramirez and Ismael Ramirez reside at 46 Stellman Road,

26   Roslindale, Massachusetts 02131.

27

28

56.     In 2005, the Ramirezes sought to refinance their existing home loan to obtain cash and to do construction on their home.  The Ramirezes' former real estate broker, Ms. Santana, referred them to First Call Mortgage Company, Inc. ("First Call"), a mortgage broker.

57.     On August 3, 2005, the Ramirezes entered into a mortgage transaction with GREENPOINT as lender and First Call as broker.

58.     The Ramirezes' loan contained a 2.000% one-month "teaser rate" that was set to adjust upwards only immediately as of October 1, 2005 and could potentially reset every month thereafter.  The cap on the interest rate is 12.000%.

59.     The Ramirezes' loan has a 30-year term and a disclosed APR of 6.191%.  The loan amount was $469,000.00.

60.     According to the Ramirezes' HUD-One Settlement Statement, First Call was paid a $5,276.25 Yield Spread Premium, $4,690.00 in Broker Points, and a $500.00 Processing Fee.

61.     On information and belief, unbeknownst to the Ramirezes, the contract APR on the mortgage loans was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component paid to First Call pursuant to GREENPOINT's Discretionary Pricing Policy.

62.     A true and correct copy of the Ramirezes' Truth-in-Lending disclosure provided is attached hereto and labeled Exhibit 1.

63.     On information and belief, the Ramirezes were subject to the Defendant's Discretionary Pricing Policy.

64.     On information and belief, the Ramirezes were charged a disproportionately greater amount in non-risk-related credit charges than similarly-situated white persons.

65.     The Ramirezes were not offered less expensive loan products that were available to borrowers.

**Facts Relating to Mr. Salazar**

66.     Plaintiff Jorge Salazar resides at 4172 51st Street. San Diego, California 92105 and maintains a rental property at 4174 51st Street, San Diego, California, 92105.

67.     In August 2006, Mr. Salazar sought to refinance his home and rental property. Mr. Salazar's tax agent, Alicia Bruche, referred him to Greenpoint and its authorized broker TLN Financial.

68.     On August 17, 2006, Mr. Salazar entered into a mortgage transaction with GREENPOINT as the lender and TLN Financial as broker.

69.     Mr. Salazar's loan has a 30-year term and a disclosed APR of 7.181%.  The loan amount was $475,000.00.

70.     According to Mr. Salazar's HUD-One Settlement Statement, TLN Financial was paid a $2,375.00 Yield Spread Premium on a "POC" basis (i.e., paid outside of closing), a $11,625.00 Origination Fee, and a $1,290 Processing Fee.

71.     On information and belief, unbeknownst to Mr. Salazar, the contract APR on his mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component paid to TLN Financial pursuant to GREENPOINT's Discretionary Pricing Policy.

72.     A true and correct copy of Mr. Salazar's Truth-in-Lending disclosure provided is attached hereto and labeled Exhibit 2.

73.     On information and belief, Mr. Salazar was subject to the Defendant's Discretionary Pricing Policy.

74.     On information and belief, Mr. Salazar was charged a disproportionately greater amount in non-risk-related credit charges than similarly-situated white persons.

75.     Mr. Salazar was not offered less expensive loan products that were available to borrowers with his credit characteristics directly under the Defendant's policies.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

77.     This class action is brought pursuant to ECOA and the FHA by the individual named Plaintiffs on behalf of themselves and all minority consumers (the "Class") who obtained a GREENPOINT home mortgage loan in the United States between January 1, 2001 and the date of judgment in this action (the "Class Period") and who were subject to GREENPOINT's

-13-

1   Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest

2   rate mark-ups in connection with their loan.  For the purposes of this Complaint, the term

3   "minority" is intended to include black and Hispanic consumers.

4       78.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules

5   23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

6       79.     "Discretionary Pricing Policy" means GREENPOINT's policy of authorizing its

7   loan officers, brokers and correspondent lenders to impose subjective, discretionary charges and

8   interest rate mark-ups that are included in the loans they originate.

9       80.     Plaintiffs do not know the exact size or identities of the proposed Class, since

10  such information is in the exclusive control of GREENPOINT.  Plaintiffs believe that the Class

11  encompasses many thousands or tens of thousands of individuals who are geographically

12  dispersed throughout the United States.  Therefore, the proposed class is so numerous that

13  joinder of all members is impracticable.

14      81.     All members of the Class have been subject to and affected by the same

15  Discretionary Pricing Policy.  There are questions of law and fact that are common to the Class

16  and that predominate over any questions affecting only individual members of the Class.  These

17  questions include, but are not limited to the following:

18              a.      the nature, scope and operations of GREENPOINT's Discretionary

19                      Pricing Policy;

20              b.      whether GREENPOINT is a creditor under the ECOA because, for

21                      example, in the ordinary course of its business it participates in the

22                      decision of whether or not to extend credit to consumers;

23              c.      whether GREENPOINT's Discretionary Pricing Policy is a facially neutral

24                      credit-pricing system that has effected racial discrimination in violation of

25                      ECOA;

26              d.      whether there are statistically significant disparities between the amount of

27                      the discretionary charges imposed on minority persons and the amount of

28

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No.  3:08-cv-00369-TEH

1                 the discretionary charges imposed on white persons that are unrelated to

2                 creditworthiness;

3        e.     whether there are any legitimate business reasons for the Discretionary

4                 Pricing Policy, and if so, whether they can be achieved by a credit-pricing

5                 system less discriminatory in its impact;

6        f.     whether the Court can enter declaratory and injunctive relief; and

7        g.     the proper measure of disgorgement or damages.

8     82.    The claims of the individual named Plaintiffs are typical of the claims of the Class

9 and do not conflict with the interests of any other members of the Class in that both the Plaintiffs

10 and the other members of the Class were subject to the same Discretionary Pricing Policy that

11 has disproportionately affected minority homeowners.

12     83.    The individual named Plaintiffs will fairly and adequately represent the interests

13 of the Class.  They are committed to the vigorous prosecution of the Class' claims and have

14 retained attorneys who are qualified to pursue this litigation and have experience in class

15 actions–in particular, consumer protection and discrimination actions.

16     84.    A class action is superior to other methods for the fast and efficient adjudication

17 of this controversy.  A class action regarding the issues in this case does not create any problems

18 of manageability.

19     85.    In the alternative, GREENPOINT has acted or refused to act on grounds generally

20 applicable to the Class, thereby making appropriate final injunctive relief or corresponding

21 declaratory relief with respect to the Class as a whole.

22              **TOLLING OF STATUTES OF LIMITATION**

23     86.    While long suspected, this discrimination has only recently been disclosed and

24 quantified.  It has only been in the last few years that mortgage lenders have been required to

25 submit details of their subprime home loans under the Home Mortgage Disclosure Act.  The

26 groups that have studied predatory lending and the mortgage market have uncovered incredible

27 racial disparities in the types of mortgages offered.

28

FIRST AMENDED CLASS ACTION COMPLAINT        Case No.  3:08-cv-00369-TEH

87.    The causes of action alleged herein accrued upon discovery of the discriminatory impact of GREENPOINT's Discretionary Pricing Policy.  Plaintiffs and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the factual bases of those claims.  Indeed, the data forming the basis of Plaintiffs' claims was only recently released and analyzed in a comprehensive manner.  Moreover, because GREENPOINT knowingly and actively concealed the facts alleged herein, Plaintiffs and the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

88.    Commission-driven, discretionary pricing systems, such as those used in the mortgage industry and structurally similar to the system utilized by Defendant, have been found to produce significant discriminatory effects.  Knowledge concerning the significant and pervasive discriminatory impact of such commission-driven, discretionary credit-pricing systems has been widely circulated within the financing industry for several years, as a result of numerous actions by the United States Department of Justice and federal regulatory agencies. *See*, Facts, section I *supra*.  Thus, Defendant knew or should have known that their credit-pricing system causes minority homeowners to pay more for mortgage financing than the amounts paid by white customers with identical or effectively identical credit scores.

89.     Despite the fact that GREENPOINT knew or should have known of the discriminatory effect of its Discretionary Pricing Policy, none of the loan documents inform the customer that its finance rates are subjective and not based solely on risk-related characteristics.

90.    GREENPOINT was and is under a continuous duty to disclose to Plaintiffs and the Class material information regarding their loans.  The fact that certain loan terms are subjective and discretionary is information a reasonable borrower would consider important when deciding whether to purchase the loan and on what terms.  The fact that the subjective and discretionary components result in a disparate impact on minority borrowers is also information reasonable minority borrowers would consider important.

91.    GREENPOINT failed to disclose this information, however, and Plaintiffs and Class Members reasonably relied upon GREENPOINT's representation that terms of their loans

1   would be based on their creditworthiness.  GREENPOINT's financing documents falsely foster

2   the image that GREENPOINT offers competitive rates that are objectively set.  However,

3   GREENPOINT never discloses to its credit applicants the fact that: (a) its credit rates are

4   subjective and can vary significantly among persons with identical credit profiles; and (b) it has

5   authorized and provided a financial incentive to mortgage brokers to subjectively increase the

6   credit rate above the rate otherwise available to homeowners.

7        92.    Due to the inherent nature of GREENPOINT's undisclosed Discretionary Pricing

8   Policy and due to GREENPOINT's deception and concealment, GREENPOINT's minority

9   customers have no way of knowing or suspecting: (a) the existence of GREENPOINT's

10  subjective credit-pricing policy; (b) that they were charged additional subjective credit charges;

11  or (c) that they were charged a disproportionately greater amount for their cost of credit than

12  similarly-situated Caucasian persons.  Thus GREENPOINT is estopped from relying on any

13  statutes of limitation in its defense of this action.

14                                **COUNT ONE**

15  **DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

16                          **(15 U.S.C. §§ 1691 - 1691f)**

17        93.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

18        94.    ECOA makes it "unlawful for any creditor to discriminate against any application,

19  with respect to any aspect of a credit transaction—(1) on the basis of race, color, religion,

20  national origin, sex or marital status, or age." 28 U.S.C. § 1691(a).

21        95.    GREENPOINT is a creditor as set forth in the ECOA because in the ordinary

22  course of its business, GREENPOINT participated in the decision to extend credit to Plaintiffs,

23  the proposed Class representative herein, and all prospective Class members.  28 U.S.C.

24  § 1691a(e).  Moreover, GREENPOINT is a creditor as set forth in the ECOA because it set the

25  terms of the credit that was extended to Plaintiffs, the proposed Class representative herein, and

26  all prospective Class members through its Discretionary Pricing Policy.  12 C.F.R. § 202.2(*l*)

27  (defining "creditor" under ECOA as one who "participates in a credit decision, including setting

28  the terms of the credit").

1    96.    GREENPOINT designed, disseminated, controlled, implemented and profited

2  from the discriminatory policy and practice alleged herein—the Discretionary Pricing Policy—

3  which has had a disparate economic impact on minority borrowers compared to similarly-

4  situated whites.

5    97.    All actions taken by GREENPOINT's loan officers and brokers were in

6  accordance with the specific authority granted to them by GREENPOINT and were in

7  furtherance of GREENPOINT's policies and practices.

8    98.    As a result of GREENPOINT's Discretionary Pricing Policy, GREENPOINT has

9  collected more in finance charges from minority borrowers than from similarly-situated white

10  persons, for reasons totally unrelated to credit risk.

11    99.    GREENPOINT's Discretionary Pricing Policy violates the Equal Credit

12  Opportunity Act.

13    100.    Plaintiffs and prospective class members are aggrieved persons as defined in

14  ECOA by virtue of having been subject to GREENPOINT's discriminatory Discretionary

15  Pricing Policy.

16  **COUNT TWO**

17  **DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**

18  **(42 U.S.C. §§ 3601 – 3619)**

19    101.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

20    102.    The Fair Housing Act makes it unlawful to discriminate against any person in

21  residential real estate-related transactions such as the making or purchasing of loans or providing

22  other financial assistance.  42 U.S.C. § 3605.

23    103.    GREENPOINT engaged in residential real estate-related transactions with respect

24  to the Plaintiffs, the proposed Class representative herein, and all prospective Class members, by

25  extending credit to Plaintiffs and all prospective Class members.

26    104.    GREENPOINT's Discretionary Pricing Policy has resulted in discrimination with

27  respect to the Plaintiffs, the proposed Class representative herein, and all prospective members of

28  the Class.

105.    As a result of GREENPOINT's Discretionary Pricing Policy, GREENPOINT has collected more in finance charges from minority borrowers than from similarly-situated white persons, for reasons totally unrelated to credit risk.

106.    GREENPOINT's Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.

107.    Plaintiffs and the Class are aggrieved persons as defined in the FHA by virtue of having been subject to GREENPOINT's discriminatory Discretionary Pricing Policy.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    Certify this case as a class action and certify the named Plaintiffs herein to be adequate class representatives and their counsel to be class counsel;

B.    Enter a judgment pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613 declaring the acts and practices of GREENPOINT complained of herein to be in violation of ECOA and the FHA;

C.    Grant a permanent or final injunction, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), enjoining GREENPOINT and GREENPOINT's agents, employees, affiliates and subsidiaries from continuing to discriminate against Plaintiffs and the members of the Class because of their race or national origin through further use of the Discretionary Pricing Policy or any non-risk-related discretionary pricing policy employed by GREENPOINT;

D.    Order GREENPOINT pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c) to adopt and enforce a policy that requires appropriate training of GREENPOINT's employees and its brokers to prevent discrimination;

E.    Order GREENPOINT pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c) to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

1    F.    Order disgorgement pursuant to 15 U.S.C. § 1691e(c) of all disproportionate non-

2          risk charges imposed on minority borrowers by GREENPOINT's Discretionary

3          Pricing Policy; and order the equitable distribution of such charges to all

4          appropriate class members; together with other relief for unjust enrichment;

5    G.    Order actual and punitive damages and/or restitution to the Plaintiffs and the

6          Class pursuant to 42 U.S.C. § 3613(c);

7    H.    Award Plaintiffs the costs of this action, including the fees and costs of experts,

8          together with reasonable attorneys' fees pursuant to 15 U.S.C. § 1691e(d) and/or

9          42 U.S.C. § 3613(c); and

10   I.    Grant Plaintiffs and the Class such other and further relief as this Court finds

11         necessary and proper.

12

13   DATED this 13th day of March, 2008            CHAVEZ & GERTLER LLP

14                                                 RODDY KLEIN & RYAN

15                                                 BONNETT FAIRBOURN FRIEDMAN &
16                                                 BALINT, P.C.

17                                                 COUGHLIN STOIA GELLER RUDMAN &
                                                   ROBBINS LLP
18
                                                   MILLER LAW LLC
19
20                                                 HAGENS BERMAN SOBOL
                                                    SHAPIRO LLP
21
22                                                 NATIONAL CONSUMER LAW CENTER

23

24                                                 _____

                                                   Mark A. Chavez
25
                                                   Attorneys for Plaintiffs
26

27

28

-20-

1

2   BONNETT FAIRBOURN FRIEDMAN &          COUGHLIN STOIA GELLER RUDMAN &
    BALINT, P.C.                          ROBBINS LLP
3   Andrew S. Friedman                    John J. Stoia, Jr. (CA SBN 141757)
    Wendy J. Harrison (CA SBN 151090)     Theodore J. Pintar (CA SBN 131372)
3   2901 N. Central Avenue, Suite 1000    Leslie E. Hurst (CA SBN 178432)
4   Phoenix, AZ 85012                     655 West Broadway, Suite 1900
    Tel:  (602) 274-1100                  San Diego, CA 92101-3301
5   Fax:  (602) 274-1199                  Tel:  (619) 231-1058
                                          Fax:  (619) 231-7423
6

7   MILLER LAW LLC                        NATIONAL CONSUMER LAW CENTER
    Marvin A. Miller                      Stuart T. Rossman
8   Lori A. Fanning                       Charles Delbaum
    115 South LaSalle Street, Suite 2910  77 Summer Street, 10th Flr.
9   Chicago, IL  60603                    Boston, MA  02141
    Tel:      (312) 332-3400              Tel:      (617) 542-8010
10                                        Fax:      (617) 542-8028

11  HAGENS BERMAN SOBOL
     SHAPIRO LLP
12  Thomas M. Sobol
    One Main Street, 4th Floor
13  Boston, MA  02142
    Tel:      (617) 475-1950
14  Fax:      (617) 482-3003

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No.  3:08-cv-00369-TEH

1

## JURY TRIAL DEMANDED

2   Plaintiffs demand a trial by jury on all issues so triable.

3

4 DATED this 13th day of March, 2008   CHAVEZ & GERTLER LLP

5                 RODDY KLEIN & RYAN

6                 BONNETT FAIRBOURN FRIEDMAN &

7                 BALINT, P.C.

8                 COUGHLIN STOIA GELLER RUDMAN &

9                 ROBBINS LLP

10               MILLER LAW LLC

11               HAGENS BERMAN SOBOL

12                SHAPIRO LLP

13               NATIONAL CONSUMER LAW CENTER

14               _____

15               Mark A. Chavez

16               Attorneys for Plaintiffs

17

18 BONNETT FAIRBOURN FRIEDMAN &   COUGHLIN STOIA GELLER RUDMAN &
  BALINT, P.C.           ROBBINS LLP

19 Andrew S. Friedman (To be admitted Pro Hac  John J. Stoia, Jr. (CA SBN 141757)
  Vice)             Theodore J. Pintar (CA SBN 131372)

20 Wendy J. Harrison (CA SBN 151090)   Leslie E. Hurst (CA SBN 178432)
  2901 N. Central Avenue, Suite 1000    655 West Broadway, Suite 1900

21 Phoenix, AZ 85012        San Diego, CA 92101-3301
  Tel:  (602) 274-1100       Tel:  (619) 231-1058

22 Fax:  (602) 274-1199       Fax:  (619) 231-7423

23

24 MILLER LAW LLC        NATIONAL CONSUMER LAW CENTER
  Marvin A. Miller (To be admitted Pro Hac   Stuart T. Rossman (To be admitted Pro Hac

25 Vice)             Vice)
  Lori A. Fanning  (To be admitted Pro Hac  Charles Delbaum (To be admitted Pro Hac

26 Vice)             Vice)
  115 South LaSalle Street, Suite 2910   77 Summer Street, 10th Flr.

27 Chicago, IL 60603        Boston, MA 02141
  Tel:   (312) 332-3400       Tel:   (617) 542-8010

28                Fax:   (617) 542-8028

FIRST AMENDED CLASS ACTION COMPLAINT     Case No.  3:08-cv-00369-TEH

HAGENS BERMAN SOBOL
 SHAPIRO LLP
Thomas M. Sobol (To be admitted Pro Hac Vice)
One Main Street, 4th Floor
Boston, MA  02142
Tel:    (617) 475-1950
Fax:    (617) 482-3003

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No.  3:08-cv-00369-TEH

# EXHIBIT 1

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (RESPA Transactions)

DATE: August 3, 2005
CREDITOR: GreenPoint Mortgage Funding, Inc.
PROPERTY: 46 Stellman RD, Roslindale, MA 02131

Loan Number: 0087400008

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your downpayment of $ N/A |
|---|---|---|---|---|
| 6.191 % | $ 626,441.47 | $ 461,893.20 | $ 1,088,334.67 | $ N/A |

Your Monthly payment schedule will be:

| Number of Payments | Amount of Payments | When payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 1 | 1,733.52 | 10/01/2005 | | | | | | |
| 11 | 1,733.52 | 11/01/2005 | | | | | | |
| 12 | 1,863.53 | 10/01/2006 | | | | | | |
| 12 | 2,003.29 | 10/01/2007 | | | | | | |
| 12 | 2,153.54 | 10/01/2008 | | | | | | |
| 12 | 2,315.06 | 10/01/2009 | | | | | | |
| 299 | 3,225.04 | 10/01/2010 | | | | | | |
| 1 | 3,220.43 | 09/01/2035 | | | | | | |

**Construction Loan:** ☐ If checked, this loan provides for interest-only payments during the construction period. Beginning you will make periodic interest-only payments during the construction period, followed by payments of principal and interest as scheduled above.

**Variable Rate:** ☒ If checked, this loan contains a variable rate feature. ☒ Disclosures about the variable rate feature were provided to you earlier. ☐ Disclosure about the variable rate feature are provided in the attached Variable Rate Disclosure Addendum.

**Assumption:** Someone buying your property ☐ cannot, unless otherwise provided by federal law, ☒ may, subject to conditions, be allowed to assume the remainder of the loan on the original terms.

**Security:** You are giving a security interest in: 46 Stellman RD, Roslindale, MA 02131
☐ the property being purchased ☒ your property.

**Late Charge:** If a payment is not received by the end of 15 days after the date it is due, you will be charged 3.000 % of the overdue ☒ payment ☐ payment of principal and interest, but not less than U.S. $ .00 and not more than U.S. $ N/A.

**Prepayment:** If you pay this loan early you ☐ may ☒ will not have to pay a penalty. ☐ If you pay off an FHA insured loan, on a date other than the regular installment date, you may be assessed interest charges until the end of the month. You ☐ may be or ☒ will not be entitled to a refund of part of the finance charge.

**Deposit:** ☐ If checked, the annual percentage rate does not take into account your required deposit.

**Demand:** ☐ If checked, this loan has a demand feature

See your contract documents for any additional information about non-payment, default, any required payment in full before the scheduled date, and any prepayment refunds

8/2/2005 6:36:58 AM

G P M W D 0 0 8 7 4 0 0 0 0 8 1 4 9

# EXHIBIT 2

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive, Novato, CA 94945

☐ Preliminary   ☒ Final

*DATE:* 08/09/2006
*LOAN NO.:* 0090307794
*Type of Loan:* Fixed Rate

BORROWERS: Jorge Salazar

ADDRESS: 4172 & 4174 51st Street
CITY/STATE/ZIP: San Diego, CA 92105
PROPERTY: 4172 & 4174 51st Street, San Diego, CA  92105

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.181 % | $ 664,345.81 | $ 459,004.01 | $ 1,123,349.82 |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $3,120.41 | 10/01/2006 | | | |
| 1 | $3,122.63 | 09/01/2036 | | | |

**DEMAND FEATURE:** ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
☐ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 4172 & 4174 51st Street, San Diego, CA  92105

**ASSUMPTION:** Someone buying this property  ☒ cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $ 45.00

**PROPERTY INSURANCE:** Property insurance is required on this loan. Flood insurance may be required if the property is located in an area designated as an area having special flood hazards. You may obtain property insurance and, if required, flood insurance from anyone you want that is acceptable to Creditor.

**LATE CHARGES:** If your payment is more than 10 days late, a late charge of 6.000% of the overdue payment of principal and interest will be assessed, but not less than U.S. $5.00 and not more than U.S. $N/A.

**PREPAYMENT:** If you pay off your loan early, you
☐ may  ☒ will not   have to pay a penalty.
☐ may  ☒ will not   be entitled to a refund of part of the finance charge.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.**
**e means estimate**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____     _____
Jorge Salazar

_____     _____

1

## **PROOF OF SERVICE**

2

3 STATE OF CALIFORNIA   )
                          ) ss.
4 COUNTY OF MARIN      )

5       I am employed in the County of Marin, State of California.  I am over the age of 18 years
6 and not a party to the within action; my business address is Chavez & Gertler LLP, 42 Miller
Avenue, Mill Valley, CA  94941.

7

       On March 13, 2008, I served the foregoing documents:

8

9       •    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

10 on the interested parties in this action by placing a true copy thereof enclosed in a sealed
envelope addressed to each as follows:

11

12 Raoul D. Kennedy, Esq.
Skadden, Arps, Slate, Meagher
 & Flom LLP
13 Four Embarcadero Center, Suite 3800
San Francisco, CA 94111-5974

14

15 **[X]**    **BY MAIL:**  I am readily familiar with the business' practice for collection and
processing of correspondence for mailing with the United States Postal Service.  I know that the
16 correspondence is deposited with the United States Postal Service on the same day this
declaration was executed in the ordinary course of business.  I know that the envelope was sealed
17 and, with postage thereon fully prepaid, placed for collection and mailing on this date, following
ordinary business practices, in the United States mail at Mill Valley, California.

18

       Executed on March 13, 2008, at Mill Valley, California.

19

20       I declare under penalty of perjury under the laws of the United States of America that the
above is true and correct.  I declare that I am employed in the office of a member of the bar of
21 this court at whose direction the service was made.

22                          _Cate Coelho_

23                             Cate L. Coelho

24

25

26

27

28