RAOUL D. KENNEDY (Bar No. 40892)
JOREN S. BASS (Bar No. 208143)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Embarcadero Center, Suite 3800
San Francisco, California 94111-4144
Telephone: (415) 984-6400
Facsimile:  (415) 984-2698
Email:  rkennedy@skadden.com, jbass@skadden.com

ANDREW L. SANDLER (Admitted *Pro Hac Vice*)
ANAND S. RAMAN (Admitted *Pro Hac Vice*)
CAITLIN M. KASMAR (Admitted *Pro Hac Vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone: (202) 371-7000
Facsimile:  (202) 393-5760
Email:  asandler@skadden.com, araman@skadden.com, ckasmar@skadden.com

Attorneys for DEFENDANT
GREENPOINT MORTGAGE FUNDING, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANA RAMIREZ, ISMAEL RAMIREZ and JORGE SALAZAR, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>          v.<br><br>GREENPOINT MORTGAGE FUNDING, INC.,<br><br>                              Defendant. | CASE NO. 3:08-cv-00369-TEH<br><br>CLASS ACTION<br><br>**(1) NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; and**<br><br>**(2) [PROPOSED] ORDER (lodged under separate cover)**<br><br>Date:   May 19, 2008<br>Time:   10:00 a.m.<br>Place:  Courtroom 12<br>Judge:  The Honorable Thelton E. Henderson |

1

## NOTICE OF MOTION AND MOTION

2

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

3    PLEASE TAKE NOTICE THAT at 10:00 a.m. on Monday, May 19, 2008, or as soon

4 thereafter as the matter may be heard, Defendant GreenPoint Mortgage Funding, Inc. will move

5 this Court to dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil

6 Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

7    This motion is based on this Notice of Motion and Motion, the attached Memorandum of

8 Points and Authorities, and all exhibits attached thereto.

9

10 DATED:  April 11, 2008                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

11

12
                                       By: _____/s/ Raoul D. Kennedy_____
13                                                      Raoul D. Kennedy

14                                            Attorneys for DEFENDANT
                                       GREENPOINT MORTGAGE FUNDING, INC.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION TO DISMISS                                              CASE NO. 3:08-cv-00369-TEH

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

I.     INTRODUCTION ........................................................................................................ 1

II.    LEGAL STANDARD ................................................................................................ 2

III.   ARGUMENT .............................................................................................................. 3

     A.     Neither The FHA Nor The ECOA Permits Disparate Impact Claims .................... 3

     B.     Plaintiffs Fail To Assert A Cognizable Disparate Impact Claim ........................... 5

           1.     Overview Of Disparate Impact ................................................................. 6

           2.     Plaintiffs Do Not State A Disparate Impact Claim Because They Do Not Point To A Specific Policy Or Practice ............................................... 7

           3.     Plaintiffs Fail To Allege A Disparate Impact ........................................... 10

     C.     The Ramirezes' Claims Are Time-Barred And Must Be Dismissed ................... 11

           1.     Each Of Plaintiffs' Claims Is Subject To A Two-Year Statute Of Limitation.................................................................................................. 12

           2.     The Tolling Allegations Do Not Save The Ramirezes' Claims ............... 12

                  (a)     The Discovery Rule ....................................................................... 12

                  (b)     Fraudulent Concealment ............................................................... 13

IV.   CONCLUSION ......................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>PAGE(S)</u>

3
<u>CASES</u>

4
*AFSCME v. State of Washington,*
   770 F.2d 1401 (9th Cir. 1985) ............................................................................................. 9

5

6
*Albemarle Paper Co. v. Moody,*
   422 U.S. 405 (1975) ............................................................................................................. 6

7
*Anderson v. Douglas & Lomason Co.,*
   26 F.3d 1277 (5th Cir. 1994) ............................................................................................... 9

8

9
*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007) ..................................................................................................... 2, 3

10
*Budnick v. Town of Carefree,*
   No. 06-15841, 2008 U.S. App. LEXIS 5152 (9th Cir. Mar. 11, 2008)................................ 3

11

12
*Conley v. Gibson,*
   355 U.S. 41 (1957) ............................................................................................................... 3

13
*Dothard v. Rawlinson,*
   433 U.S. 321 (1977) ............................................................................................................. 6

14

15
*Edwards v. Johnston County Health Department,*
   885 F.2d 1215 (4th Cir. 1989) ........................................................................................... 11

16
*Garcia v. Johanns,*
   444 F.3d 625 (D.C. Cir. 2006) ........................................................................................ 4, 7

17

18
*Gerdom v. Continental Airlines, Inc.,*
   692 F.2d 602 (9th Cir. 1982) ............................................................................................... 6

19
*Gibson v. United States,*
   781 F.2d 1334 (9th Cir. 1986) ........................................................................................... 14

20

21
*Gregory v. Litton Systems, Inc.,*
   472 F.2d 631 (9th Cir. 1972) ............................................................................................... 6

22
*Griggs v. Duke Power Co.,*
   401 U.S. 424 (1971) ........................................................................................................ 4, 6

23

24
*Harriss v. Pan American World Airways, Inc.,*
   649 F.2d 670 (9th Cir. 1980) ............................................................................................... 6

25
*Hipp v. Liberty National Life Insurance Co.,*
   252 F.3d 1208 (11th Cir. 2001) ......................................................................................... 15

26

27
*Keith v. Volpe,*
   858 F.2d 467 (9th Cir. 1988) ............................................................................................... 3

28

-iii-

1
*Khalil v. Farash Corp.*,
      452 F. Supp. 2d 203 (W.D.N.Y. 2006) ................................................................................. 7

2

3
*Knapp v. Eagle Property Management. Corp.*,
      54 F.3d 1272 (7th Cir. 1995) ................................................................................................ 7

4
*Larson v. Northrup Corp.*,
      21 F.3d 1164 (D.C. Cir. 1994) ........................................................................................... 13

5

6
*Lierboe v. State Farm Mutual Automobile Insurance Co.*,
      350 F.3d 1018 (9th Cir. 2003) ........................................................................................... 15

7
*Lockard v. Pizza Hut, Inc.*,
      162 F.3d 1062 (10th Cir. 1998) ......................................................................................... 10

8

9
*Moore v. Hughes Helicopters, Inc.*,
      708 F.2d 475 (9th Cir. 1983) ............................................................................................. 11

10
*NAACP v. American Family Mutual Insurance Co.*,
      978 F.2d 287 (7th Cir. 1992) ........................................................................................... 6, 8

11

12
*Neff v. American Dairy Queen Corp.*,
      58 F.3d 1063 (5th Cir. 1995) ............................................................................................. 10

13
*Orr v. Bank of America, NT & SA*,
      285 F.3d 764 (9th Cir. 2002) ............................................................................................. 12

14

15
*Ove v. Gwinn*,
      264 F.3d 817 (9th Cir. 2001) ............................................................................................... 3

16
*Rambus Inc. v. Samsung Electronics Co.*,
      No. C-05-02298, 2007 U.S. Dist. LEXIS 3088 (N.D. Cal. Jan. 4, 2007) ...................... 13, 14

17

18
*Rutledge v. Boston Woven Hose & Rubber Co.*,
      576 F.2d 248 (9th Cir. 1978) ............................................................................................. 13

19
*Smith v. City of Jackson*,
      544 U.S. 228 (2005) ............................................................................................... 3, 4, 5, 8, 9

20

21
*Spaulding v. University of Washington*,
      740 F.2d 686 (9th Cir. 1984) .......................................................................................... 7, 10

22
*Stout v. Potter*,
      276 F.3d 1118 (9th Cir. 2002) ................................................................................. 5, 8, 9, 10

23

24
*Stutz Motor Car of America, Inc. v. Reebok International, Ltd.*,
      909 F. Supp. 1353 (C.D. Cal. 1995) .................................................................................. 14

25
*Volk v. D.A. Davidson & Co.*,
      816 F.2d 1406 (9th Cir. 1987) ........................................................................................... 14

26

27
*Wards Cove Packing Co. v. Atonio*,
      490 U.S. 642 (1989) ........................................................................................ 5, 8, 9, 10, 11

28

-iv-

*Watson v. Fort Worth Bank & Trust*,
  487 U.S. 977 (1988) ..................................................................................................... 8

## STATUTES

12 C.F.R. § 203.5 ...................................................................................................... 13

15 U.S.C. § 1691 *et seq.* ............................................................................................. 2

15 U.S.C.S. § 1691e(f) .............................................................................................. 12

42 U.S.C. § 2000e-2 .................................................................................................... 6

42 U.S.C. § 2000e-2(a) ............................................................................................... 4

42 U.S.C. § 2000e-2(a)(2) ........................................................................................... 4

42 U.S.C. § 3601 ......................................................................................................... 2

42 U.S.C. § 3613(a)(1)(A) ........................................................................................ 12

## OTHER AUTHORITIES

Peter N. Cubita & Michelle Hartmann, *The ECOA Discrimination Proscription and Disparate
  Impact – Interpreting the Meaning of the Words That Actually Are There*,
  61 Bus. Law. 829 (2006) ............................................................................................ 5

Ronald Turner, *Thirty Years of Title VII's Regulatory Regime:  Rights, Theories, and Realities*,
  46 Ala. L. Rev. 375, 456 (1995) ................................................................................ 6

-v-

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant GreenPoint Mortgage Funding, Inc. ("GreenPoint") moves this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the First Amended Complaint ("Complaint") in this case, which alleges disparate impact discrimination,[1] for failure to state a claim upon which relief can be granted.

## I.   INTRODUCTION

This putative class action filed by plaintiffs Ana and Ismael Ramirez and Jorge Salazar ("Plaintiffs") is one of a number of cookie cutter cases filed against mortgage lenders in courts across the country in the past year.  *See, e.g.*, *Alleyne v. Flagstar Bank, FSB*, No. 07cv12128 (D. Mass.) (filed 11/13/07); *Garcia v. Countrywide Fin. Corp.*, No. 07cv01161 (C.D. Cal.) (filed 9/12/07); *Zamora v. Wachovia Corp.*, No. 3:07cv4603 (N.D. Cal.) (filed 9/5/07); *Taylor v. Accredited Home Lenders, Inc.*, No. 07cv01732 (S.D. Cal.) (filed 8/31/07); *Ventura v. Wells Fargo Bank, N.A.*, No. 3:07cv04309 (N.D. Cal.) (filed 8/21/07); *Sanchez v. Wash. Mut., Inc.*, No. 2:07cv05542 (C.D. Cal) (filed 8/13/07).

In this installment of the series, both the Ramirezes and Mr. Salazar allege that they obtained loans to refinance their existing home loans through mortgage brokers.  (Compl. ¶¶ 56, 67.)  The Ramirezes obtained a mortgage loan through their broker, First Call, with a 30-year term and an APR of 6.191%.  (*Id.* ¶ 59.)  Mr. Salazar obtained a loan through his broker, TLN Financial, with a 30-year term and an APR of 7.181%.  (*Id.* ¶ 69.)  Plaintiffs allege that GreenPoint was the lender of record on each loan, but nowhere in the Complaint do they allege any direct contact between themselves and GreenPoint.[2]

Plaintiffs contend that GreenPoint's "Discretionary Policy" resulted in a disparate impact against them and other minority borrowers.  (*Id.* ¶ 44.)  Plaintiffs allege that this Policy gives brokers discretion to use subjective factors to determine the interest rate and fees charged to borrowers.  (*Id.*)  Plaintiffs further allege that this Policy has resulted in minority borrowers

---

[1]   Plaintiffs do not allege intentional discrimination on the part of GreenPoint.

[2]   GreenPoint permanently closed its lending operations in late 2007.

-1-

1   receiving more costly loans than similarly-situated white borrowers.  (*Id.* ¶ 48.)

2        Plaintiffs allege violations of the Equal Credit Opportunity Act ("ECOA") (15 U.S.C.

3   § 1691 *et seq.*) and the Fair Housing Act ("FHA") (42 U.S.C. § 3601).  They seek injunctive and

4   monetary relief.  First, there is a threshold question whether disparate impact claims are even

5   permitted under either the ECOA or the FHA.  Second, even if such claims are permitted in the

6   abstract, Plaintiffs' claims still fail because they are unable to point to any *specific practice or*

7   *policy of GreenPoint* that resulted in the alleged disparate impact on minorities.  Plaintiffs allege

8   that they obtained mortgage loans from brokers and that the brokers charged them too much on

9   account of their race.  However, rather than bring an action against the brokers, they have chosen to

10  proceed against the lender of record, GreenPoint, who had no interaction with the customers and

11  who, Plaintiffs concede, set the component of the loan that it controls in an objective and non-

12  discriminatory manner.  Moreover, Plaintiffs are actually complaining about alleged disparate

13  treatment by *brokers*, none of whom is even named as a defendant.

14       Plaintiffs' claim is in actuality one of disparate treatment by brokers.  However, Plaintiffs

15  try to create a claim against GreenPoint by alleging that the brokers' setting of fees is a "policy" of

16  GreenPoint.  But, as Plaintiffs themselves allege, there are two components of loan pricing – the

17  base (or par rate) which is set by GreenPoint and the discretionary fee that is charged by the broker.

18  Quite simply, GreenPoint cannot be held liable under the fair lending laws for any actions of the

19  brokers – and Plaintiffs' invocation of a "Discretionary Pricing Policy" is simply a linguistic

20  attempt to circumvent the legal and factual reality that if Plaintiffs' loans were priced in a

21  discriminatory manner, it is the brokers with whom they dealt, and not GreenPoint, that are

22  responsible.

23       Finally, the Ramirezes' claims are time-barred by the applicable statutes of limitations.

24  Both the ECOA and the FHA have a two-year statute of limitations.  The Ramirezes obtained their

25  loan on August 3, 2005 – more than two years prior to the filing of their Complaint.  Therefore,

26  their claims are time-barred and must be dismissed.

27  **II.    LEGAL STANDARD**

28       Recently, in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court

-2-

1  clarified the pleading standard applicable to a motion to dismiss under Federal Rule of Civil

2  Procedure 12(b)(6).  The Supreme Court explicitly rejected the previously-accepted "no set of

3  facts" language set forth in *Conley v. Gibson*,[3] and instead held that a plaintiff must allege "enough

4  facts to state a claim to relief that is plausible on its face" in order to survive a Rule 12(b)(6)

5  motion.  *Twombly*, 127 S. Ct. at 1974.  "Factual allegations must be enough to raise a right to relief

6  above the speculative level . . . ."  *Id.* at 1965.

7         In other words, a complaint must be dismissed if it does not contain a "set of facts" that

8  renders a plaintiff's claims "plausible" rather than merely "conceivable."  *Id.* at 1965, 1974.  A

9  plaintiff's "obligation to provide the grounds of his entitle[ment] to relief requires more than labels

10  and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at

11  1964-65 (internal quotations omitted).

12         Accordingly, while a court must assume the truth of the *facts* that are alleged, "conclusory

13  allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Ove*

14  *v. Gwinn*, 264 F.3d 817, 821 (9th Cir. 2001).

15  **III.**    **ARGUMENT**

16         **A.**    **Neither The FHA Nor The ECOA Permits Disparate Impact Claims**

17         GreenPoint acknowledges that current Ninth Circuit precedent allows disparate impact

18  claims under the ECOA and the FHA.  *See, e.g., Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988).

19  However, the Ninth Circuit does not appear to have addressed the conflict between this position

20  and the recent Supreme Court decision of *Smith v. City of Jackson*, 544 U.S. 228 (2005), which

21  mandates that courts undertake a careful textual analysis of anti-discrimination statutes in deciding

22  whether they provide for a disparate impact claim.[4]

---

23  [3]   *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), was widely interpreted to stand for the
proposition that a court could dismiss a complaint on a Rule 12(b)(6) motion only if "no set of
24  facts" could be proved in support of the plaintiff's claim.  The Court in *Twombly* noted that
"*Conley*'s 'no set of facts' language has been questioned, criticized, and explained away long
25  enough . . .[A]fter puzzling the profession for 50 years, this famous observation has earned its
retirement.  The phrase is best forgotten . . . ."  *Twombly*, 127 S. Ct. at 1969.

26  [4]   *See, e.g.*, *Budnick v. Town of Carefree*, No. 06-15841, 2008 U.S. App. LEXIS 5152, at *22-24
27  (9th Cir. Mar. 11, 2008) (affirming grant of summary judgment on disparate impact claim
arising under FHA without addressing whether such claims may be maintained following
28  *Smith*).

1   The Supreme Court held in *Smith* that certain sections of the Age Discrimination in

2   Employment Act (ADEA) permit a disparate impact claim because they include language

3   regarding the "effect" on protected classes equivalent to that found in § 703(a)(2) of Title VII.[5]

4   The Court noted that the statutory basis for disparate impact claims under Title VII comes from

5   § 703(a)(2) of that statute, which states:

6   It shall be an unlawful employment practice for an employer –

7   (1) to fail or refuse to hire or to discharge any individual, or
    otherwise to discriminate against any individual with respect to his
8   compensation, terms, conditions, or privileges of employment,
    because of such individual's race, color, religion, sex, or national
9   origin; or

10  (2) to limit, segregate, or classify his employees or applicants for
    employment in any way which would deprive or tend to deprive any
11  individual of employment opportunities *or otherwise adversely affect*
    his status as an employee, because of such individual's race, color,
12  religion, sex, or national origin.

13  Title VII § 703(a), 42 U.S.C. § 2000e-2(a) (emphasis added); *see also Griggs v. Duke Power Co.*,

14  401 U.S. 424 (1971).  Comparing the ADEA to § 703(a)(2) of Title VII, the Court found that the

15  ADEA permits disparate impact claims because § 4(a)(2) of the ADEA mirrors the language of

16  § 703(a)(2) of Title VII.  *Smith*, 544 U.S. at 235-38, 240.  In contrast, the Court noted, subsection

17  (a)(1) of both statutes – which do not contain the "effects" language – do *not* allow for disparate

18  impact claims, based on the "key textual differences" between subsection (a)(1) and (a)(2) of both

19  statutes.  *Id.* at 236-38.  Rather, based on the plain language of subsection (a)(1) of both statutes,

20  intentional discrimination is required to bring a claim under those subsections.  *Id.*

21  This portion of *Smith* is dispositive here, because neither the FHA nor the ECOA contain

22  the crucial "effects" language discussed in *Smith*.  *See Garcia v. Johanns*, 444 F.3d 625, 633 n.9

23  (D.C. Cir. 2006) ("The Supreme Court has held that this ['effects'] language gives rise to a cause of

24  action for disparate impact discrimination under Title VII and the ADEA.  ECOA contains no such

25  language.") (citation omitted).  In fact, the language of the FHA and ECOA is more similar to the

26  (a)(1) language discussed above, which the Court held requires a showing of intentional

27

28  [5]   42 U.S.C. § 2000e-2(a)(2).  *Smith*, 544 U.S. at 235-36.

-4-

1  discrimination.  Thus, both the ECOA and the FHA should be read to require a showing of

2  discriminatory intent in order to state a claim.  *Smith*, 544 U.S. at 236-38.

3        In sum, *Smith* requires this Court to look to the plain language of both statutes, as the

4  Supreme Court did in interpreting the ADEA.[6]  Because it is clear from their plain language that

5  neither the ECOA nor the FHA permits a disparate impact claim, Plaintiffs' Complaint must be

6  dismissed.[7]

7              **B.**     **Plaintiffs Fail To Assert A Cognizable Disparate Impact Claim**

8        Even if the Court were to find that disparate impact is a viable theory under the FHA and

9  ECOA as a general matter, the Complaint should nonetheless be dismissed because Plaintiffs have

10  failed to state a claim of discrimination based on disparate impact.

11        A disparate impact claim requires:  (1) a specific and clearly delineated policy adopted by

12  the defendant; (2) a disparate impact on a protected group; and (3) facts demonstrating a causal

13  connection between the specific challenged policy and the alleged disparate impact.  *Smith*, 544

14  U.S. at 241; *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657-58 (1989); *Stout v. Potter*, 276

15  F.3d 1118, 1121 (9th Cir. 2002).

16        In this case, Plaintiffs were free to have filed suit against the *brokers* from whom they

17  obtained their loans.  In fact, to the extent their claims are not time-barred (*see infra* § III.C), they

18  remain free to do so.  Instead, Plaintiffs chose to sue GreenPoint.  In so doing, they have, in

19  essence, attempted to cast their claim of intentional discrimination by the *brokers* as a claim of

20  disparate impact by *GreenPoint*.  This contorts the very concept of disparate impact.  Because

21  Plaintiffs' Complaint fails to allege a specific policy that resulted in a disparate impact on a

22  protected class, and because disparate impact analysis is not applicable in this case, the Complaint

---

6    For further discussion of the impact of *Smith* on disparate impact claims brought under ECOA, see Peter N. Cubita & Michelle Hartmann, *The ECOA Discrimination Proscription and Disparate Impact – Interpreting the Meaning of the Words That Actually Are There*, 61 Bus. Law. 829 (2006).

7    Although a recent decision by Judge Phillips of the U.S. District Court for the Central District of California holds otherwise, GreenPoint respectfully disagrees with the analysis performed by the court in that case.  *Garcia v. Countrywide Fin. Corp.*, Case No. EDCV 07-1161-VAP (JCRx) (Order, January 17, 2008) (Attached as Ex. A).  In that case, Judge Phillips sustained plaintiff's disparate impact claims but dismissed his disparate treatment claims.  *See id.*

1    must be dismissed.

2    **1.    Overview Of Disparate Impact**

3        The disparate impact analysis applied by courts today evolved out of employment

4    discrimination cases brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2).

5    In the first such case to reach the Supreme Court, *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971),

6    the Court held that an employer could not require a high school education or the passing of a

7    standardized intelligence test as a condition of employment where neither requirement was

8    significantly related to successful job performance and where both requirements disqualified black

9    candidates at a higher rate than whites.

10       Cases decided after *Griggs* have applied disparate impact to *specific policies* of employers,

11   such as policies requiring certain physical characteristics of employees (*e.g.*, that employees be of a

12   certain height and weight or other requirements affecting those of a certain sex) *e.g., Dothard v.*

13   *Rawlinson*, 433 U.S. 321 (1977); *Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602 (9th Cir. 1982)

14   (en banc); policies requiring commencement of leave upon pregnancy, *e.g., Harriss v. Pan*

15   *American World Airways, Inc.*, 649 F.2d 670 (9th Cir. 1980); or policies which exclude applicants

16   based on arrest records, *e.g., Gregory v. Litton Sys., Inc.*, 472 F.2d 631 (9th Cir. 1972).  In each of

17   these cases, the court relied on a specific employment practice or policy which, although facially

18   neutral, was potentially being used as a "pretext" for intentional discrimination.  *See Albemarle*

19   *Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).

20       Although disparate impact analysis in the employment context does not require a showing

21   of discriminatory intent on the part of the defendant, the approach outlined by the Court in *Griggs*

22   and its progeny "makes an initial assumption that any significant 'underrepresentation' of protected

23   groups in an employer's work force may reflect and constitute evidence of discrimination."  Ronald

24   Turner, *Thirty Years of Title VII's Regulatory Regime:  Rights, Theories, and Realities*, 46 Ala. L.

25   Rev. 375, 456 (1995).  But the assumptions that apply in the context of employment do not

26   translate well to the realm of fair lending.  *See, e.g., NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d

27   287, 290-91 (7th Cir. 1992) (noting that the practice of "redlining," in which insurers charge higher

28   rates or decline to underwrite insurance for people who live in certain neighborhoods, is not

-6-

1    necessarily appropriate for disparate impact analysis because "efforts to differentiate more fully

2    among risks may produce classifications that could be generated by discrimination").

3         A brief sampling of cases in the fair lending context in which courts have applied (or not

4    applied) the disparate impact analysis demonstrate that Title VII cases cannot automatically be

5    applied to non-employment situations.  *See, e.g., Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272,

6    1280 (7th Cir. 1995) (refusal of landlord to accept Section 8 tenants cannot form basis of a claim

7    for racial discrimination under disparate impact analysis); *Garcia*, 444 F.3d 625 (affirming district

8    court's refusal to certify class of Hispanic farmers where plaintiffs failed to demonstrate, under

9    disparate impact theory, a facially-neutral USDA policy that adversely affected them as a class);

10   *Khalil v. The Farash Corp.*, 452 F. Supp. 2d 203, 209 (W.D.N.Y. 2006) (dismissing disparate

11   impact claims where "the gist" of plaintiffs' claims was that the rule at issue was being applied in a

12   discriminatory manner, which is "essentially a claim of disparate treatment").

13        2.    **Plaintiffs Do Not State A Disparate Impact Claim Because They Do Not
             Point To A Specific Policy Or Practice**

14

15        The cases cited above illustrate the fact that all claims labeled "disparate impact" are not cut

16   from the same cloth.  Rather, the court must determine whether the facts at hand lend themselves to

17   such an analysis or not.  *See Knapp*, 54 F.3d at 1280.  Here, Plaintiffs do not point to a specific rule,

18   test, or policy of the Defendant, but instead are simply attacking the cumulative effects of pricing

19   by thousands of independent brokers.  As the Ninth Circuit has explained, the cumulative effects of

20   numerous decisions and negotiations cannot be aggregated into a claim of disparate impact:

21             The case before us simply does not fit into the disparate impact
               model. The model was developed as a form of pretext analysis to
22             handle specific employment practices not obviously job-related, such
               as [] intelligence tests . . . [T]he discriminatory impact model of
23             proof . . . is not, however, the appropriate vehicle from which to
               launch a wide ranging attack on the *cumulative effect of a company's*
24             *employment practices.*

25   *Spaulding v. Univ. of Wash.*, 740 F.2d 686, 707 (9th Cir. 1984) (emphasis added) (internal citations

26   and quotations omitted).[8]

27   _____

28   [8]   S*ee also Knapp,* 54 F.3d at 1280 ("we 'refuse[] to conclude that every action which produces
         discriminatory effects is illegal. . . . Rather, the courts must use their discretion in deciding

                                                                                              *(cont'd)*

-7-

1    To state a disparate impact claim, a plaintiff must "isolat[e] and identif[y] the *specific* . . .

2  practices that are allegedly responsible for any observed statistical disparities." *Smith*, 544 U.S. at

3  241 (emphasis in original).  Both the U.S. Supreme Court and the Ninth Circuit have stressed that

4  plaintiffs in disparate impact cases must identify a specific policy or practice of the defendants

5  rather than waging broad-based attacks against decision-making processes.  *See, e.g.*, *Smith*, 544

6  U.S. at 241; *Wards Cove*, 490 U.S. at 657; *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994

7  (1988); *Stout v. Potter*, 276 F.3d 1118 (9th Cir. 2002).

8    Plaintiffs attempt to bypass the "specific practice" requirement through the linguistic

9  artifice of framing the "policy" that they are purportedly challenging as being GreenPoint's "policy"

10  relating to brokers.  However, as even the most liberal reading of the Complaint reveals, Plaintiffs

11  have not been harmed by any GreenPoint "policy," "rule," or "test."  Plaintiffs are instead

12  complaining about the decision-making processes of thousands of brokers during their negotiations

13  with individual customers.  Quite simply, Plaintiffs fail to identify a *policy of GreenPoint* that is

14  subject to challenge in a lawsuit against GreenPoint.

15    The situation here is similar to that in *Smith*, where the plaintiffs challenged a pay plan that

16  granted proportionately greater pay raises to employees with less than five years of tenure.

17  Plaintiffs argued that this plan had a discriminatory effect on older employees. *Id.* at 231.  The

18  Supreme Court, however, held that the plaintiffs had failed to state a claim for disparate impact:

19  
> They have not identified any specific test, requirement, or practice
> within the pay plan that has an adverse impact on older workers.  As
> we held in *Wards Cove*, it is not enough to simply allege that there is

20  
> a disparate impact on workers, or point to a generalized policy that
> leads to such an impact.  Rather, the employee is "'responsible for

21  
> isolating and identifying the *specific* employment practices that are
> allegedly responsible for any observed statistical disparities.'"

22  
> Petitioners have failed to do so.  Their failure to identify the specific

23  
> practice being challenged is the sort of omission that could "result in
> employers being potentially liable for 'the myriad of innocent causes

24  
> that may lead to statistical imbalances . . . .'"

25  _____
(cont'd from previous page)

26  whether, given the particular circumstances of each case, relief should be granted under the
statute.") (quoting *Metropolitan Housing Development Corp. v. Village of Arlington Heights*,

27  558 F.2d 1283, 1290 (7th Cir. 1977), *cert. denied*, 424 U.S. 1025 (1978); *Am. Family*, 978 F.2d
at 290-91 (noting that "risk discrimination" in the context of insurance is not the same as race

28  discrimination).

-8-

1   *Smith*, 544 U.S. at 241 (internal citations omitted; emphasis in original).

2   Similarly, in *AFSCME v. State of Washington*, 770 F.2d 1401 (9th Cir. 1985), plaintiffs

3   contended that the state's practice of setting salaries based on periodic studies assessing prevailing

4   market rates for each position was discriminatory.  The District Court entered judgment in favor of

5   the plaintiff class.  The Court of Appeals, in a decision written by then Circuit Judge Anthony

6   Kennedy, reversed, holding that "the decision to base compensation on the *competitive market . . .*

7   involves the assessment of a number of complex factors not easily ascertainable, an assessment too

8   multifaceted to be appropriate for disparate impact analysis." *Id.* at 1406 (emphasis added).  Thus,

9   a compensation system that is "responsive to supply and demand and other market forces" does not

10   constitute an "employment practice that yields to disparate impact analysis." *Id.*

11   More recently, in *Stout v. Potter*, 276 F.3d 1118 (9th Cir. 2002), a group of postal

12   inspectors challenged the process by which a review panel screened applicants for promotion.

13   Judge Wilken granted summary judgment in favor of the defendant after which the Ninth Circuit

14   affirmed, explaining that the plaintiffs had "fail[ed] to identify a specific employment practice that

15   disproportionately excludes female applicants because of their gender." *Id.* at 1125.  The court

16   went on to note:

17   > Plaintiffs generally cannot attack an overall decision-making process
> in the disparate impact context, but must instead identify the
18   > particular element or practice within the process that causes an
> adverse impact.
19

20   *Id.* at 1124 (citing *Wards Cove*, 490 U.S. at 656-57).  *See also Anderson v. Douglas & Lomason*

21   *Co.*, 26 F.3d 1277, 1284 (5th Cir. 1994) (affirming district court's refusal to consider plaintiff's

22   claims under disparate impact theory where plaintiff failed to "identify a specific aspect of

23   subjective decision-making by [defendant] that was shown to have any causal connection to the

24   alleged class-based imbalance in [defendant]'s general or supervisory work force," but instead

25   "merely launched a wide-ranging attack on the cumulative effects of [defendant]'s employment

26   practices").

27   Returning to the present case, Plaintiffs have not identified a specific policy of the type

28   required to state a claim of disparate impact.  Instead, they allege that GreenPoint, through its

-9-

1  "Discretionary Pricing Policy," authorized brokers to impose discretionary charges on borrowers

2  based on subjective criteria.  (*See* Compl. ¶ 35.)  The Complaint does not allege what these

3  subjective criteria are, nor does it allege that the subjective criteria actually relied upon by brokers

4  were authorized by GreenPoint.  Rather, Plaintiffs simply challenge the cumulative effects of the

5  pricing practices of thousands of brokers.

6         As in *Stout* and *Spaulding*, Plaintiffs here are attempting to mount a broad-based attack on

7  the cumulative effects of decision-making processes.  That does not relieve them of the need to

8  satisfy the well-established requirement of pleading a *specific policy or practice* of the Defendant

9  (and not of someone else) to state a disparate impact claim.  In short, Plaintiffs are asserting the

10 kind of non-specific disparate impact claim that courts have repeatedly disallowed.[9]

11               **3.    Plaintiffs Fail To Allege A Disparate Impact**

12        Even if Plaintiffs could allege a specific GreenPoint "policy," their Complaint would still

13 fail because they have not alleged an actual disparate impact on a protected class.  *Wards Cove*,

14 490 U.S. at 657-58.

15        Plaintiffs tacitly acknowledge that they must allege that *similarly-situated* minority

16 borrowers paid more for their loans.  (*See* Compl. ¶ 48 ("statistical analysis of . . . customers of

17 other mortgage companies . . . has revealed that minority borrowers, after controlling for credit risk,

18 are substantially more likely than similarly situated whites to pay such charges").)[10]  But they do

19 not follow that principle through to its obvious conclusion – which is that, at a minimum, they must

20 allege that *GreenPoint* charged those minority borrowers more.  Instead, Plaintiffs' sole allegation

21

22  [9]   Plaintiffs' attempt to hold GreenPoint accountable for the actions of brokers is analogous to
         suits brought against franchisors by plaintiffs who allege that they experienced discrimination
23       at the hands of a franchisee.  Courts have rejected such lawsuits under various federal anti-
         discrimination laws.  *See, e.g., Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1071 (10th Cir. 1998)
24       (rejecting attempt to hold franchisor liable for allegedly discriminatory conduct of employees
         of franchisee under Title VII, finding, *inter alia*, no evidence that franchisor controlled the day-
25       to-day employment decisions of franchisee); *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063,
         1068-69 (5th Cir. 1995) (affirming summary judgment in favor of franchisor in ADA claim
26       based on franchisee's failure to make accommodations for disabled people, holding that
         franchisor did not have structural control over its franchise stands).

27  [10]  In this regard, Plaintiffs are right.  A disparate impact case must be premised on a comparison
         of similarly-situated applicants.  *See Wards Cove*, 490 U.S. at 651-53.

28

regarding similarly-situated borrowers pertains to an analysis of "*other mortgage companies*." (*Id.* (emphasis added).) Any pattern of alleged discrimination by other mortgage lenders cannot be the basis for a disparate impact claim against GreenPoint.

The only statistical allegation Plaintiffs make that is based on data particular to GreenPoint is publicly available Home Mortgage Disclosure Act (HMDA) data, which, according to Plaintiffs, shows that minorities were more likely than white borrowers to receive high-APR loans from GreenPoint. (*See* Compl. ¶¶ 35-36.) Significantly, however, the HMDA data does not control for credit risk differences between minority and white borrowers, thus rendering it facially insufficient in support of a disparate impact claim.

Under established precedent, borrowers cannot be similarly situated if they are not alleged to have equal credit risk and other factors affecting available loan terms and programs, including equal financial resources to secure the same loan products. *See Wards Cove*, 490 U.S. at 651-53 (holding that plaintiffs had not made out a disparate impact claim based on a statistical comparison of two workforces that compared unskilled workers with skilled workers, two populations which were not similarly situated). And a plaintiff that does not support allegations with facts illustrating that the groups are similarly situated cannot state a claim for disparate impact. *See id.; see also Edwards v. Johnston County Health Dep't*, 885 F.2d 1215, 1223 (4th Cir. 1989) (in evaluating a motion to dismiss, noting that "merely demonstrating a statistical imbalance, without more, does not establish a greater discriminatory adverse effect on one race compared to another"); *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482-83 (9th Cir. 1983).

In sum, Plaintiffs' claims do not fit within the framework of disparate impact analysis due to their inability to point to any policy of GreenPoint responsible for the alleged disparate impact, and because Plaintiffs fail to allege facts demonstrating a disparate impact on a protected class.

**C.    The Ramirezes' Claims Are Time-Barred And Must Be Dismissed**

Even if the Court finds that Plaintiffs have alleged a disparate impact claim, the Ramirezes' claims still fail because they are barred by the two-year statute of limitation governing ECOA and FHA claims.

1.    **Each Of Plaintiffs' Claims Is Subject To A Two-Year Statute Of Limitation**

Claims brought under either the ECOA or the FHA must be brought within two years of the date of the injury.  *See* 15 U.S.C.S. § 1691e(f) (ECOA) ("No such action shall be brought later than two years from the date of the occurrence of the violation."); 42 U.S.C. § 3613(a)(1)(A) (FHA) ("An aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice.").  Here, the Ramirezes allege that they obtained their allegedly discriminatory loan on August 3, 2005.  (Compl. ¶ 57.)  Therefore, the last date on which Plaintiffs could have commenced their action was August 2, 2007.

2.    **The Tolling Allegations Do Not Save The Ramirezes' Claims**

The Ramirezes seek to forestall the obvious statute of limitations problem by arguing that they could not have discovered the factual bases of their claims until recently.  (Compl. ¶ 87.) They contend that they did not discover, and were unable to discover, the factual bases of their claims due to both the nature of their cause of action and GreenPoint's knowing and active concealment of the facts.  (*Id.*)  However, each of those theories of tolling carves out only a limited exception to the statute of limitations, and neither applies in this case.

(a)    **The Discovery Rule**

Under the so-called "discovery rule," a plaintiff's cause of action does not accrue until such date as the plaintiff discovered or reasonably could have discovered the injury.  *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 780 (9th Cir. 2002) (holding plaintiff's claim barred by statute of limitations where she "failed to exercise reasonable diligence in attempting to discover the cause of her injury").  This rule does not save the Ramirezes' claims, because they do not allege any facts that plausibly illustrate that they exercised "reasonable diligence" to uncover the factual basis for their claims.  As they themselves concede, that information regarding the alleged discriminatory impact of discretionary pricing systems has been publicly available for years.  (Compl. ¶ 88 ("[k]nowledge concerning the . . . discriminatory impact of such commission-driven, discretionary credit-pricing systems has been widely circulated within the financing industry for several years, as a result of numerous actions by the United States Department of Justice and federal regulatory

-12-

1    agencies").)  These "facts" were a matter of public record – and in fact,  according to the Ramirezes

2    were widely known.  Thus, this information was manifestly available to the Ramirezes through the

3    exercise of reasonable diligence.

4         Moreover, the Ramirezes themselves allege that as far back as 2004, GreenPoint's lending

5    data, as reported under HMDA, reflected a disparity in the percentage of high-APR loans made to

6    minorities as compared to white customers.  (Compl. ¶ 35.)  (As discussed above, this allegation is

7    the *only* pricing discrimination allegation in the Complaint that specifically relates to GreenPoint).

8    That 2004 HMDA data has been publicly available since at least *March 31, 2005*.  *See* 12 C.F.R.

9    § 203.5 (requiring HMDA data to be made available to the public no later than March 31 of the

10   calendar year following the year for which the data were compiled).  Consequently, the Ramirezes

11   cannot reasonably argue that as of the date of their loan they would have been unable to determine

12   the facts underlying their cause of action.

13              **(b)    Fraudulent Concealment**

14        Similarly, the Ramirezes' "fraudulent concealment" allegations do not save their claims.

15   First and foremost, "fraudulent concealment " must be alleged with particularity pursuant to

16   Federal Rule of Civil Procedure 9(b).  *See, e.g., Larson v. Northrup Corp.*, 21 F.3d 1164, 1173

17   (D.C. Cir. 1994); *Rambus Inc. v. Samsung Elecs. Co.*, No. C-05-02298, 2007 U.S. Dist. LEXIS

18   3088, at *19-22 (N.D. Cal. Jan. 4, 2007).  The allegations of GreenPoint's "deception and

19   concealment" are wholly conclusory and fail to meet the heightened pleading standard for fraud

20   under Rule 9(b).  *See Rambus*, 2007 U.S. Dist. LEXIS, at *19-22 (dismissing fraudulent

21   concealment allegations for failure to meet heightened pleading standard); *see also Rutledge v.*

22   *Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) (affirming dismissal of

23   allegations of fraudulent concealment where plaintiff failed to "plead with particularity the

24   circumstances surrounding the concealment" and failed to "state facts showing his due diligence in

25   trying to uncover the facts").  The Ramirezes have not alleged any facts supporting their claim that

26   GreenPoint "knowingly and actively concealed" the facts alleged in the Complaint, nor have they

27   alleged facts detailing their efforts to uncover the basis of their claims through reasonable diligence.

28        Second, the doctrine of fraudulent concealment "is properly invoked only if a plaintiff

-13-

1 establishes 'affirmative conduct upon the part of the defendant which would, under the

2 circumstances of the case, lead a reasonable person to believe that he [the plaintiff] did not have a

3 claim for relief.'" *Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1363 (C.D.

4 Cal. 1995) (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987)); *see also*

5 *Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986). As discussed above, the Ramirezes

6 allege no facts suggesting that GreenPoint took any affirmative steps to hide relevant facts from the

7 Ramirezes, and instead allege to the contrary, that GreenPoint publicly reported data that supports

8 their claim.

9       Third, the Ramirezes must further demonstrate "that they had neither actual nor

10 constructive notice of the facts constituting their claims for relief." *Volk*, 816 F.2d at 1415. As

11 with the discovery rule, the doctrine of fraudulent concealment "does not come into play, whatever

12 lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a

13 potential claim." *Rambus*, 2007 U.S. Dist. LEXIS, at *23 (internal citation omitted). Similarly, "[a]

14 plaintiff is under a duty to reasonably investigate, and a *suspicion* of wrongdoing, coupled with a

15 knowledge of the harm and its cause, commences the limitations period." *Id.* The Ramirezes' own

16 allegations – including those based on GreenPoint's publicly available HMDA data –  contradict

17 their claim that they had no knowledge nor any way to uncover the basis of their action. The

18 "facts" cited in their Complaint were publicly available long before the limitations period expired

19 for the Ramirezes.

20       Similarly, the Ramirezes cannot avail themselves of the continuing violations doctrine to

21 extend the limitations period. The continuing violations doctrine, like the discovery rule, is a

22 narrow exception to the statute of limitations, under which some courts have extended limitations

23 periods where a plaintiff was subject to a continuing practice of discrimination both *within and*

24 *outside of the limitations period*.

25       Even assuming for the sake of argument that this doctrine is applicable here, it does not

26 benefit the Ramirezes, since the discrimination of which they complain occurred entirely outside of

27 the limitations period. Indeed, even under the continuing violations doctrine:

28

-14-

1

> If an event or series of events should have alerted a reasonable
> person to act to assert his or her rights at the time of the violation, the
> victim cannot later rely on the continuing violation doctrine to
> overcome the statutory requirement of filing [suit] with respect to
> that event or series of events.

2

3

4   *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001) (quotations and citations

5   omitted).

6          In addition, even though the Ramirezes seek to represent a class of potential plaintiffs, some

7   of whom may have obtained loans within the limitations period, they cannot use their putative class

8   status to avoid the constitutional requirement that they themselves have standing by virtue of

9   having suffered an injury within the limitations period.  *See, e.g., Lierboe v. State Farm Mut. Auto.*

10  *Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("'if none of the named plaintiffs purporting to

11  represent a class establishes the requisite of a case or controversy with the defendants, none may

12  seek relief on behalf of himself or any other member of the class'") (quoting *O'Shea v. Littleton*,

13  414 U.S. 488, 494 (1974)).

14  **IV.    CONCLUSION**

15         For the foregoing reasons, GreenPoint's motion should be granted and the Complaint

16  dismissed with prejudice.

17

18  DATED:  April 11, 2008             SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

19

20

21                                     By:  _____/s/ Raoul D. Kennedy_____
                                                Raoul D. Kennedy

22                                     Attorneys for DEFENDANT
                                       GREENPOINT MORTGAGE FUNDING, INC.

23

24

25

26

27

28

NOTICE OF MOTION TO DISMISS                              CASE NO. 3:08-cv-00369-TEH
205335-San Francisco Server 1A - MSW

# EXHIBIT A

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL GARCIA, | Case No. EDCV 07-1161-VAP (JCRx) |
| Plaintiff, | **[Motion filed on November 8, 2007]** |
| v. | |
| COUNTRY WIDE FINANCIAL CORPORATION and COUNTRYWIDE HOME LOANS, INC., | **AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

Defendants' Motions to Dismiss came before the Court for hearing on January 7, 2008.  After reviewing and considering all papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced by counsel at the hearing, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.

## I. BACKGROUND

### A.    Procedural History

Plaintiff Gabriel Garcia filed a putative class action Complaint ("Compl.") on September 12, 2007,

1  alleging that Defendants Countrywide Financial
2  Corporation and Countrywide Home Loans, Inc.
3  (collectively, "Defendants") violated and continue to
4  violate (1) the Equal Credit Opportunity Act ("ECOA");
5  (2) the Fair Housing Act ("FHA"); and (3) the Civil
6  Rights Act, 42 U.S.C. §§ 1981 and 1982.

7

8      On November 8, 2007, Defendants filed a Motion to
9  Dismiss ("Mot.") pursuant to Federal Rule of Civil
10  Procedure 12(b)(6).  Plaintiff filed an Opposition
11  ("Opp'n") on December 3, 2007.  On December 10, 2007,
12  Defendants filed a Reply.

13

14      **B.   Plaintiff's Allegations**

15      Nationwide, minority consumers "have less-than-equal
16  access to loans at the best prices and on the best terms
17  that their credit history, income, and other individual
18  financial considerations merit."  (Compl. ¶ 13 (citing
19  Joint Center for Housing Studies, The Dual Mortgage
20  Market: The Persistence of Discrimination in Mortgage
21  Lending (2005).)  Even after controlling for a borrower's
22  gender, income, property location, and loan amount,
23  federally mandated lender disclosures show that Hispanic
24  and black borrowers were 37.5 to 50 per cent more likely
25  to receive a higher-rate home loan than non-Hispanic
26  whites.  (Id.  ¶ 15-16.)
27  ///

28

2

1    Defendants represent themselves as "America's #1 home
2 lender" and "America's #1 Lender to Minorities." (Id. ¶
3 19.)  They originate and fund mortgage loans through loan
4 officers, brokers and a network of correspondent lenders
5 (collectively "loan originators").  (Id.)  These loan
6 originators act as Defendants' agents in originating
7 loans.  (Id. ¶¶ 26-27.)

8

9    Defendants encourage and offer incentives to these
10 loan originators to increase interest rates, charge
11 additional fees, and include prepayment penalties and
12 other less favorable terms in loans to certain borrowers.
13 (Id. ¶ 3.)  As a direct result of these policies,
14 minorities receive residential loans with higher interest
15 rates and higher fees and costs than similarly situated
16 non-minority borrowers.  (Id.)

17

18    Specifically, Defendants employ discretionary loan
19 pricing procedures that cause minority borrowers to
20 purchase loans with prepayment penalties and other
21 unfavorable terms, and to pay subjective fees such as
22 yield spread premiums and other mortgage-related finance
23 charges, at higher rates than similarly situated non-
24 minority borrowers.  (Id. ¶ 21.)  Defendants' loan
25 originators receive more compensation when they steer
26 borrowers into loans with these higher interest rates,
27 penalties and fees.  (Id. ¶ 22.)

28

3

1    Moreover, these discretionary charges are unrelated
2  to any objective risk-based credit evaluation.  When a
3  loan applicant provides credit information to Defendants
4  through a loan originator, Defendants perform an initial
5  objective credit analysis, evaluating numerous risk-
6  related credit variables, including debt-to-income
7  ratios, loan-to-value ratios, credit bureau histories,
8  debt ratios, bankruptcies, automobile repossessions,
9  prior foreclosures, payment histories, and credit scores.
10  (Id. ¶ 29.)  From these objective factors, Defendants
11  derive a risk-based financing rate called the "par rate."
12  (Id. ¶ 30.)

13

14    Defendants, however, authorize and offer incentives
15  to their loan originators to charge discretionary, non-
16  risk-based fees in addition to the "par rate," including
17  "yield spread" or "broker premiums."  (Id. ¶ 31.)  This
18  practice causes persons with identical or similar credit
19  scores to pay differing amounts for obtaining credit, and
20  disparately impacts Defendants' minority borrowers.  (Id.
21  ¶ 34.)  Specifically, Defendants' use of yield spread
22  premiums and other discretionary fees disproportionately
23  and adversely affects minorities relative to similarly
24  situated non-minorities.  (Id. ¶ 35.)

25

26    Defendants have intentionally discriminated against
27  minority borrowers through these policies and procedures,

28

4

1 systematically giving them mortgage loans with less
2 favorable conditions than were given to similarly
3 situated non-minority borrowers.  (<u>Id.</u> ¶ 21, 36.)  This
4 pattern of discrimination is a direct result of
5 Defendants' mortgage lending policies and procedures,
6 cannot be justified by business necessity, and could be
7 avoided by alternative policies and procedures that have
8 less discriminatory impact and no less business efficacy.
9 (<u>Id.</u> ¶¶ 21, 25, 26.)

10

11    These discriminatory practices directly damaged
12 Plaintiff.  (<u>Id.</u> ¶ 37.)  On or about February 27, 2006,
13 Plaintiff obtained $415,000 in financing from Defendants
14 to purchase a single-family house.  (<u>Id.</u>)  The loan
15 originator and Defendants knew that Plaintiff was a
16 minority borrower, and because of Defendants'
17 discriminatory practices, Plaintiff received a loan on
18 worse terms with higher costs than similarly situated
19 non-minority borrowers.  (<u>Id.</u> ¶¶ 40-41.)  Specifically,
20 Plaintiff paid a $8,300 "broker origination fee," a
21 $1,250 "broker administration fee," a $550 "processing
22 fee," a $830 yield spread premium, a $150 "loan tie in
23 fee" and a $995 "underwriting fee." (<u>Id.</u> ¶ 39.)  All of
24 these fees were assessed pursuant to Defendants' credit
25 pricing policies.  (<u>Id.</u>)
26 ///
27 ///
28

5

1

## II. LEGAL STANDARD

2     Under Rule 12(b)(6), a party may bring a motion to
3 dismiss for failure to state a claim upon which relief
4 can be granted. As a general matter, the Federal Rules
5 require only that a plaintiff provide "'a short and plain
6 statement of the claim' that will give the defendant fair
7 notice of what the plaintiff's claim is and the grounds
8 upon which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47
9 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); <u>Bell Atlantic</u>
10 <u>Corp. v. Twombly</u>, 550 U.S. __, 127 S. Ct. 1955, 1964
11 (2007). In addition, the Court must accept all material
12 allegations in the complaint -- as well as any reasonable
13 inferences to be drawn from them -- as true. <u>See</u> <u>Doe v.</u>
14 <u>United States</u>, 419 F.3d 1058, 1062 (9th Cir. 2005); <u>ARC</u>
15 <u>Ecology v. U.S. Dep't of Air Force</u>, 411 F.3d 1092, 1096
16 (9th Cir. 2005).

17

18     "While a complaint attacked by a Rule 12(b)(6)
19 motion to dismiss does not need detailed factual
20 allegations, a plaintiff's obligation to provide the
21 'grounds' of his 'entitlement to relief' requires more
22 than labels and conclusions, and a formulaic recitation
23 of the elements of a cause of action will not do." <u>Bell</u>
24 <u>Atlantic</u>, 127 S. Ct. at 1964-65 (citations omitted).
25 Rather, the allegations in the complaint "must be enough
26 to raise a right to relief above the speculative level."
27 <u>Id</u>. at 1965.

28

6

1    Although the scope of review is limited to the
2 contents of the complaint, the Court may also consider
3 exhibits submitted with the complaint, Hal Roach Studios,
4 Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19
5 (9th Cir. 1990), and "take judicial notice of matters of
6 public record outside the pleadings," Mir v. Little Co.
7 of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988).

8

9                      **III. DISCUSSION**

10    Defendants argue that (1) the FHA and ECOA do not
11 authorize disparate impact claims; (2) Plaintiff fails to
12 state a disparate impact claim; (3) Plaintiff fails to
13 state a claim for intentional discrimination; (4)
14 Plaintiff does not have standing to assert claims on
15 behalf of minority populations of which he is not a
16 member; (5) Plaintiff fails to allege liability on the
17 part of Defendant Countrywide Financial Corporation,
18 Inc.; and (6) Plaintiff's allegations regarding tolling
19 of the statute of limitations should be stricken.   The
20 Court considers each of these arguments in turn.

21

22 **A.   Disparate Impact Under the FHA and ECOA**

23    Plaintiff alleges that Defendants violate the FHA and
24 ECOA, in part, because Defendants' policies have a
25 negative disparate impact on minority borrowers.   The
26 Fair Housing Act, in relevant part, states that "it shall
27 be unlawful":

28

                              7

1

2

3

4

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

5

6

7

8

9

42 U.S.C. § 3604(a). In the Ninth Circuit, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment or disparate impact. Gamble v. City of Escondido, 104 F.3d 300, 304-05 (9th Cir. 1996).

10

11

12

13

14

15

16

17

18

19

The ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a). A plaintiff can establish an ECOA claim under a theory of disparate treatment or disparate impact. Miller v. American Exp. Co., 688 F.2d 1235, 1240 (9th Cir. 1982).

20

21

22

23

24

25

26

27

28

Defendant argues that the Ninth Circuit cases recognizing disparate impact claims under FHA and ECOA "were wrongly decided" and "cannot be good law in light of the subsequent Supreme Court decision in Smith v. City of Jackson." (Mot. at 14 (citing Smith v. City of Jackson, 544 U.S. 228 (2005)).) In Smith, the Supreme Court held a plaintiff could bring a disparate impact claim under the Age Discrimination in Employment Act

8

1 ("ADEA"). Smith, 544 U.S. at 235-39. The Court compared
2 the text of the ADEA to the text of Title VII, and
3 reasoned that both statutes authorized disparate impact
4 claims when they prohibited "actions that deprive any
5 individual of employment opportunities or *otherwise*
6 *adversely affect* his status as an employee, because of
7 such individual's race or age." Id. at 235 (emphasis in
8 original; citations omitted).

9

10     Defendants argue that the FHA and ECOA do not support
11 disparate impact claims because, unlike the ADEA and
12 Title VII, they do not contain text expressly prohibiting
13 actions that "otherwise adversely affect" individuals
14 based on their protected status. (Mot. at 15-16.)
15 Smith, however, did not hold that a statute *must* contain
16 this "effects" language in order to authorize disparate
17 impact claims. Indeed, the Court did not rely only on
18 this textual analysis of the statutes, but also held that
19 the purpose and legislative history of the ADEA, as well
20 as unanimous circuit court treatment of the Act,
21 supported disparate treatment claims. Smith, 544 U.S. at
22 236-39.

23

24     Like the Supreme Court in Smith, the Ninth Circuit
25 relied on the purposes of the ECOA in determining that
26 Act supports disparate impact claims. See Miller, 688
27 F.2d at 1239-40. It held that "not requiring proof of
28

9

1   discriminatory intent is especially appropriate in

2   analysis of ECOA violations because discrimination in

3   credit transactions is more likely to be of the

4   unintentional, rather than the intentional, variety."

5   Id. at 1239 (citations omitted).

6

7       Moreover, all eleven circuits that have considered

8   the matter have concluded that the FHA supports disparate

9   impact claims.  See 2922 Sherman Ave. Tenants' Ass'n v.

10  District of Columbia, 444 F3d 673, 679 (D.C. Cir. 2006)

11  (analyzing circuit holdings); Note, The Fair Housing Act

12  and Disparate Impact in Homeowners' Insurance, 104 Mich.

13  L. Rev. 1993, 2006-07 & n.117 (listing cases).

14  Furthermore, in Village of Arlington Heights v.

15  Metropolitan Housing Development Corp., the Supreme Court

16  affirmed summary judgment against the plaintiffs on all

17  claims requiring discriminatory intent, finding that the

18  plaintiffs had failed to prove such intent, but remanded

19  for consideration of an FHA claim, thus implying that

20  discriminatory intent was not necessary for an FHA claim.

21  Village of Arlington Heights v. Metropolitan Housing

22  Development Corp., 429 U.S. 252, 270-71 (1977).

23

24      Indeed, the Ninth Circuit has recognized the

25  viability of disparate impact claims under the FHA after

26  Smith.  See Affordable Housing Dev. Corp. v. City of

27  Fresno, 433 F.3d 1182, 1195-96 (9th Cir. 2006) (affirming

28

1 a judgment for the defendants but recognizing the
2 viability of such a claim). The Sixth Circuit similarly
3 has recognized the continuing viability of ECOA disparate
4 impact claims. See Golden v. City of Columbus, 404 F.3d
5 950, 964-65 (6th Cir. 2005) (same). Accordingly, this
6 Court declines to hold that Smith overturned Ninth
7 Circuit precedent recognizing disparate impact claims
8 under the FHA and ECOA.
9

10 **B. Disparate Impact**

11    In analyzing discrimination claims under the FHA,
12 courts have borrowed the analysis that they use in
13 assessing claims under Title VII. Gamble, 104 F.3d at
14 304. To establish discrimination through disparate
15 impact, a plaintiff must (1) identify a specific practice
16 of the Defendant; (2) identify a significant
17 discriminatory impact on the protected class of which the
18 plaintiff is a member; and (3) demonstrate that the
19 identified practice causes the identified discriminatory
20 impact. Paige v. California, 291 F.3d 1141, 1144-45 (9th
21 Cir. 2002); Gamble, 104 F.3d at 304. The causation
22 requirement may be inferred through statistical evidence
23 showing a sufficiently substantial disparity. Id.
24

25    **1. Specific Practice**

26    Defendants argue that Plaintiff fails to challenge a
27 sufficiently specific practice on the part of Defendants.
28

11

1  (Mot. at 6-10.)  To establish discrimination based on
2  disparate impact, a plaintiff must "isolate[e] and
3  identify[y] the *specific* . . . practices that are
4  allegedly responsible for any observed statistical
5  disparities."  Smith, 544 U.S. at 241 (emphasis in
6  original; citations omitted).  In Smith, plaintiffs
7  challenged a pay plan that granted proportionately
8  greater pay raises to employees with less than five years
9  of tenure, arguing that the plan had a discriminatory
10 impact on older employees.  Id. at 231.  The Supreme
11 Court held that the plaintiffs failed to identify the
12 specific practice being challenged, and that imposing
13 liability for the pay plan in general could "result in
14 employers being potentially liable for the myriad of
15 innocent causes that may lead to statistical imbalances."
16 Id. at 241.  Additionally, the Court stressed that the
17 plaintiffs could not successfully challenge the plan as a
18 whole because it "was based on reasonable factors other
19 than age."  Id.
20
21     The Ninth Circuit similarly has rejected challenges
22 to a defendant's overall processes.  In Stout v. Potter,
23 postal inspectors challenged the process by which a
24 review panel screened applicants for promotion.  Stout v.
25 Potter, 276 F.3d 1118, 1121 (9th Cir. 2002).  The Ninth
26 Circuit held that by merely attacking "the decision-
27 ///
28

12

1  making process" or "the process by which the [screening]
2  Panel evaluated applications," the plaintiffs failed
3  toidentify a "specific employment practice or selection
4  criterion."  Id. at 1124.  The court explained,

5              Plaintiffs generally cannot attack an
             overall decisionmaking process in the
6              disparate impact context, but must
             instead identify the particular element
7              or practice within the process that
             causes an adverse impact. A
8              decisionmaking process may be analyzed as
             a single employment practice if the
9              complaining party can demonstrate to the
             court that the elements of a respondent's
10             decisionmaking process are not capable of
             separation for analysis.
11
   Id.  In Stout, the court did not treat the decision-
12
   making process as a single practice because the overall
13
   process consisted of discrete elements and the plaintiffs
14
   failed to argue that the various elements could not be
15
   separated for analysis.  Id. at 1124-25.
16

17
        Similarly, the Ninth Circuit has frowned on a
18
   challenge to a complex market-based process.  In AFSCME
19
   v. State of Wash., the plaintiffs attacked the state's
20
   practice of setting salaries based on biennial studies
21
   assessing prevailing market rates for each position.
22
   AFSCME v. State of Wash., 770 F.2d 1401, 1403 (9th Cir.
23
   1985.)  The Ninth Circuit held that "the decision to base
24
   compensation on the competitive market . . . involves the
25
   assessment of a number of complex factors not easily
26
   ascertainable, an assessment too multifaceted to be
27
   appropriate for disparate impact analysis."  Id. at 1406.
28

                              13

1        In contrast, challenges to subjective decision-making
2   practices are more likely to survive initial pleading
3   attacks.   In Watson v. Fort Worth Bank and Trust, the
4   plaintiff challenged her employer's practice of promoting
5   employees based on the "subjective judgment of
6   supervisors who were acquainted with the candidates and
7   with the nature of the jobs to be filled." Watson v.
8   Fort Worth Bank and Trust, 487 U.S. 977, 982 (1988). The
9   Court held that "subjective or discretionary employment
10  practices may be analyzed under the disparate impact
11  approach," but did not decide whether the plaintiff had
12  made out a *prima facie* claim for disparate impact
13  discrimination.  Id. at 991, 1000.

14

15       Here, Plaintiff challenges Defendants' practice of
16  authorizing and offering incentives to their loan
17  originators to charge discretionary, non-risk-based fees
18  in addition to the "par rate," including "yield spread"
19  or "broker premiums."  (Compl. ¶ 31.)  Like the practice
20  challenged in Watson, Defendants' practice allows
21  subjective decision-making that is alleged to result in a
22  discriminatory impact.  Unlike the practice challenged in
23  Smith, the challenged decision-making, is *not*, on its
24  face, based on objective factors other than prohibited
25  discrimination.  See Smith, 544 U.S. at 241 (stressing
26  that the challenged plan is based on reasonable factors
27  other than age).

28

14

 1          Defendants argue that, like the practice challenged
 2   in AFSCME, the practice attacked here is merely a "policy
 3   of allowing pricing to be responsive to supply and demand
 4   and other market forces."  (Mot. at 9 (quotations
 5   omitted).)  Plaintiff, however, alleges that Defendants'
 6   assessment of fees in addition to the "par rate" is not
 7   based on market-based factors such as risk or
 8   creditworthiness, and indeed is unrelated to legitimate
 9   business necessity.  (Compl. ¶ 25, 28-35.)  From this, it
10   is reasonable to infer that the challenged practices do
11   not merely allow pricing to be responsive to market
12   forces.  In the context of a motion to dismiss, the Court
13   takes as true these allegations and reasonable inferences
14   therefrom.  See Doe, 419 F.3d at 1062.

15

16          Finally, unlike in Stout, Plaintiff does not
17   challenge the overall process by which Defendants
18   determine borrowers' rates and fees.  Instead, Plaintiff
19   challenges only the practice of allowing and
20   incentivizing individual loan originators to assess
21   additional, non-risk-based fees.  (Compl. ¶ 31.)  In the
22   context of a  motion to dismiss, this is sufficient to
23   give Defendants "fair notice of what the plaintiff's
24   claim is and the grounds upon which it rests."  See
25   Conley, 355 U.S. at 47; Bell Atlantic, 127 S. Ct. at
26   1964.

27   ///

28

                                15

1        **2. Significant Discriminatory Impact**

2        To establish disparate impact discrimination, a
3   plaintiff must demonstrate that there is a significant
4   disparity in outcomes between minorities and similarly
5   situated non-minorities. See, e.g. Wards Cove, 490 U.S.
6   at 651-53. Here, Defendants argue that the nationwide
7   statistics cited by Plaintiff "fail[] to allege a
8   disparate impact because the cited data is not specific
9   to Countrywide." (Mot. at 10.) As Plaintiff points out,
10  however, he is not required at the pleading stage to
11  produce statistical evidence proving a disparate impact
12  on Defendants' customers -- all that is required is fair
13  notice of the claims and the grounds upon which they
14  rest, sufficient to raise a right to relief above the
15  speculative level. Bell Atlantic, 127 S. Ct. at 1964-65
16  (citations omitted); see also Swierkeiwicz v. Sorema, 534
17  U.S. 506, 514-15 (2002) (no heightened pleading standard
18  to state a discrimination claim). Here, Plaintiff does
19  allege that Defendants' minority customers, specifically,
20  pay disproportionately higher fees for mortgages than
21  Defendants' nonminority customers. (See Compl. ¶¶ 21,
22  22, 24, 35.) Moreover, he provides statistical evidence
23  of a nationwide disparate impact which, combined with an
24  allegation that Defendants are "America's #1 home
25  lender," is enough to raise above the speculative level
26  Plaintiff's allegation that Defendants' minority buyers
27  ///

28

16

1  pay disproportionately high fees.  (See Compl. ¶¶ 13-16,
2  19.)

3

4      Defendants also argue that Plaintiff fails to allege
5  that "the relevant groups of whites and Hispanics are
6  similarly-situated."  (Mot. at 10-11.)  The Complaint,
7  however, does allege that Defendants charge minorities
8  higher fees "even after controlling for borrowers'
9  gender, income, property location, and loan amount."
10 (Compl. ¶ 15.)  Moreover, Plaintiff alleges that
11 Defendants charge minorities higher fees than others with
12 the same "par-rate," a number which takes into account
13 numerous risk-related credit variables, including debt-
14 to-income ratios, loan-to-value ratios, credit bureau
15 histories, debt ratios, bankruptcies, automobile
16 repossessions, prior foreclosures, payment histories, and
17 credit scores.  (Id. ¶ 29.)  Finally, Plaintiff alleges
18 Defendants' use of yield spread premiums and other
19 discretionary fees disproportionately and adversely
20 affects minorities "relative to similarly situated non-
21 minorities."  (Id. ¶ 35.)  Accordingly, Plaintiff has
22 alleged that there is a significant disparate impact on
23 minorities compared to similarly situated non-minorities.
24

25     **3.  Causation**

26     To allege causation, Plaintiff must allege facts
27 sufficient to raise above a speculative level the
28

17

1  inference that, but for Defendants' challenged policy,
2  minorities would not receive higher-cost loans than
3  similarly situated non-minority borrowers. See Bell
4  Atlantic, 127 S. Ct. at 1964-65.  Here, Plaintiff alleges
5  that Defendants' policy of allowing and offering
6  incentives to its loan originators to add fees in
7  addition to the "par rate" directly causes minorities to
8  receive home loans with higher interest rates and higher
9  fees and costs.  (Compl. ¶¶ 3, 21, 24, 35, 62, 80.)
10 Defendants argue that these allegations are conclusory
11 and that Plaintiff fails to "allege a set of facts from
12 which causation plausibly can be inferred."  (Mot. at
13 13.)

15     Defendants claim that the higher costs imposed on
16 minority borrowers could be explained by such borrowers'
17 lower average credit scores.  (Id.)  This explanation
18 ignores Plaintiff's allegation that Defendants impose the
19 challenged discretionary fees in addition to the "par
20 rate," which is calculated based on a borrower's credit
21 score.  (Compl. ¶¶ 15, 29.)  Indeed, Plaintiff alleges
22 that the higher costs imposed on minority borrowers
23 cannot be explained by any factor other than Defendants'
24 challenged policies.  (Compl. ¶ 15.)  These allegations
25 are sufficient to raise above a speculative level the
26 inference that, but for Defendants' policy of offering
27 incentives for discretionary fees, minorities would not
28

18

1  receive higher-cost loans than similarly situated non-
2  minority borrowers.  Accordingly, Plaintiff has stated a
3  claim for disparate impact discrimination.

4

5  **C.  Disparate Treatment**

6     To show disparate treatment based on race, a
7  plaintiff must establish that the defendant was *motivated*
8  to discriminate against the plaintiff on the basis of
9  race.  See AFSCME, 770 F.2d at 1406-07.  Where a
10 plaintiff challenges a defendant's policy, the plaintiff
11 must establish that the defendant implemented the policy
12 "because of, not merely in spite of," its adverse effects
13 on the protected group.  Personnel Adm'r of Massachusetts
14 v. Feeney, 442 U.S. 256, 279 (1979).

15

16    Here, Plaintiff alleges that Defendants have
17 intentionally discriminated against minority borrowers
18 through their policy of offering incentives for
19 discretionary loan fees, and that Defendants
20 intentionally designed this policy to discriminate
21 against minority borrowers.  (Compl. ¶¶ 21, 36.)
22 Plaintiff maintains that this policy perpetuates past
23 racial discrimination in mortgage lending.  (Id. at 12-
24 18.)

25

26    To state a claim for disparate treatment, Plaintiff
27 must provide more than mere conclusory allegations of

28

19

1  Defendants' intent to discriminate.  See Bell Atlantic,
2  127 S. Ct. at 1964-65.  Rather, the allegations in the
3  complaint "must be enough to raise a right to relief
4  above the speculative level."  Id. at 1965.  Here,
5  Plaintiff provides no factual allegations regarding
6  intent to discriminate beyond his bare assertion that
7  Defendants "intentionally discriminated" and that
8  Defendants' policy "by design discriminates against
9  minority borrowers."  (Compl. ¶¶ 21, 36.)  These
10 assertions are not enough to raise Plaintiff's right to
11 relief for disparate treatment above the speculative
12 level.  See Bell Atlantic, 127 S. Ct. at 1965.
13 Accordingly, Plaintiff has failed to state a claim for
14 disparate treatment.
15
16 **D.  Standing**
17     To satisfy Article III's standing limitations, a
18 plaintiff must demonstrate that:  (1) he or she has
19 suffered an "'injury in fact' -- an invasion of a legally
20 protected interest which is (a) concrete and
21 particularized, and (b) actual or imminent, not
22 conjectural or hypothetical"; (2) there is a causal
23 connection between the injury and the conduct complained
24 of -- the injury is "fairly traceable" to the challenged
25 action of Defendants, and not the result of the
26 independent action of some third party not before the
27 court; and (3) it is "likely," as opposed to merely
28

20

1   "speculative," that the injury will be redressed by a

2   favorable judicial decision.  Lujan v. Defenders of

3   Wildlife, 504 U.S. 555, 560-561 (1992) (citations

4   omitted).  "In the class action context, Article III

5   standing simply requires that the class representatives

6   satisfy standing individually."  In re Verisign, Inc.,

7   2005 WL 88969, *4 (N.D. Cal. 2005).

8

9       Defendants argue that Plaintiff cannot establish

10  standing to sue on behalf of potential class members of

11  minority groups other than Hispanics.  (Mot. at 19-20.)

12  To establish Article III standing, however, Plaintiff

13  must only show that he has standing to sue on his own

14  behalf.  In re Verisign, 2005 WL at *4.  Whether he may

15  represent the claims of the class is a separate inquiry,

16  governed by Federal Rule of Civil Procedure 23.  Id.

17

18      Defendants do not argue that Plaintiff does not have

19  standing to sue on his own behalf.  Indeed, Plaintiff has

20  alleged he has suffered an actual injury that is fairly

21  traceable to Defendants' acts, and the type of injury he

22  alleges (discriminatory fees) is redressible by a federal

23  court.  (See Compl. ¶¶ 39-41 (alleging that as a result

24  of Defendants' discriminatory credit pricing policies,

25  Plaintiff received a loan on worse terms with higher

26  costs than similarly situated non-minority borrowers).)

27  ///

28

1  Accordingly, Plaintiff has established Article III

2  standing.[1]

3

4  **E.  Liability of Defendant Countrywide Financial**

5  **Corporation, Inc.**

6  Plaintiff's Complaint does not distinguish between

7  the two named Defendants.  (Compl. ¶ 1.)  Nonetheless,

8  Defendants argue that Defendant Countrywide Financial

9  Corporation ("CFC") cannot be liable because Plaintiff

10 "states no factual allegations at all as to CFC."  (Mot.

11 at 21.)  The Complaint, however, alleges numerous acts by

12 CFC.  Every allegation of an act by Defendants is an

13 allegation of an act by both CFC and Countrywide Home

14 Loans, Inc.  (See Compl. passim.)  For instance, the

15 Complaint alleges Plaintiff obtained a residential loan

16 from "CONTRYWIDE," which he defines as Countrywide

17 Financial Corporation *and* Countywide Home Loans, Inc.

18 (See Compl. ¶¶ 1, 37-38.)  The Complaint also alleges

19

20 ――――――――――――――――――――――――――――――――

21 [1]At the hearing on this matter, Defendants' counsel
   argued that Plaintiff lacks Article III standing to

22 represent minority groups of which he is not a part under
   the Ninth Circuit holding in Black Coalition v. Portland

23 School Dist. No. 1.  Black Coalition held that a
   plaintiff has no standing to challenge a policy or

24 procedure which has not adversely affected that
   individual plaintiff's interests.  Black Coalition v.

25 Portland School Dist. No. 1., 484 F.2d 1040, 1042-43
   (1973).  In contrast, Plaintiff here challenges a policy

26 that he alleges directly and adversely affected him.
   Moreover, while Black Coalition considered an appeal of a

27 district court judgment in a class action, here a class
   has not yet been certified, so the issue of whether

28 Plaintiff may represent all members of the class is not
   yet properly before the Court.

22

1  that Defendants collectively designed, implemented, and
2  oversee the allegedly discriminatory policy of allowing
3  loan officers to add discretionary fees to the
4  objectively determined "par rate."  (Compl. ¶¶ 3, 21-25,
5  29-36.)

7       Defendant argues that these allegations are untrue
8  and cannot be proven as to CFC, but for the purposes of a
9  Motion to Dismiss, the Court takes Plaintiff's
10 allegations as true.   Doe, 419 F.3d at 1062.
11 Accordingly, the Court declines to dismiss Defendant CFC.

13 **F.    Motion to Strike Allegations re Tolling of the**
14 **       Statute of Limitations**

15      Under Federal Rule of Civil Procedure 12(f), a party
16 may ask the court to strike any "insufficient defense or
17 any redundant, immaterial, impertinent, or scandalous
18 matter."  Fed. R. Civ. Proc. 12(f).  "'Immaterial' matter
19 is that which has no essential or important relationship
20 to the claim for relief or the defenses being pleaded. .
21 . . 'Impertinent' matter consists of statements that do
22 not pertain, and are not necessary, to the issues in
23 question."  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527
24 (9th Cir. 1993), rev'd on other grounds by Fogerty v.
25 Fantasy, Inc., 510 U.S. 517 (1994).
26 ///
27 ///

23

1     "Motions to strike are generally regarded with
2 disfavor because of the limited importance of pleading in
3 federal practice, and because they are often used as a
4 delaying tactic." Cal. Dept. of Toxic Substances Control
5 v. Alco Pacific, Inc., 217 F. Supp. 2d 1028, 1033 (C.D.
6 Cal. 2002). Thus, "courts often require 'a showing of
7 prejudice by the moving party' before granting the
8 requested relief," and "[u]ltimately, whether to grant a
9 motion to strike lies within the sound discretion of the
10 district court." Id. (citing Fantasy, 984 F.2d at 1528).
11 A court should deny "[a] motion to strike under Rule
12 12(f) . . . unless it can be shown that no evidence in
13 support of the allegation would be admissible, or those
14 issues could have no possible bearing on the issues in
15 the litigation." Gay-Straight Alliance Network v.
16 Visalia Unified Sch. Dist., 262 F. Supp. 2d 1088, 1099
17 (E.D. Cal. 2001).
18
19     Defendant moves to strike the allegations in
20 paragraphs 51-58 of the Complaint. (Mot. 21-22.) These
21 paragraphs allege that class members' claims did not
22 accrue until shortly before the filing of the action,
23 that Defendants fraudulently concealed their
24 discriminatory practices, and that Defendants'
25 discriminatory conduct is continuing and recurrent.
26 (Compl. ¶¶ 51-55.) Accordingly, Plaintiff alleges that
27 "[t]he statute of limitations applicable to any claims
28

24

1 | that Plaintiff or other class members have brought or
2 | could bring as a result of the unlawful and fraudulent
3 | concealment and course of conduct described herein, have
4 | been tolled."  (Id. ¶ 58.)

5

6 |     Defendants argue that the allegations in paragraphs
7 | 51-58 of the Complaint are irrelevant because the named
8 | Plaintiff filed his claim within all applicable statutes
9 | of limitations.  (Mot. 21-22.)  This argument is
10 | premature.  Until the Court has ruled on the issue of
11 | class certification, it cannot be shown that the
12 | allegations regarding other class members "could have no
13 | possible bearing on the issues in the litigation."  See
14 | Gay-Straight Alliance Network, 262 F. Supp. 2d at 1099.
15

16 |     Defendants further argue that the Court should strike
17 | Plaintiff's allegations of fraudulent concealment because
18 | Plaintiff failed to plead with particularity sufficient
19 | facts showing fraudulent conduct.  (Mot. at 22-23.)
20 | Indeed, one pleading fraudulent concealment "must plead
21 | with particularity the facts which give rise to the
22 | claim.  Conerly v. Westinghouse Elec. Corp., 623 F.2d
23 | 117, 120 (9th Cir. 1980); see also Fed. R. Civ. Proc.
24 | 9(b).  Here, Plaintiff merely alleges that Defendants
25 | "took steps to conceal [their] fraudulent and unfair
26 | conduct," but fails to allege what steps were taken, how
27 | those steps were intended to mislead Plaintiff and class
28

1  members, or why those steps would lead a reasonable
2  person to be misled into believing that he did not have a
3  claim for relief. See Conerly, 623 F.2d at 120. In his
4  Opposition, Plaintiff does not contest that the Complaint
5  fails to plead fraudulent concealment properly.

6

7      Plaintiff has failed to plead fraudulent concealment
8  with sufficient particularity, and Plaintiff's
9  allegations regarding fraudulent concealment are
10 stricken.

11

12     Finally, Defendants argue that Plaintiff's
13 allegations of a continuing violation are insufficient as
14 a matter of law to justify tolling the statute of
15 limitations under the "continuing violation" doctrine.
16 (Mot. at 24-25.) Defendants cite Ledbetter v. Goodyear
17 Tire & Rubber Co. Inc., which held that the statute of
18 limitations was not tolled when the alleged
19 discriminatory act was a pay decision that occurred
20 before the limitations period, even though the plaintiff
21 continued to receive lower pay during the limitations
22 period. Ledbetter v. Goodyear Tire & Rubber Co. Inc.,
23 127 S. Ct. 2162, 2166-69 (2007). The Court held that a
24 limitations period does not recommence "upon the
25 occurrence of subsequent nondiscriminatory acts that
26 entail adverse effects resulting from the past
27 discrimination." Id. at 2169.

28

26

1    Unlike the plaintiff in Ledbetter, however, Plaintiff
2    here alleges a discriminatory act -- Defendants' sale to
3    him of an allegedly high-cost loan  -- which occurred
4    during the limitations period.  (Compl. ¶ 37.)   Indeed,
5    in an FHA case similar to this one, the Supreme Court
6    tolled the statute of limitations under a "continuing
7    violation" theory.  See Havens Realty Corp. v. Coleman,
8    455 U.S. 363, 380 (1982).   In Havens Realty, the
9    plaintiffs alleged five specific incidents of alleged FHA
10   violations.  Id.  Only one of the incidents, involving
11   only one of the plaintiffs, occurred within the
12   limitations period.  Id.  Nevertheless, the Court tolled
13   the statute as to the other incidents involving the other
14   plaintiff.  Id.  The Court held, "where a plaintiff,
15   pursuant to the Fair Housing Act, challenges not just one
16   incident of conduct violative of the Act, but an unlawful
17   practice that continues into the limitations period, the
18   complaint is timely when it is filed within 180 days of
19   the last asserted occurrence of that practice."  Id. at
20   380-81.

21

22   Here, Plaintiff alleges an occurrence of Defendants'
23   allegedly discriminatory practice within the statute of
24   limitations.  (Compl. ¶ 37.)  Thus, his allegations
25   regarding a "continuing violation" as to other potential
26   class members are not irrelevant, redundant, or
27   scandalous, and are accordingly not stricken.

28

                            27

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS
Defendants' Motion to Dismiss as to Plaintiff's claims of
disparate treatment discrimination under the FHA, ECOA,
and 42 U.S.C. §§ 1981 and 1982 with leave to amend,
DENIES the Motion to Dismiss as to Plaintiff's claims of
disparate impact discrimination, and STRIKES the
allegations of fraudulent concealment in paragraphs 53,
57, and 58 of the Complaint.

Defendants shall answer or otherwise respond to the
Complaint by January 23, 2008.

Dated: ___January 17, 2008___     _____
                                  VIRGINIA A. PHILLIPS
                                  United States District Judge

28

1

2

3

4

5

6

7

8     **UNITED STATES DISTRICT COURT**

9     **NORTHERN DISTRICT OF CALIFORNIA**

10    **SAN FRANCISCO DIVISION**

11    ANA RAMIREZ, ISMAEL RAMIREZ and        ) CASE NO. 3:08-cv-00369-TEH
      JORGE SALAZAR, on behalf of themselves and )
12    all others similarly situated,             ) CLASS ACTION
                                                 )
13                           Plaintiffs,         ) **[PROPOSED] ORDER GRANTING**
                                                 ) **DEFENDANT GREENPOINT**
14         v.                                    ) **MORTGAGE FUNDING, INC.'S**
                                                 ) **MOTION TO DISMISS PLAINTIFFS'**
15    GREENPOINT MORTGAGE FUNDING, INC., ) **FIRST AMENDED COMPLAINT**
                                                 )
16                           Defendant.          )
      _____ ) Date:   May 19, 2008
17                                                 Time:   10:00 a.m.
                                                   Place:  Courtroom 12
18                                                 Judge:  The Honorable Thelton E. Henderson

19

20

21

22

23

24

25

26

27

28

**PROPOSED ORDER**

1

2          The Motion To Dismiss Plaintiffs' First Amended Complaint filed by Defendant

3  GreenPoint Mortgage Funding, Inc. ("GreenPoint") came on regularly for hearing on May 19, 2008,

4  in Courtroom 12 of this Court, the Honorable Thelton E. Henderson presiding.  After considering

5  all supporting and opposing papers, the arguments of counsel, and all other matters properly before

6  the Court, and good cause appearing therefore, IT IS THEREFORE ORDERED that:

7          1.    GreenPoint's Motion To Dismiss Plaintiffs' First Amended Complaint is

8  GRANTED.

9          2.    The First Amended Complaint and all causes of action stated therein are

10  hereby DISMISSED WITH PREJUDICE.

11

12  IT IS SO ORDERED.

13

14

15  DATED: _____    _____
                                                         The Honorable Thelton E. Henderson
16                                                            United States District Judge

17  Respectfully Submitted by:

18  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

19

20

21  By: _____/s/ Raoul D. Kennedy_____
                          Raoul D. Kennedy

22            Attorneys for DEFENDANT
23  GREENPOINT MORTGAGE FUNDING, INC.

24

25

26

27

28