1   CHAVEZ & GERTLER, L.L.P.
    Mark A. Chavez (CA SBN 90858)
2   Nance F. Becker (CA SBN 99292)
    Dan Gildor (CA SBN 223027)
3   42 Miller Avenue
    Mill Valley, California 94941
4   Tel:    (415) 381-5599
    Fax:    (415) 381-5572
5   E-mail:  mark@chavezgertler.com
            nance@chavezgertler.com
6           dgildor@chavezgertler.com

7   RODDY KLEIN & RYAN
    Gary Klein (*Admitted Pro Hac Vice*)
8   Shennan Kavanagh
    727 Atlantic Avenue
9   Boston, MA 02111-2810
    Tel:    (617) 357-5500, ext. 15
10  Fax:    (617) 357-5030

11  [*Additional counsel listed on signature page*]

12  Attorneys for Plaintiffs and the Proposed Class

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16  ANA RAMIREZ, ISMAEL RAMIREZ and    )  Case No.  3:08-cv-00369-TEH
17  JORGE SALAZAR, on behalf of themselves )
    and all others similarly situated,    )
                                          )
18                                        )  **CLASS ACTION**
                                          )
19              Plaintiffs,               )  Hon. Thelton E. Henderson
                                          )
20                                        )  **PLAINTIFFS' MEMORANDUM OF**
        vs.                               )  **POINTS AND AUTHORITIES IN**
21                                        )  **OPPOSITION TO DEFENDANTS'**
                                          )  **MOTION TO DISMISS**
22  GREENPOINT MORTGAGE FUNDING,          )
    INC.,                                 )  DATE: May 19, 2008
23                                        )
                                          )  TIME: 10:00 am
24              Defendant.                )
                                          )  COURTROOM: 12
25  _____  )

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................... 1

II.  FACTUAL ALLEGATIONS ...................................................................... 2

    A.   Plaintiffs' Allegations Identifying and Describing Greenpoint's Challenged Policy ................................................................................... 2

    B.   Plaintiffs' Allegations on Disparate Impact ...................................... 3

    C.   Plaintiffs' Allegations on Causation ................................................. 3

    D.   Plaintiffs' Allegations on Damages .................................................. 4

    E.   Plaintiffs' Allegations Regarding Greenpoint's Participation and Liability ........... 5

III. LEGAL STANDARD ................................................................................ 6

IV.  ARGUMENT ............................................................................................ 7

    A.   The FHA and ECOA Prohibit Disparate Impact Discrimination ........................... 7

    B.   Plaintiffs Allege a Cognizable Disparate Impact Claim Against Greenpoint ....... 11

        1.   Disparate Impact Analysis Under the FHA and ECOA ........................... 12

        2.   Plaintiffs Have Clearly Identified and Defined Greenpoint's Discretionary Pricing Policy ..................................................... 13

        3.   Plaintiffs Have Adequately Alleged that They Were Disparately Impacted by Greenpoint's Discretionary Pricing Policy ......................... 15

    C.   The Claims of Ana and Ismael Ramirez Are Not Time-Barred ........................... 16

        1.   The Discovery Rule Tolls the Statute of Limitations ............................... 16

        2.   The Doctrine of Continuing Violation Fatally Undermines Greenpoint's Statute of Limitations Argument ......................................... 18

        3.   The Ramirezes' Claim Is Not Time Barred Because of Greenpoint's Fraudulent Concealment ....................................................... 20

V.   CONCLUSION ........................................................................................ 22

# TABLE OF AUTHORITIES

Page

## CASES

*22 Sherman Ave Tenants' Ass'n v. District of Columbia,*
    444 F.3d 673 (D.C. Cir. 2006) ................................................................................ 1

*Affordable Housing Dev. Corp. v. City of Fresno,*
    433 F.3d 1182 (9th Cir. 2006) ......................................................................... 1, 10

*Alexander v. Local 496,*
    177 F.3d 394 (6th Cir. 1999) ................................................................................ 12

*Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977) ................................................................................................ 7

*Arthur v. City of Toledo,*
    782 F.2d 565 (6th Cir. 1986) ................................................................................. 7

*Barkley, et al. v. Olympia Mortgage Co., et al.,*
    2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007) ..................................................... 17

*Bazemore v. Friday,*
    478 U.S. 385 (1986) .............................................................................................. 19

*Beard v. Dominion Homes Financial Services, Inc.,* No. 06-00137,
    2007 WL 2137944 (S.D. Ohio July 23, 2007) ..................................................... 21

*Beaulialice v. Federal Home Loan Mortgage Corp.,* No. 8:04-CV02316-T-24-EAJ,
    2007 WL 744646 (M.D. Fla. Mar. 6, 2007) ......................................................... 10

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ........................................................................................... 6

*Buycks-Roberson v. Citibank Federal Sav. Bank,*
    162 F.R.D. 322 (N.D.Ill. 1995) ........................................................................... 13

*Carter Ware v. Indymac Bank,* No. 07-C-1982,
    __ F. Supp. 2d __, 2008 WL 441600 (N.D. Ill. Feb. 14, 2008) ................. 2, 6, 10, 15

*Casa Marie, Inc. v. Superior Court of Puerto Rico,*
    988 F.2d 252, (1st Cir. 1993) ................................................................................. 7

*Coleman v. Gen. Motors Acceptance Corp.,*
    196 F.R.D. 315 (M.D. Tenn. 2000) ....................................................................... 8

*Comm. of Massachusetts v. Fremont Investment & Loan, et al.,* No. 07-4373-BLS1,
    23 Mass. L. Reporter, 2008 WL 517279 (Mass. Super. Ct. Feb. 26, 2008) ........... 19

*Conley v. Gibson,*
    355 U.S. 41 (1957) ............................................................................................... 14

*Conmar Corp. v. Mitsui & Co.,*
    858 F.2d 499 (9th Cir. 1988) ............................................................................... 20

*Davis v. General Motors Acceptance Corp.,*
    406 F. Supp. 2d 698 (N.D. Miss. 2005) ............................................................... 18

-ii-

## TABLE OF AUTHORITIES

**Page**

*E.E.O.C. v. Concentra Health Services, Inc.*,
    496 F.3d 773 (7th Cir. 2007) ............................................................. 16

*Erickson v. Pardus*,
    ___ U.S. ___, 127 S. Ct. 2197 (2007) .................................................. 6

*Ford Motor Credit Co. v. Milhollin*,
    444 U.S. 555 (1980) .......................................................................... 9

*Gamble v. City of Escondido*,
    104 F.3d 300 (9th Cir. 1996) ........................................................ 7, 10

*Garcia v. Countrywide*, No. EDCV 07-1161-VAP(JCRx) ............................... 2, 14

*Gibson v. United States*,
    781 F.2d 1334 (9th Cir. 1986) ........................................................... 16

*Golden v. City of Columbus*,
    404 F.3d 950 (6th Cir. 2005) ............................................................ 10

*Harris v. Itzhaki*,
    183 F.3d 1043 (9th Cir. 1999) ............................................................. 7

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................. 18, 19

*Haynes v. Bank of Wedowee*,
    634 F.2d 266 (11th Cir. 1981) ............................................................. 8

*Hill v. Metropolitan Atlanta Rapid Transit Authority*,
    841 F.2d 1533 (11th Cir. 1988) ......................................................... 18

*Jackson v. Novastar Mortg., Inc.*, No. 06-2249,
    2007 WL 4568976 (W.D. Tenn. Dec. 20, 2007) ........................................ 2

*Jackson v. Okaloosa County*,
    21 F.3d 1531 (11th Cir. 1994) ............................................................. 7

*Jensen v. Frank*,
    912 F.2d 517 (1st Cir. 1990) ............................................................. 19

*Jones v. Ford Motor Credit Co.*,
    2002 WL 88431 (S.D.N.Y. 2002) ........................................................ 13

*Keith v. Volpe*,
    858 F.2d 467 (9th Cir. 1988) .............................................................. 7

*Kennedy v. Josephthal & Co.*,
    814 F.2d 798 (1st Cir. 1987) ............................................................. 21

*Ledbetter v. Goodyear Tire & Rubber Co.*,
    127 S. Ct. 2162 (2007) .................................................................... 20

*Martinez v. Freedom Mortg. Team, Inc.*,
    527 F. Supp. 2d 827 ................................................................... 2, 10

-iii-

## TABLE OF AUTHORITIES

**Page**

*Metropolitan Housing. Dev. Corp. v. Arlington Heights*,
  558 F.2d 1283 (7th Cir. 1977) ............................................................. 7

*Miller v. American Express Co.*,
  688 F.2d 1235 (9th Cir. 1982) ...................................................... 1, 8, 10

*Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873
  (9th Cir. 1984).............................................................................. 17

*Mountain Side Mobile Estates P'ship v. HUD*,
  56 F.3d 1243 (10th Cir. 1995) .............................................................. 7

*National Fair Housing Alliance v. A.G. Spanos Const., Inc.*
  --- F.Supp.2d ----, 2008 WL 927711 6 N.D.Cal. 2008)........................... 19

*Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304
  (9th Cir. 1992)............................................................................... 17

*Newman v. Apex Financial Group, Inc.*, No. 07 C 4475,
  2008 WL 130924 (N.D. Ill. Jan. 11, 2008)............................... 2, 6, 10, 15

*Ojo v. Farmers Group, Inc.*, No. 05-5818-JFW,
  2006 WL 4552707 (C.D. Cal. Mar. 7, 2006)..................................... 10

*Orr v. Bank of Am.*, 285 F.3d 764
  (9th Cir. 2002).............................................................................. 17

*Pavlak v. Church*,
  727 F.2d 1425 (9th Cir. 1984) ......................................................... 16

*Pfaff v. U.S. Dep't of Housing & Urban Dev.*,
  88 F.3d 739 (9th Cir. 1996) ............................................................ 10

*Phillips v. Better Homes Depot, Inc.*,
  2003 U.S. Dist. Lexis 27299 (E.D.N.Y. Nov. 12, 2003) ........................ 17

*Powell v. American General Finance, Inc.*,
  310 F.Supp.2d 481 (N.D.N.Y. 2004)................................................ 13

*Reinhart v. Lincoln County*,
  482 F.3d 1225 (10th Cir. 2007) ...................................................... 10

*Resident Advisory Bd. v. Rizzo*,
  564 F.2d 126 (3d Cir. 1977) ............................................................. 7

*Rindley v. Gallager*,
  890 F. Supp. 1540 (S.D. Fla. 1995) ................................................. 17

*Rutledge v. Boston Woven Hose & Rubber Co.*,
  576 F.2d 248 (9th Cir. 1978) .......................................................... 20

*Silver State Fair Housing Council, Inc. v. ERGS, Inc.*,
  362 F. Supp. 2d 1218 (D. Nev. 2006).............................................. 18

-iv-

## TABLE OF AUTHORITIES

**Page**

*Simms v. First Gibraltar Bank*,
  83 F.3d 1546 (5th Cir. 1996) .................................................................................. 7

*Smith v. Chrysler Financial Co.*,
  2003 WL 328719 (D.N.J. Jan. 15, 2003) .............................................................. 13

*Smith v. City of Jackson*,
  544 U.S. 228 (2005)........................................................................................... 9, 14

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ............................................................................... 7

*Stout v. Potter*,
  276 F.3d 1118 (9th Cir. 2002) ............................................................................. 14

*Timmel v. Moss*, 803 F.2d 519
  (9th Cir. Cal. 1986)............................................................................................. 16

*United States v. Starrett City Assocs.*,
  840 F.2d 1096 (2d Cir. 1988) ................................................................................ 7

*Watson v. Fort Worth Bank and Trust*,
  487 U.S. 977 (1988).......................................................................................... 12, 20

*Zamudio v. HSBC North America Holdings, Inc.*, No. 07-C-4315,
  2008 WL 517138 (N.D. Ill. Feb. 20, 2008) ............................................. 2, 6, 10, 15

**STATUTES**

15 U.S.C. § 1691a ....................................................................................................... 11

**OTHER AUTHORITIES**

Pub. L. No. 100-430 , 102 Stat. 1619 (1988)............................................................. 18

S. Rep. No. 94-589 (1976) ........................................................................................... 9

**RULES**

Fed. R. Civ. P. Rule 15 ......................................................................................... 18, 20

Fed. R. Civ. P. Rule 8 .................................................................................................. 6

**REGULATIONS**

12 C.F.R. § 202.2 ....................................................................................................... 11

12 C.F.R. Pt. 202, Supp. I, §202.6 .............................................................................. 8

24 C.F.R. § 100.30.................................................................................................... 11

1    **I.    <u>INTRODUCTION</u>**

2        Plaintiffs Ana Ramirez, Ismael Ramirez and Jorge Salazar (collectively "Plaintiffs") are

3    minority homeowners who brought this action to challenge Defendant Greenpoint Mortgage

4    Funding Inc.'s ("Greenpoint") discriminatory mortgage lending practices under the Fair Housing

5    Act ("FHA") and the Equal Credit Opportunity Act ("ECOA").  Specifically, Greenpoint utilizes

6    a loan pricing policy that causes minority borrowers to pay thousands of dollars more for their

7    home loans than white borrowers with similar credit qualifications.  This challenged policy has

8    led to hundreds of millions of dollars in unjustified and hidden costs to minority homeowners.

9        As a threshold matter, Plaintiffs' disparate impact claims alleged in their First Amended

10   Class Action Complaint ("Complaint") are permissible under the FHA and the ECOA.

11   Controlling Ninth Circuit authority uniformly holds that the FHA and ECOA allow for disparate

12   impact claims.  *Affordable Housing Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir.

13   2006); *Miller v. American Express Co.*, 688 F.2d 1235, 1240 (9th Cir. 1982).  Additionally,

14   every Circuit Court in the country agrees that the FHA provides for disparate impact claims.  *See*

15   *22 Sherman Ave Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006).

16       Plaintiffs have stated cognizable disparate impact claims against Greenpoint.  Their

17   Complaint identifies and describes clearly Greenpoint's "Discretionary Pricing Policy," alleging

18   that Greenpoint authorizes its brokers to use subjective criteria to markup standard interest rates

19   and financing charges on Greenpoint loans irrespective of the credit-worthiness of the borrower.

20   They precisely allege that Greenpoint, not the brokers, caused the loan cost disparities at issue in

21   this case by creating and implementing the "Discretionary Pricing Policy," by channeling

22   minority borrowers into broker arranged loans where it is more likely the loans will be marked

23   up, and by encouraging its brokers to use the discretion afforded by its policy to markup loans.

24   Finally, Plaintiffs allege that Greenpoint's policy results in minority borrowers receiving

25   mortgage loans with significantly higher interest rates and financing charges than similarly

26   creditworthy white borrowers.

27       Greenpoint's contention that the Complaint fails to state valid claims is meritless.

28   Indeed, virtually identical disparate impact claims arising out of similar mortgage lending

-1-

practices have recently withstood motions to dismiss in six district courts, including one in the
Ninth Circuit:

- *Garcia v. Countrywide*, No. EDCV 07-1161-VAP(JCRx), Amended Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (C.D. Cal. Jan. 17, 2008) ("*Garcia* Order" attached as Exhibit 1);

- *Newman v. Apex Financial Group, Inc.*, No. 07 C 4475, 2008 WL 130924 (N.D. Ill. Jan. 11, 2008) (Der-Yeghiayan, J.);

- *Carter Ware v. Indymac Bank*, No. 07-C-1982, __ F. Supp. 2d __, 2008 WL 441600 (N.D. Ill. Feb. 14, 2008) (Bucklo, J.);

- *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827 (N.D. Ill. 2007);

- *Jackson v. Novastar Mortg., Inc.*, No. 06-2249, 2007 WL 4568976 (W.D. Tenn. Dec. 20, 2007); and

- *Zamudio v. HSBC North America Holdings, Inc.*, No. 07-C-4315, 2008 WL 517138 (N.D. Ill. Feb. 20, 2008) (Darrah, J.).

Nor are the Ramerizes' claims time-barred.  Jurisprudence on the discovery rule,
continuing violation and fraudulent concealment doctrines shows not only that the Ramirezes
claims may be considered by the Court, but also that the factual issues raised by Greenpoint as
bases to avoid tolling are wholly inappropriate for resolution on a motion to dismiss.

For these reasons, Greenpoint's motion to dismiss should be denied in its entirety.

## II.    FACTUAL ALLEGATIONS

### A.    Plaintiffs' Allegations Identifying and Describing Greenpoint's Challenged Policy

The Complaint challenges Greenpoint's "Discretionary Pricing Policy."  In accordance
with this policy, Greenpoint authorizes its loan officers and brokers to impose subjective,
discretionary charges and interest rate mark-ups that are included in the loans they originate.
(Compl. ¶ 79.)  These charges and markups are totally unrelated to a borrower's objective credit
characteristics, and they result in charges that are determined on a purely subjective basis and
that adversely affect the rate otherwise available to borrowers.  (*Id*. ¶ 37.)

At all relevant times, Greenpoint provided its loan officers and brokers with credit
applications, loan contracts and other required financing forms, as well as instructions on filling
out such documents necessary to complete home mortgage transactions.  (Compl. ¶ 40.)  When

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                          3:08-CV-00369 TEH

1  an individual sought financing, Greenpoint derived a risk-based financing rate at which it would

2  provide a home mortgage, often called the "Par Rate."  (*Id.* ¶ 43.)  This credit analysis

3  considered numerous risk-related variables of creditworthiness, including credit bureau histories,

4  payment amounts, debt-to-asset ratio, bankruptcies, automobile repossessions, charge-offs, prior

5  foreclosures, payment histories, credit score, debt-to-income ratios, loan-to-value ratios and other

6  risk-related attributes or variables.  (*Id.* ¶ 42.)

7       Although Greenpoint's initial analysis applied objective criteria to calculate this risk-

8  related Par Rate, Greenpoint then authorized a subjective component in its credit-pricing

9  system—the Discretionary Pricing Policy—to impose additional non-risk-related charges.

10  (Compl. ¶ 44.)  Greenpoint's Discretionary Pricing Policy is unrelated to a borrower's objective

11  credit characteristics such as credit history, credit score, debt-to-income ratio and loan-to-value

12  ratios and results in charges that are determined on a purely subjective basis and that adversely

13  affect the rate otherwise available to borrowers.  (*Id.* ¶ 37.)  Loan officers and brokers had

14  discretion, within the limits set by Greenpoint, to impose discretionary mark-ups as additional

15  points in interest—"a rate mark-up."  (*Id.* ¶ 46.)

16       **B.     Plaintiffs' Allegations on Disparate Impact**

17       Greenpoint's Discretionary Pricing Policy, although facially neutral (insofar as

18  Greenpoint uses the same policy for all credit applicants), has a disproportionately adverse effect

19  on minority borrowers compared to similarly-situated whites in that minority borrowers pay

20  disparately more discretionary charges (both in frequency and amount) than similarly-situated

21  whites.  (Compl. ¶ 48.)  Moreover, based on Home Mortgage Disclosure Act ("HMDA") data

22  from the Department of Housing and Urban Development, minorities who borrowed from

23  Greenpoint between 2004 and 2006 were almost 50% more likely than white borrowers to have

24  received a high-APR loan to purchase or refinance their home.  (*Id.* ¶ 35.)

25       **C.     Plaintiffs' Allegations on Causation**

26       Greenpoint's Discretionary Pricing Policy, by design, causes persons with identical or

27  similar credit scores to pay different amounts for credit.  (Compl. ¶ 47.)  As a result of using a

28  subjective pricing component that is designed to charge persons with the same credit profile

1   different finance charges, the objective qualities of the initial credit analysis used to calculate the

2   Par Rate are undermined and the potential for race bias becomes inherent in the transaction.  (*Id.*)

3   The disparate impact suffered by minority borrowers is a direct result of Greenpoint's

4   Discretionary Pricing Policy in that Greenpoint designed, disseminated, controlled, implemented

5   and profited from the Discretionary Pricing Policy, creating the disparate impact.  (*Id.* ¶ 50.)

6          The disparities between the terms of Greenpoint's transactions involving minority

7   homeowners and the terms involving white homeowners cannot be a product of chance and

8   cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the

9   use of the discriminatory Discretionary Pricing Policy.  (Compl. ¶ 52.)  Commission-driven,

10  discretionary pricing systems—such as those in the real estate mortgage industry that are

11  structurally similar to the system utilized by Greenpoint—have been found to produce significant

12  discriminatory effects.  Knowledge concerning the significant and pervasive discriminatory

13  impact of such commission-driven, discretionary credit-pricing systems has been widely

14  circulated throughout the financing industry for many years, particularly since 1994, as a result

15  of numerous high-profile actions by the United States Department of Justice and federal

16  regulatory agencies.  (*Id.* ¶ 54.)  In addition, numerous studies have demonstrated the impact of

17  the challenged policies on minority borrowers.  (*Id.* ¶¶ 10-19)

18         **D.      Plaintiffs' Allegations on Damages**

19         Greenpoint's Discretionary Pricing Policy, although facially neutral (insofar as

20  Greenpoint uses the same or effectively the same policy for all credit applicants), has a

21  disproportionately adverse effect on minority borrowers compared to similarly-situated whites in

22  that minority borrowers pay disparately more discretionary charges (both in frequency and

23  amount) than similarly-situated whites.  (Compl. ¶ 48.)  Plaintiffs were subject to Greenpoint's

24  Discretionary Pricing Policy and were consequently charged a disproportionately greater amount

25  in non-risk-related credit charges than similarly-situated white persons.  (*Id.* ¶¶ 63, 64, 73, 74.)

26  / / /

27  / / /

28  / / /

-4-

1    **E.      Plaintiffs' Allegations Regarding Greenpoint's Participation and Liability**

2         For approximately 20 years, Greenpoint publicly promoted its home financing expertise

3    by means of nationwide advertising campaigns.  In its advertisements, Greenpoint solicited

4    persons to apply for financing with Greenpoint either in one of its offices or through one of its

5    authorized mortgage brokers.  (Compl. ¶ 29.)  Greenpoint made home mortgage loans that were

6    arranged by its network of mortgage brokers.  Those loans were made in reliance on

7    Greenpoint's credit-granting policies and with Greenpoint's participation.  (*Id.* ¶ 31.)  Greenpoint

8    authorized mortgage brokers who have signed a contract with it to accept applications on its

9    behalf, quote financing rates and terms for loans from it (within the limitations set by

10   Greenpoint), inform credit applicants of Greenpoint's financing options, and originate finance

11   transactions using Greenpoint's forms, in accordance with its policies.  (*Id.* ¶ 39.)  Greenpoint

12   provided authorized mortgage brokers with substantial information about its loan programs, rates

13   and credit criteria, as well as its policies for compensating mortgage brokers who arrange

14   business for it.  (*Id.* ¶ 38.) Due to Greenpoint's policies as to where to place its offices and how

15   to market its products, minority borrowers were more likely than white borrowers to apply for

16   credit from Greenpoint by an application made to an authorized broker rather than one made

17   directly to Greenpoint.  (*Id.* ¶ 32.)

18        In all of the home mortgage transactions at issue, Greenpoint advanced the funds to make

19   the loans and bears or did bear the risk of default.  (Compl. ¶ 40.)  After a customer provided

20   credit information to one of Greenpoint's loan officers or brokers, Greenpoint computed a

21   financing rate through an objective credit analysis that discerned the creditworthiness of the

22   customer.  (*Id.* ¶ 41.)  Greenpoint then authorized a subjective component in its credit pricing

23   system – the Discretionary Pricing Policy – to impose additional non-risk-related charges. (*Id.*

24   ¶ 44.) Loan officers and brokers had discretion, within the limits set by Greenpoint, to impose

25   discretionary mark-ups as additional points in interest—"a rate mark-up."  When there was a rate

26   mark-up, Greenpoint shared the additional income, even if a broker originated the loan.  (*Id.*

27   ¶ 46.)

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                                    3:08-CV-00369 TEH

1    Brokers were Greenpoint's agents for the purpose of setting credit price, which was

2  always based on Greenpoint's policy.  (Compl. ¶ 49.)  Plaintiffs were subject to Greenpoint's

3  Discretionary Pricing Policy.  (*Id.* ¶¶ 63, 73.)

4  **III.   LEGAL STANDARD**

5    The Supreme Court's ruling in *Twombly* is neither a radical departure from existing

6  federal pleading rules nor a judicially-created imposition of a new heightened pleading standard.

7  The Court simply held that a complaint must allege "enough facts to state a claim to relief that is

8  plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  The

9  *Twombly* Court further stated that "[a]sking for plausible grounds . . . does not impose a

10 probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable

11 expectation that discovery will reveal evidence" on the issue before the court.  *Id.* at 1965; *see*

12 *also Zamudio*, 2008 WL 517138, at *2 ("The only way for [plaintiff] to ascertain a more detailed

13 picture of Defendants' use of credit-related variables would be through discovery."); *Carter*

14 *Ware*, 2008 WL 441600, at *3 ("Here, taking the facts alleged in the amended complaint as true,

15 plaintiffs have a right to relief that is more than speculative because they have alleged sufficient

16 facts to suggest the possibility that Homestart and Indymac discriminated against minority

17 borrowers."); *Newman*, 2008 WL 130924, at *4 ("requiring the plaintiff to plead those unknown

18 details before discovery would improperly deny the plaintiff the opportunity to prove its claim").

19    *Twombly* itself states that its holding is in accordance with Fed. R. Civ. P. Rule 8(a)(2),

20 which requires only "a short and plain statement of the claim showing that the pleader is entitled

21 to relief."  127 S. Ct. at 1964.  As the Supreme Court recognized in *Erickson v. Pardus*,

22 ___ U.S. ___, 127 S. Ct. 2197 (2007) (*per curiam*), ***decided two weeks after Twombly***, it is still

23 the law under Fed. R. Civ. P. Rule 8(a)(2) that for a complaint, "[s]pecific facts are not

24 necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the

25 grounds upon which it rests.'"  (Citations omitted.) Plaintiffs' Complaint meets and exceeds this

26 standard.

27 / / /

28 / / /

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                3:08-CV-00369 TEH

1  IV.  **ARGUMENT**

2      A.    **The FHA and ECOA Prohibit Disparate Impact Discrimination**

3          Left with no legal basis for challenging Plaintiffs' claims, Greenpoint resigns to asking

4  the Court to ignore well-established, current and controlling case law that unequivocally allows

5  disparate impact claims under the ECOA and the FHA.  (*See* Defs' Mem. at 3.)  The Ninth

6  Circuit has long held that the FHA prohibits disparate impact discrimination, and these decisions

7  are certainly controlling here.  *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (*prima*

8  *facie* case for disparate impact claims under FHA); *Gamble v. City of Escondido*, 104 F.3d 300,

9  306 (9th Cir. 1996) (same); *Keith v. Volpe*, 858 F.2d 467, 482-83 (9th Cir. 1988) (same).  Indeed,

10 every Circuit that has considered the issue concurs.  *See 2922 Sherman Ave. Tenants' Ass'n*, 444

11 F.3d at 679 (finding that all eleven circuits that have considered the issue have "held that the

12 FHA similarly prohibits not only intentional housing discrimination, but also housing actions

13 having a disparate impact").[1]  Furthermore, in *Arlington Heights v. Metro. Housing Dev. Corp.*,

14 429 U.S. 252, 270-71 (1977), the Supreme Court affirmed summary judgment against the

15 plaintiffs on all claims requiring discriminatory intent (finding that the plaintiffs had failed to

16 prove such intent), but remanded for consideration of the FHA claim, clearly indicating that

17 discriminatory intent was not necessary for an FHA claim.

18

19

---

20 [1]  *See, e.g.*:

21    • *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996);

22    • *Mountain Side Mobile Estates P'ship v. HUD*, 56 F.3d 1243, 1250-51
         (10th Cir. 1995);

23    • *Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (11th Cir. 1994);

24    • *Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 269 n.20
         (1st Cir. 1993);

25    • *United States v. Starrett City Assocs.*, 840 F.2d 1096, 1100 (2d Cir. 1988);

      • *Arthur v. City of Toledo*, 782 F.2d 565, 575 (6th Cir. 1986);

26    • *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982);

27    • *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 147-48 (3d Cir. 1977);

28    • *Metropolitan Housing. Dev. Corp. v. Arlington Heights*, 558 F.2d 1283,
         1290 (7th Cir. 1977).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                    3:08-CV-00369 TEH

1    The Ninth Circuit also permits disparate impact claims brought under the ECOA. *Miller*,

2    688 F.2d at 1240.  In *Miller*, the Ninth Circuit recognized that an ECOA violation could be

3    established by a showing of disparate impact. *Id.*  The court reasoned that allowing a disparate

4    impact claim under ECOA was particularly appropriate because "discrimination in credit

5    transactions is more likely to be of the unintentional, rather than the intentional, variety." *Id.* at

6    1239 (citation omitted).  Like the FHA-related case law, this Ninth Circuit precedent is

7    controlling.

8    Moreover, other courts agree that the ECOA permits disparate impact claims. *Haynes v.*

9    *Bank of Wedowee*, 634 F.2d 266, 269 n.5 (11th Cir. 1981) ("ECOA regulations endorse use of

10   the disparate impact test to establish discrimination . . . ."); *Coleman v. Gen. Motors Acceptance*

11   *Corp.*, 196 F.R.D. 315, 325-26 (M.D. Tenn. 2000) ("there is clear support for the use of a

12   disparate impact theory in an ECOA case"), *modified on other grounds*, 296 F.3d 443 (6th Cir.

13   2002).

14   The Federal Reserve Board, charged with interpreting ECOA, has concluded that the

15   statute *permits* disparate impact claims:

16   > *Effects test.*  The effects test is a judicial doctrine that was developed in a series of
17   > employment cases decided by the U.S. Supreme Court under Title VII of the Civil
     > Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such
18   > employment cases were codified by Congress in the Civil Rights Act of 1991 (42
     > U.S.C. 2000e-2).  Congressional intent that this doctrine apply to the credit area is
19   > documented in the Senate Report that accompanied H.R. 6516, No. 94-589, pp. 4-
     > 5; and in the House Report that accompanied H.R. 6516, No. 94-210, p.5.  ***The***
20   > ***Act and regulation may prohibit a creditor practice that is discriminatory in***
     > ***effect*** because it has a disproportionately negative impact on a prohibited basis,
21   > ***even though the creditor has no intent to discriminate and the practice appears***
     > ***neutral on its face***, unless the creditor practice meets a legitimate business need
22   > that cannot reasonably be achieved as well by means that are less disparate in
     > their impact.

23   12 C.F.R. Pt. 202, Supp. I, § 202.6(a)(2) (emphasis added); *see also* Official Staff

24   Interpretations.[2]  Because it is not demonstrably irrational, the Board's interpretation is entitled

25   _____
     [2]  The relevant legislative history of the ECOA is as follows:

26   > ***The prohibitions against discrimination on the basis of race,***
     > ***color, religion or national origin are unqualified***.  In the
27   > Committee's view, these characteristics are totally unrelated to
     > creditworthiness and cannot be considered by any creditor.  In
28   > determining the existence of discrimination on these grounds, as

-8-

1   to deference.  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980); *Smith v. City of*

2   *Jackson*, 544 U.S. 228, 244 (2005) (agency interpretation that disparate impact analysis is

3   applicable to discrimination statute is entitled to deference) (Scalia, J. concurring).

4        While the Ninth Circuit's rulings authorizing disparate impact claims under the FHA and

5   ECOA have not been disturbed, Greenpoint nevertheless argues that *Smith v. City of Jackson*,

6   544 U.S. 228 (2005), which dealt with the Age Discrimination in Employment Act ("ADEA"),

7   affects the uniform recognition of disparate impact claims under the FHA and ECOA.  In *City of*

8   *Jackson*, the Supreme Court held that the plaintiff could bring a disparate impact claim under the

9   ADEA.  544 U.S. at 235-39.  The Court compared the text of the ADEA to the text of §703(a)(2)

10  of the Civil Rights Act of 1964 ("Title VII") and reasoned that both statutes authorized disparate

11  impact claims when they prohibited "actions that deprive any individual of employment

12  opportunities or ***otherwise adversely affect*** his status as an employee, because of such

13  individual's race or age."  *City of Jackson*, 544 U.S. at 235 (emphasis in original).

14       Greenpoint argues that this ruling demonstrates that the FHA and ECOA do not support

15  disparate impact claims because, unlike Title VII and the ADEA, they do not contain text

16  expressly prohibiting actions that "otherwise adversely affect" individuals based on their

17  protected status.  (Defs' Mem. at 4-5.)  However, *City of Jackson* did not hold that a statute must

18  contain this "effects" language in order to authorize disparate impact claims.  Indeed, the Court

19  did not solely rely on a textual comparative analysis of the ADEA to Title VII, but also held that

20  the purpose and legislative history of the ADEA, as well as unanimous Circuit Court treatment of

21  the Act, supported disparate impact claims.  *City of Jackson*, 544 U.S. at 236-39.

22

23           well as on the grounds discussed below, ***courts or agencies are***
24           ***free to look at the effects of a creditor's practices as well as the***
             ***creditor's motives or conduct in individual transactions.***  Thus
             judicial constructions of anti-discrimination legislation in the
25           employment field, in cases such as *Griggs v. Duke Power Co.*, 401
             U.S. 424 (1971), and *Albemarle Paper Company v. Moody* (U.S.
26           Supreme Court, June 25, 1975), are intended to serve as guides in
             the application of this Act, especially with respect to the
27           allocations of burdens of proof.

28  S. Rep. No. 94-589 (1976), *reprinted in* 1976 U.S.C.C.A.N. 403, 406 (emphasis added).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                    3:08-CV-00369 TEH

1     The courts have rightfully interpreted the FHA and the ECOA in accord with the Title

2  VII disparate impact analysis.  *See*, *e.g.*, *Gamble*, 104 F.3d at 304 ("Title VII discrimination

3  analysis" applies to FHA discrimination claims); *Pfaff v. U.S. Dep't of Housing & Urban Dev.*,

4  88 F.3d 739, 745 n.1 (9th Cir. 1996) (same); *Miller*, 688 F.2d at 1239-40 (Title VII disparate

5  impact analysis applies to ECOA).  *City of Jackson* does not change this analysis.

6     Indeed, if *City of Jackson* had overruled an extensive and long-standing body of ECOA

7  and FHA precedent as Greenpoint claims, one would expect to find support for this in decisions

8  since 2005.  Greenpoint fails to cite any such decisions.  Moreover, arguments identical to

9  Greenpoint's have been considered and rejected by courts across the country.  *See Reinhart v.*

10  *Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007) (unlawful discrimination under FHA

11  "may occur either by disparate treatment or disparate impact"); *Affordable Housing Dev. Corp.*,

12  433 F.3d at 1194 (disparate impact claims are cognizable under FHA); *Golden v. City of*

13  *Columbus*, 404 F.3d 950, 963 (6th Cir. 2005) (recognizing the continuing viability of ECOA

14  disparate impact claims); *Martinez*, 527 F. Supp. 2d at 834-35 (finding disparate impact

15  discrimination can constitute violation of FHA and ECOA); *Zamudio*, 2008 WL 517138, at *2

16  ("it is well established that a disparate-impact claim is available under both the ECOA and FHA"

17  and rejecting argument that *City of Jackson* changed this precedent); *Carter Ware*, 2008 WL

18  441600, at *3 (rejecting defendants' claims that plaintiff had failed to state a disparate impact

19  claim under the FHA and ECOA); *Newman*, 2008 WL 130924 at *3-5 (finding that the plaintiff

20  had sufficiently pleaded disparate impact causes of action under FHA and ECOA); *Beaulialice v.*

21  *Federal Home Loan Mortgage Corp.*, No. 8:04-CV02316-T-24-EAJ, 2007 WL 744646, at *4

22  (M.D. Fla. Mar. 6, 2007) (*City of Jackson* notwithstanding, plaintiff "may bring a disparate

23  impact claim under the FHA" and ECOA); *Ojo v. Farmers Group*, *Inc.*, No. 05-5818-JFW, 2006

24  WL 4552707, at *15 (C.D. Cal. Mar. 7, 2006) (FHA "prohibits racial discrimination in the form

25  of disparate impact").

26     Because the decades-long precedent allowing the disparate impact claims under the

27  ECOA and FHA remain controlling, Greenpoint's argument must be rejected.

28

1    **B.    Plaintiffs Allege a Cognizable Disparate Impact Claim Against Greenpoint**

2    Greenpoint's mystifying argument that Plaintiffs' lawsuit should be a disparate treatment

3    case against its brokers rather than a disparate impact case against Greenpoint (Defs' Mem. at 5)

4    is irrelevant to determining whether Plaintiffs' Complaint states a valid disparate impact claim.[3]

5    Greenpoint argues that it cannot be liable for the discriminatory effects of its own pricing policy

6    in broker-arranged transactions.  (Defs' Mem. at 2.)  The ECOA and FHA provide otherwise.

7    Greenpoint's liability flows directly from its participation in these transactions as the

8    "creditor" which set the Discretionary Pricing Policy at issue, not from any derivative liability

9    theory.  (*See* Compl. ¶ 47 (noting that as a result of Greenpoint's Discretionary Pricing Policy

10    "the potential for race bias becomes inherent in the transaction").)

11    The ECOA defines a "creditor" as "any person who regularly extends, renews, or

12    continues credit; any person who regularly arranges for the extension, renewal or continuation of

13    credit; or any assignee of an original creditor who participates in the decision to extend, renew,

14    or continue credit."  15 U.S.C. § 1691a(e).  The ECOA's implementing regulations ("Regulation

15    B") further refines the definition of "creditor" to include:

16    
> a person who, in the ordinary course of business, regularly
> participates in the decision of whether or not to extend credit.  The

17    
> term includes a creditor's assignee, transferee, or subrogee who so
> participates.  For purposes of §§ 202.4 and 202.5(a), the term also

18    
> includes a person who, in the ordinary course of business, regularly
> refers applicants or prospective applicants to creditors, or selects or

19    
> offers to select creditors to whom requests for credit may be made.

20    12 C.F.R. § 202.2(*l*).  Greenpoint plainly meets this definition.[4]  24 C.F.R. § 100.30(b) (defining

21    unlawful conduct under the FHA as using different policies, practices or procedures in evaluating

22    or determining creditworthiness of a person because of race, color, religion, sex, handicap,

23    familial status, or national origin).

24    

25    [3]  Greenpoint's citation to *Lockhard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998) and *Neff*

26    *v. Am. Dairy Queen Corp.*, 58 F3d 1063 (5th Cir. 1995) for the proposition that it should not be
     accountable for the actions of its brokers just like franchisors might not be liable for the acts of

27    its franchisees is inapposite given that here, Greenpoint is directly liable under the FHA and the
     ECOA as a creditor.

28    [4]  The standard under the FHA is the same.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                    3:08-CV-00369 TEH

1    As a creditor, Greenpoint is responsible for all of the procedures by which credit price is

2  set.  (Compl. ¶ 50.)  Under the relevant congressional standard, Greenpoint cannot escape

3  liability when it designed, disseminated, controlled, implemented and profited from the

4  Discretionary Pricing Policy.  *Alexander v. Local 496*, 177 F.3d 394, 410 (6th Cir. 1999) ("We

5  are baffled and amazed as to how [the defendant] can contend that it did not instigate, support,

6  ratify, or encourage a policy that it created.").

7               1.    Disparate Impact Analysis Under the FHA and ECOA

8    Greenpoint's "overview" of how courts analyze disparate impact claims is limited to a

9  discussion of the treatment of these claims in the employment context.  (Defs' Mem. at 6-7.)

10  Greenpoint then attempts to argue that disparate impact claims are inappropriate in the fair

11  lending context.  (Defs' Mem. at 6.)  However, Greenpoint fails to recognize that the Supreme

12  Court has held squarely that, under the discrimination laws, subjective or discretionary practices

13  akin to the Discretionary Pricing Policy at issue here, are impermissible if they have disparate

14  impact.  In *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977 (1988), the Court stated:

15           We are also persuaded that disparate impact analysis is in principle
         no less applicable to subjective employment criteria than to
16         objective or standardized tests.  In either case, a facially neutral
         practice, adopted without discriminatory intent, may have effects
17         that are indistinguishable from intentionally discriminatory
         practices. . . .  If an employer's undisciplined system of subjective
18         decision-making has precisely the same effects as a system
         pervaded by impermissible and intentional discrimination, it is
19         difficult to see why Title VII's proscription against discriminatory
         actions should not apply. . . .  We conclude, accordingly, that
20         subjective or discretionary employment practices may be analyzed
         under the disparate impact approach in appropriate cases.

21  *Id*. at 990-91.  As demonstrated by *Watson*, disparate impact analysis must be applied to a policy

22  that appears neutral on its face, but is applied subjectively by those who are ceded authority

23  under the policy.  Any other conclusion, the Court reasoned, would permit an entity responsible

24  for compliance with discrimination laws to "insulate" itself from disparate impact analysis by

25  "refrain[ing] from making standardized criteria absolutely determinative[.]"  *Id*. at 990.

26    In the automobile financing context, lenders typically cede discretion to automobile

27  dealers to set marked-up final credit prices based on subjective standards. Cases challenging

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                3:08-CV-00369 TEH

those policies on a disparate impact basis have been routinely sustained in the face of motions to dismiss. For example, in *Jones v. Ford Motor Credit Co*., 2002 WL 88431 (S.D.N.Y. 2002), the plaintiffs alleged that Ford's policy of authorizing automobile dealers to subjectively markup an otherwise objective, risk-based finance charge rate had a disparate impact on black consumers and violated the ECOA. The plaintiffs' complaint was sustained over a motion to dismiss, based on allegations that a specific policy—a creditor's authorization allowing third-party subjective markups to loan rates—resulted in disproportionately high interest rates for African-American borrowers.  *Id.* at *1; *see also Smith v. Chrysler Financial Co.*, 2003 WL 328719 (D.N.J. Jan. 15, 2003) (holding that "[s]ubjective applications of neutral underwriting criteria is standardized conduct because the loan originators have the opportunity to use their discretion with respect to each loan application" (citing *Buycks-Roberson v. Citibank Federal Sav. Bank*, 162 F.R.D. 322, 332 (N.D. Ill. 1995)); *Powell v. American General Finance*, *Inc*., 310 F. Supp. 2d 481, 488 (N.D.N.Y. 2004) (dismissing the plaintiffs' ECOA claims, but only based on their failure to allege that banks used subjective indicators when making loan decisions).

As in *Jones v. Ford Motor Credit Co*, *supra*, and *Smith v. Chrysler Financial Co.*, *supra*, the Plaintiffs here have alleged that Greenpoint has a policy of authorizing its brokers to impose subjective, discretionary charges and interest markups that are included in the finance charges of loans they originate.  (Compl. ¶ 44-46.)  The Plaintiffs termed this policy the "Discretionary Pricing Policy."  (*Id.* ¶ 47.)  There is no basis to distinguish this case from those involving automobile loan markups.

2.    Plaintiffs Have Clearly Identified and Defined Greenpoint's Discretionary Pricing Policy

Greenpoint also argues that the Plaintiffs fail to allege a specific Greenpoint policy responsible for the resulting loan cost disparities between minority and white borrowers.  (Defs' Mem. at 7-10.)  This is simply untrue.  *See*, Factual Allegations Section II(1), *supra* (reciting Plaintiffs' detailed allegations identifying and describing Greenpoint's Discretionary Pricing Policy).  While Greenpoint points out that "all claims labeled 'disparate impact' are not cut from the same cloth," (Defs' Mem. at 7), this point is irreconcilable with its introductory notation that

-13-

1  this action is one of a number of "cookie cutter cases," filed across the country.  As stated earlier,

2  these similar disparate impact cases have uniformly survived motions to dismiss based on similar

3  arguments Greenpoint presents here.

4          The cases upon which Greenpoint relies do not support its proposition that Plaintiffs in

5  this case have failed to isolate and identify a specific policy.  (Defs' Mem. at 9-11.)  In *Smith v.*

6  *City of Jackson*, 544 U.S. 228 (2005), the Court affirmed *summary judgment* for the City, finding

7  that the plaintiff had failed to identify a policy and concluding, based upon evidence, that the

8  disparate impact identified by the plaintiffs was attributable to the City's decision to give raises

9  based on *permissible* factors, such as seniority and position, rather than age.  *City of Jackson*,

10  544 U.S. at 241 ("it is also clear from the record that the City's plan was based on reasonable

11  factors other than age").  Here, the Plaintiffs have identified a specific pricing policy and have

12  alleged that the disparate impact is attributable to race.  (Compl. ¶¶ 2, 34, 44, 52.)  Moreover,

13  unlike the plaintiffs in *City of Jackson*, Plaintiffs here have had no opportunity to develop the

14  record.  *City of Jackson*, therefore, is inapposite.

15          Greenpoint also cites *Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002) for the

16  proposition that the Plaintiffs fail to allege a specific Greenpoint policy that caused the disparate

17  impact.   In *Garcia v. Countrywide Financial Corp.*, *supra* and attached as Exhibit 1, the court

18  considered a nearly identical claim challenging a discretionary pricing policy in the mortgage

19  industry.  With regard to the plaintiff's effort to identify a specific policy, the court found that:

20          [U]nlike in *Stout*, Plaintiff does not challenge the overall process
            by which Defendants determine borrower's rates and fees.  Instead,
21          Plaintiff challenges only the practice of allowing and incentivizing
            individual loan originators to assess additional, non-risk based
22          fees.  In the context of a motion to dismiss, this is sufficient to give
            Defendants 'fair notice of what the plaintiff's claim is and the
23          grounds upon which it rests.'

24  *Garcia*, at *15 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (other citations omitted)).

25  Greenpoint's contention that the Plaintiffs do not point to a specific Greenpoint practice or policy

26  should likewise fail.

27  / / /

28  / / /

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                    3:08-CV-00369 TEH

3.     <u>Plaintiffs Have Adequately Alleged that They Were Disparately Impacted by Greenpoint's Discretionary Pricing Policy</u>

Greenpoint argues that the Plaintiffs' disparate impact claims fail because they have not alleged that Greenpoint's Discretionary Pricing Policy disparately impacted them. (Defs' Mem. at 10-11.) Greenpoint's argument on this point fails completely.

Plaintiffs allege: that they are minorities (Compl. ¶¶ 8-9); that they obtained financing from Greenpoint (*id*. ¶¶ 57, 68); that statistical analysis of discretionary charges imposed on minority and white customers of other mortgage companies that use credit pricing systems structured like Greenpoint's has revealed that minorities, *after controlling for credit risk*, are substantially more likely than similarly situated whites to pay such charges (*id*. ¶ 48); that Greenpoint's Discretionary Pricing Policy results in charges that adversely affect the rate otherwise available to borrowers (*id*. ¶ 37); that Plaintiffs were subjected to the Discretionary Pricing Policy (*id*. ¶¶ 63, 73); that the Plaintiffs were charged a disproportionately greater amount in non-risk-related credit charges than similarly-situated whites (*id*. ¶¶ 64, 74); and that the disparate impact suffered by minorities is a direct result of Greenpoint's Discretionary Pricing Policy in that Greenpoint designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact. (*Id*. ¶ 50.)

Thus, fairly read and drawing all reasonable inferences in their favor, the Complaint alleges that Greepoint's Discretionary Pricing Policy adversely affected Plaintiffs by causing them to pay higher markup and total finance charges for their loans than similarly-situated whites. Further, since Greenpoint's Discretionary Pricing Policy is hidden from consumers, Plaintiffs should not be expected to plead more specifically until after a reasonable opportunity for discovery. *Zamudio*, 2008 WL 517138, at *2 ("The only way for [plaintiff] to ascertain a more detailed picture of Defendants' use of credit-related variables would be through discovery."); *Carter Ware*, 2008 WL 441600, at *3 ("Here, taking the facts alleged in the amended complaint as true, plaintiffs have a right to relief that is more than speculative because they have alleged sufficient facts to suggest the possibility that Homestart and Indymac discriminated against minority borrowers"); *Newman*, 2008 WL 130924, at *4 ("requiring the

-15-

1  plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the

2  opportunity to prove its claim") (quoting *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d

3  773, 780 (7th Cir. 2007)).

4      **C.  The Claims of Ana and Ismael Ramirez Are Not Time-Barred**

5      Greenpoint argues that the claims of Ana and Ismael Ramirez are time-barred under the

6  statute of limitations contained in the FHA and ECOA.  (Defs' Mem. at 11-15.)  At the core of

7  the Plaintiffs' complaint is the claim that Greenpoint maintained a Discretionary Pricing Policy

8  that was designed to cause persons with identical or similar credit scores to pay different

9  amounts for the credit they received.  (*See* Compl. ¶ 47.)  Given the nature of the Discretionary

10  Pricing Policy, as alleged in the Plaintiffs' Complaint, the statutes of limitations periods of the

11  FHA and ECOA do not bar the Ramirezes' claim under the common law discovery rule, nor

12  under the doctrines of continuing violation or fraudulent concealment.

13      1.  The Discovery Rule Tolls the Statute of Limitations

14      Under the discovery rule, the statute of limitations does not begin to run until the

15  aggrieved person discovers, or could reasonably have discovered through the exercise of due

16  diligence, the basis of his cause of action.  *See Gibson v. United States*, 781 F.2d 1334, 1344 (9th

17  Cir. 1986); *Pavlak v. Church*, 727 F.2d 1425, 1428 (9th Cir. 1984).  In this case, Greenpoint

18  argues that the Ramirezes failed to exercise due diligence because the discriminatory impact of

19  such pricing policies was known within the financing industry as a result of Department of

20  Justice and other federal regulatory actions.  (Defs' Mem. at 12-13.)

21      Whether the Ramirezes can be charged with constructive notice of the discriminatory

22  impact of the Discretionary Pricing Policy at issue is a quintessential question of fact that cannot

23  be decided at this stage of the litigation.  *Timmel v. Moss*, 803 F.2d 519, 521 (9th Cir. Cal. 1986)

24  ("Where the cause of action was belatedly discovered, the issue whether the plaintiff exercised

25  reasonable diligence is a question of fact.").  Rather, the issue raised by Greenpoint requires a

26  factfinder to determine whether the Ramirezes exercised reasonable diligence.  *Id*.  The context

27  of the transaction, the education and financial sophistication of the Ramirezes, as well as the

28  extent to which this information was disseminated are all factual questions inherent in the

1    measure of reasonable diligence.  As the Ninth Circuit has often stated in applying the discovery

2    rule, application of the discovery rule can only be decided as a matter of law when

3    uncontroverted evidence irrefutably demonstrates that plaintiff discovered or should have

4    discovered the facts giving rise to their claims.  *Orr v. Bank of Am.*, 285 F.3d 764, 780 (9th Cir.

5    2002); *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992); *Mosesian v.

6    Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984).

7         Here, the evidence does not irrefutably demonstrate that the Ramirezes should have

8    discovered the facts giving rise to their claims.  The HMDA data cited in the Complaint does not

9    foreclose the diligence inquiry.  Without knowledge of the underlying Discretionary Pricing

10   Policy, the HMDA data alone would not put the Ramirezes on notice of their claim.  The HMDA

11   data makes up but one portion of the allegations and, as a whole, there is much more to the

12   Complaint than HMDA data.  Even if the Ramirezes had access to all of this information, it is

13   only after study of this data by statistical and economic experts, in concert with the corroborating

14   knowledge of the operation of the Discretionary Pricing Policy that a reasonable plaintiff would

15   even begin to understand that they had been the subject of discrimination.  *See, e.g.*, *Rindley v.

16   Gallager*, 890 F. Supp. 1540, 1550 (S.D. Fla. 1995) (plaintiff's claim not time-barred because

17   "[p]laintiff did not know, or could not have known, that the actions of the defendants were

18   impermissibly motivated, [so that] he was not 'on notice that [his] civil rights had been

19   violated'").

20        Furthermore, it is both true and irrelevant that the exorbitant terms of the Ramirezes'

21   individual loan were disclosed on the HUD-One Settlement Sheet and Truth-In-Lending

22   Disclosure Statement.  Even upon realizing that they had been sold a bad loan, the Ramirezes'

23   did not yet have a cause of action accrue under the discovery rule.  As another district court

24   noted in applying the discovery rule to a claim of policy-based discrimination, "[t]here is a

25   difference between being aware that you got a bad deal and being aware that you were

26   discriminated against in a systemic fashion."  *Barkley, et al. v. Olympia Mortgage Co., et al.*,

27   2007 WL 2437810, at *17 (E.D.N.Y. Aug. 22, 2007) (quoting *Phillips v. Better Homes Depot,

28   Inc.*, 2003 U.S. Dist. Lexis 27299, at *76-79 (E.D.N.Y. Nov. 12, 2003)).  Disparate impact

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                     3:08-CV-00369 TEH

1    causes of action and other claims of systemic discrimination merit particular attention under the

2    discovery rule—"[w]ithout meeting other [of the defendant's] clients or explaining their

3    circumstances to an attorney who responsibly represented their interests, plaintiffs had no way of

4    knowing exactly how and why they had been victimized." *Id.*  The statute of limitations should

5    be adjudged to have begun running from the date that the plaintiff knows or should reasonably

6    know that he has been discriminated against.  *See Hill v. Metropolitan Atlanta Rapid Transit*

7    *Authority*, 841 F.2d 1533, 1545 (11th Cir. 1988).  In this case, that is the date that the Ramirezes

8    first met with counsel.[5]

9              2.    The Doctrine of Continuing Violation Fatally Undermines
                     Greenpoint's Statute of Limitations Argument
10

11          Statutes of limitations are intended to keep stale claims out of courts.  *Havens Realty*

12   *Corp. v. Coleman*, 455 U.S. 363, 380 (1982).  However, in *Havens*, the Supreme Court,

13   considering a set of claims under the Fair Housing Act, found reason to treat differently an

14   ongoing continuing practice of discrimination, in contrast with a discrete act.  "Where the

15   challenged violation is a continuing one, the staleness concern disappears." *Id.*  When a plaintiff

16   alleges not just one incident, but rather an unlawful practice of discrimination, the claim will not

17   be time-barred when the defendant's actions continue into the statute of limitations period – the

18   statute begins to run at the last asserted occurrence of that practice.  *See Silver State Fair*

19   *Housing Council, Inc. v. ERGS, Inc.*, 362 F. Supp. 2d 1218, 1221 (D. Nev. 2006).  Congress

20   since codified this continuing violation doctrine by amending the FHA to include both the

21   occurrence *and* the termination of an alleged discriminatory housing practice as events triggering

22   the two-year statute of limitations.  *See* Pub. L. No. 100-430, § 8(2), 102 Stat. 1619, 1633

23   (1988); *see also Davis v. General Motors Acceptance Corp.*, 406 F. Supp. 2d 698, 703 (N.D.

24   Miss. 2005) (continuing violations doctrine applicable to toll ECOA challenge).

25          The Complaint alleges a practice of discrimination—indeed that is the core of the

26   Ramirezes' Discretionary Pricing Policy claim.  The Complaint contains allegations that the

27   _____
     [5]  To the extent, if any, the Court concludes that the Complaint is without necessary technical
     factual allegations to make out their tolling claims, the Ramirezes seek leave to amend under
28   Fed. R. Civ. P. 15(a)(2).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                    3:08-CV-00369 TEH

1   Discretionary Pricing Policy was employed by Greenpoint as part of its mortgage lending over a

2   period of twenty years.  (Compl. ¶¶ 29-48.)  This practice included the loan to the Ramirezes, as

3   well as the loan to Plaintiff Salazar within the statute of limitations period.   Thus, the Ramirezes

4   have sufficiently pled an unlawful practice that extended into the statute of limitations period.

5   *Jensen v. Frank*, 912 F.2d 517, 523 (1st Cir. 1990) (a systemic violation usually "has its roots in

6   a discriminatory policy or practice; so long as the policy or practice itself continues into the

7   limitation period, a challenger may be deemed to have filed a timely complaint," even if he fails

8   to show "an identifiable discrete act of discrimination transpiring within the period.").

9        Indeed, given the "teaser rate" structure of the Ramirezes' loan (*see* Compl. ¶ 58), it is

10  apparent that Greenpoint intended the Ramirezes to continue to need its services into the future,

11  as the design of the loan almost certainly necessitated a refinance prior to the maturity date.  *Cf.*

12  *Comm. of Massachusetts v. Fremont Investment & Loan, et al.*, No. 07-4373-BLS1, 23 Mass. L.

13  Reporter, 2008 WL 517279, at *10 (Mass. Super. Ct. Feb. 26, 2008) (finding that loans with

14  similar characteristics were structurally unfair under state consumer law because, *inter alia*, such

15  loans were "doomed to foreclosure unless the borrower was able to refinance the loan at or

16  around the close of the introductory period").  "As in *Havens*, [Greenpoint] advocate[s] a

17  'wooden' application of the statute of limitations, intended to 'undermine[] the broad remedial

18  intent of Congress embodied in the [FHA].'"  *National Fair Housing Alliance v. A.G. Spanos*

19  *Const., Inc.* --- F.Supp.2d ----, 2008 WL 927711, at *6 (N.D. Cal. 2008) (quoting *Havens Realty*

20  *Corp.*, 455 U.S. at 380).  Moreover, the application of the continuing violation doctrine is

21  particularly appropriate here, because the Ramirezes continue to make payments under the aegis

22  of a systemic policy of discrimination.  *See*, *e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 395 (1986)

23  "[e]ach...paycheck that delivers less to a black than to a similarly situated white is a wrong

24  actionable under Title VII, regardless of the fact that this pattern was begun prior to the  effective

25  date").[6]  The Ramirezes' claim is not time-barred due to the operation of the doctrine of

26  continuing violation.

27  ──────────────────
[6]  As the Supreme Court recently noted in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, the
28  holding of *Bazemore* is that an allegation of a discriminatory practice,  as opposed to a single
    discrete act of discrimination, tolls the statute where the practice continues into the statute of

-19-

1

3.    The Ramirezes' Claim Is Not Time Barred Because of
       Greenpoint's Fraudulent Concealment

2

In order to invoke the doctrine of fraudulent concealment and toll the statute of

limitations, the Ramirezes must allege that Greenpoint "fraudulently concealed the existence of

the cause of action so that [the plaintiff] acting as a reasonable person, did not know of its

existence." *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 502 (9th Cir. 1988). The facts

underlying such a claim must be plead with particularity—alleging that the defendant concealed

operative facts and that the plaintiffs had neither actual nor constructive knowledge of the facts

giving rise to their claim. *Id.* Although normally the plaintiff is required to allege some

affirmative act of concealment, silence or passive concealment will suffice where the defendant

has a duty to disclose to the plaintiff. *Id.* at 505 (citing *Rutledge v. Boston Woven Hose &

Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) ("Silence or passive conduct of the defendant is

not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant

to make disclosure.")).

The Ramirezes have met this pleading standard.[7] The Complaint specifically alleges that

the loan documents at issue fail to inform the customer that its finance rates are subjective and

not based solely on risk-related characteristics. (Compl. ¶ 89.) Further, the Complaint alleges

that Greenpoint had an affirmative duty to disclose to the plaintiffs information regarding their

loans. (*Id.* ¶ 90.) Moreover, critical facts necessary to the plaintiff's disparate impact cause of

action—i.e., that similarly-situated white borrowers were offered credit on more favorable terms

were not and could not have been discovered by the Ramirezes during the statute of limitations

period. (*Id.* ¶ 87.) Finally, the Complaint, read in light of the appropriate standard on a motion

to dismiss, alleges that Greenpoint took the affirmative step of permitting and encouraging loan

brokers to conceal the non-discretionary aspect of the credit price. (*Id.* ¶¶ 32-38.)

---

limitations period—that a defendant who adopts and retains such a structure "can surely be
regarded as intending to discriminate on the basis of race as long as the structure is used."
*Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2173 (2007). The same logic should
apply where the discrimination is alleged by way of disparate impact. *See Watson*, 487 U.S at
990-91.

[7] Again, if the Court disagrees on this point, the Ramirezes seek leave to amend under Fed. R.
Civ. P. 15(a)(2).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                3:08-CV-00369 TEH

1      Once again, Greenpoint raises an issue in its Motion to Dismiss that contains inherent

2   questions of fact not appropriate for resolution at this stage.  *See Beard v. Dominion Homes*

3   *Financial Services, Inc*., No. 06-00137, 2007 WL 2137944, at *3-4 (S.D. Ohio July 23, 2007).

4   In *Beard*, the defendant moved to dismiss the plaintiffs' ECOA claim arguing that it was time-

5   barred and that the plaintiffs had failed to adequately plead fraudulent concealment.  *Id.*  Like

6   here, the defendant argued that the plaintiffs had failed to sufficiently plead "wrongful

7   concealment."  *Id.*  The court disagreed holding that wrongful concealment could be satisfied by

8   misleading statements rather than active conduct.  *Id.* at *4.  The court further held that after

9   taking "all possible inferences" in favor of the plaintiffs it could not hold:  "[A]s a matter of law,

10   that Plaintiffs, through due diligence, could have known that their loans were not FHA insured.

11   Indeed, other circuits have pointed out that due diligence is often an issue of fact inappropriate

12   for summary disposition." *Id.* at *3-4; *see also Kennedy v. Josephthal & Co*., 814 F.2d 798, 802

13   (1st Cir. 1987) ("The exercise of reasonable diligence is determined by examining 'the nature of

14   the misleading statements alleged, the opportunity to discover the misleading nature of the

15   statements, and the subsequent actions of the parties.'").  Here, as in *Beard*, Plaintiffs have

16   adequately pled fraudulent concealment.

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1    **V.    <u>CONCLUSION</u>**

2        For each of the foregoing reasons, Greenpoint's motion to dismiss should be denied in its

3    entirety.

4

5    DATED this 25th day of April, 2008            CHAVEZ & GERTLER LLP

6                                                RODDY KLEIN & RYAN

7                                                BONNETT FAIRBOURN FRIEDMAN &
                                                 BALINT, P.C.
8
                                                 COUGHLIN STOIA GELLER RUDMAN &
9                                                ROBBINS LLP

10                                               MILLER LAW LLC

11
                                                 HAGENS BERMAN SOBOL
12                                               SHAPIRO LLP

13                                               NATIONAL CONSUMER LAW CENTER

14                                                      /s/

15                                               _____
                                                 Mark A. Chavez
16
                                                 Attorneys for Plaintiffs
17

18

19   MILLER LAW LLC                              NATIONAL CONSUMER LAW CENTER
     Marvin A. Miller (To be admitted Pro Hac    Stuart T. Rossman (To be admitted Pro Hac
20   Vice)                                       Vice)
     Lori A. Fanning  (To be admitted Pro Hac    Charles Delbaum (To be admitted Pro Hac
21   Vice)                                       Vice)
     115 South LaSalle Street, Suite 2910        77 Summer Street, 10th Flr.
22   Chicago, IL  60603                          Boston, MA  02141
     Tel:    (312) 332-3400                      Tel:    (617) 542-8010
23                                               Fax:    (617) 542-8028

24   HAGENS BERMAN SOBOL
      SHAPIRO LLP
25   Thomas M. Sobol (To be admitted Pro Hac
     Vice)
26   One Main Street, 4th Floor
     Boston, MA  02142
27   Tel:    (617) 475-1950
     Fax:    (617) 482-3003

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS                    3:08-CV-00369 TEH

# EXHIBIT 1

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL GARCIA, | Case No. EDCV 07-1161-VAP (JCRx) |
| Plaintiff, | |
| v. | **[Motion filed on November 8, 2007]** |
| COUNTRY WIDE FINANCIAL CORPORATION and COUNTRYWIDE HOME LOANS, INC., | **AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

Defendants' Motions to Dismiss came before the Court for hearing on January 7, 2008. After reviewing and considering all papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced by counsel at the hearing, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.

## I. BACKGROUND

### A. Procedural History

Plaintiff Gabriel Garcia filed a putative class action Complaint ("Compl.") on September 12, 2007,

1  alleging that Defendants Countrywide Financial
2  Corporation and Countrywide Home Loans, Inc.
3  (collectively, "Defendants") violated and continue to
4  violate (1) the Equal Credit Opportunity Act ("ECOA");
5  (2) the Fair Housing Act ("FHA"); and (3) the Civil
6  Rights Act, 42 U.S.C. §§ 1981 and 1982.

7

8      On November 8, 2007, Defendants filed a Motion to
9  Dismiss ("Mot.") pursuant to Federal Rule of Civil
10 Procedure 12(b)(6).  Plaintiff filed an Opposition
11 ("Opp'n") on December 3, 2007.  On December 10, 2007,
12 Defendants filed a Reply.

13

14     **B.  Plaintiff's Allegations**

15     Nationwide, minority consumers "have less-than-equal
16 access to loans at the best prices and on the best terms
17 that their credit history, income, and other individual
18 financial considerations merit."  (Compl. ¶ 13 (citing
19 Joint Center for Housing Studies, <u>The Dual Mortgage</u>
20 <u>Market: The Persistence of Discrimination in Mortgage</u>
21 <u>Lending</u> (2005).)  Even after controlling for a borrower's
22 gender, income, property location, and loan amount,
23 federally mandated lender disclosures show that Hispanic
24 and black borrowers were 37.5 to 50 per cent more likely
25 to receive a higher-rate home loan than non-Hispanic
26 whites.  (<u>Id.</u>  ¶ 15-16.)
27 ///

28

2

1    Defendants represent themselves as "America's #1 home
2  lender" and "America's #1 Lender to Minorities."  (<u>Id.</u> ¶
3  19.)   They originate and fund mortgage loans through loan
4  officers, brokers and a network of correspondent lenders
5  (collectively "loan originators").  (<u>Id.</u>)   These loan
6  originators act as Defendants' agents in originating
7  loans.  (<u>Id.</u> ¶¶ 26-27.)

8

9    Defendants encourage and offer incentives to these
10  loan originators to increase interest rates, charge
11  additional fees, and include prepayment penalties and
12  other less favorable terms in loans to certain borrowers.
13  (<u>Id.</u> ¶ 3.)   As a direct result of these policies,
14  minorities receive residential loans with higher interest
15  rates and higher fees and costs than similarly situated
16  non-minority borrowers.  (<u>Id.</u>)

17

18    Specifically, Defendants employ discretionary loan
19  pricing procedures that cause minority borrowers to
20  purchase loans with prepayment penalties and other
21  unfavorable terms, and to pay subjective fees such as
22  yield spread premiums and other mortgage-related finance
23  charges, at higher rates than similarly situated non-
24  minority borrowers.  (<u>Id.</u> ¶ 21.)  Defendants' loan
25  originators receive more compensation when they steer
26  borrowers into loans with these higher interest rates,
27  penalties and fees.  (<u>Id.</u> ¶ 22.)

28

3

1     Moreover, these discretionary charges are unrelated
2 to any objective risk-based credit evaluation.  When a
3 loan applicant provides credit information to Defendants
4 through a loan originator, Defendants perform an initial
5 objective credit analysis, evaluating numerous risk-
6 related credit variables, including debt-to-income
7 ratios, loan-to-value ratios, credit bureau histories,
8 debt ratios, bankruptcies, automobile repossessions,
9 prior foreclosures, payment histories, and credit scores.
10 (<u>Id.</u> ¶ 29.)  From these objective factors, Defendants
11 derive a risk-based financing rate called the "par rate."
12 (<u>Id.</u> ¶ 30.)

13

14     Defendants, however, authorize and offer incentives
15 to their loan originators to charge discretionary, non-
16 risk-based fees in addition to the "par rate," including
17 "yield spread" or "broker premiums."  (<u>Id.</u> ¶ 31.)  This
18 practice causes persons with identical or similar credit
19 scores to pay differing amounts for obtaining credit, and
20 disparately impacts Defendants' minority borrowers.  (<u>Id.</u>
21 ¶ 34.)  Specifically, Defendants' use of yield spread
22 premiums and other discretionary fees disproportionately
23 and adversely affects minorities relative to similarly
24 situated non-minorities.  (<u>Id.</u> ¶ 35.)

25

26     Defendants have intentionally discriminated against
27 minority borrowers through these policies and procedures,
28

1    systematically giving them mortgage loans with less
2    favorable conditions than were given to similarly
3    situated non-minority borrowers.  (Id. ¶ 21, 36.)  This
4    pattern of discrimination is a direct result of
5    Defendants' mortgage lending policies and procedures,
6    cannot be justified by business necessity, and could be
7    avoided by alternative policies and procedures that have
8    less discriminatory impact and no less business efficacy.
9    (Id.  ¶¶ 21, 25, 26.)

10

11       These discriminatory practices directly damaged
12   Plaintiff.  (Id. ¶ 37.)  On or about February 27, 2006,
13   Plaintiff obtained $415,000 in financing from Defendants
14   to purchase a single-family house.  (Id.)  The loan
15   originator and Defendants knew that Plaintiff was a
16   minority borrower, and because of Defendants'
17   discriminatory practices, Plaintiff received a loan on
18   worse terms with higher costs than similarly situated
19   non-minority borrowers.  (Id.  ¶¶ 40-41.)  Specifically,
20   Plaintiff paid a $8,300 "broker origination fee," a
21   $1,250 "broker administration fee," a $550 "processing
22   fee," a $830 yield spread premium, a $150 "loan tie in
23   fee" and a $995 "underwriting fee." (Id. ¶ 39.)  All of
24   these fees were assessed pursuant to Defendants' credit
25   pricing policies.  (Id.)
26   ///
27   ///
28

                             5

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  As a general matter, the Federal Rules require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atlantic Corp. v. Twombly, 550 U.S. __, 127 S. Ct. 1955, 1964 (2007).  In addition, the Court must accept all material allegations in the complaint -- as well as any reasonable inferences to be drawn from them -- as true.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic, 127 S. Ct. at 1964-65 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id. at 1965.

6

1    Although the scope of review is limited to the
2   contents of the complaint, the Court may also consider
3   exhibits submitted with the complaint, <u>Hal Roach Studios,</u>
4   <u>Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19
5   (9th Cir. 1990), and "take judicial notice of matters of
6   public record outside the pleadings," <u>Mir v. Little Co.</u>
7   <u>of Mary Hosp.</u>, 844 F.2d 646, 649 (9th Cir. 1988).

8

9                       **III. DISCUSSION**
10    Defendants argue that (1) the FHA and ECOA do not
11   authorize disparate impact claims; (2) Plaintiff fails to
12   state a disparate impact claim; (3) Plaintiff fails to
13   state a claim for intentional discrimination; (4)
14   Plaintiff does not have standing to assert claims on
15   behalf of minority populations of which he is not a
16   member; (5) Plaintiff fails to allege liability on the
17   part of Defendant Countrywide Financial Corporation,
18   Inc.; and (6) Plaintiff's allegations regarding tolling
19   of the statute of limitations should be stricken.  The
20   Court considers each of these arguments in turn.

21

22   **A.   Disparate Impact Under the FHA and ECOA**
23    Plaintiff alleges that Defendants violate the FHA and
24   ECOA, in part, because Defendants' policies have a
25   negative disparate impact on minority borrowers.  The
26   Fair Housing Act, in relevant part, states that "it shall
27   be unlawful":

28

                              7

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a). In the Ninth Circuit, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment or disparate impact. Gamble v. City of Escondido, 104 F.3d 300, 304-05 (9th Cir. 1996).

The ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a). A plaintiff can establish an ECOA claim under a theory of disparate treatment or disparate impact. Miller v. American Exp. Co., 688 F.2d 1235, 1240 (9th Cir. 1982).

Defendant argues that the Ninth Circuit cases recognizing disparate impact claims under FHA and ECOA "were wrongly decided" and "cannot be good law in light of the subsequent Supreme Court decision in Smith v. City of Jackson." (Mot. at 14 (citing Smith v. City of Jackson, 544 U.S. 228 (2005)).) In Smith, the Supreme Court held a plaintiff could bring a disparate impact claim under the Age Discrimination in Employment Act

8

1  ("ADEA").  <u>Smith</u>, 544 U.S. at 235-39.  The Court compared

2  the text of the ADEA to the text of Title VII, and

3  reasoned that both statutes authorized disparate impact

4  claims when they prohibited "actions that deprive any

5  individual of employment opportunities or *otherwise*

6  *adversely affect* his status as an employee, because of

7  such individual's race or age."  <u>Id.</u> at 235 (emphasis in

8  original; citations omitted).

9

10      Defendants argue that the FHA and ECOA do not support

11  disparate impact claims because, unlike the ADEA and

12  Title VII, they do not contain text expressly prohibiting

13  actions that "otherwise adversely affect" individuals

14  based on their protected status.  (Mot. at 15-16.)

15  <u>Smith</u>, however, did not hold that a statute *must* contain

16  this "effects" language in order to authorize disparate

17  impact claims.  Indeed, the Court did not rely only on

18  this textual analysis of the statutes, but also held that

19  the purpose and legislative history of the ADEA, as well

20  as unanimous circuit court treatment of the Act,

21  supported disparate treatment claims.  <u>Smith</u>, 544 U.S. at

22  236-39.

23

24      Like the Supreme Court in <u>Smith</u>, the Ninth Circuit

25  relied on the purposes of the ECOA in determining that

26  Act supports disparate impact claims.  <u>See</u> <u>Miller</u>, 688

27  F.2d at 1239-40.  It held that "not requiring proof of

28

discriminatory intent is especially appropriate in
analysis of ECOA violations because discrimination in
credit transactions is more likely to be of the
unintentional, rather than the intentional, variety."
Id. at 1239 (citations omitted).

 Moreover, all eleven circuits that have considered
the matter have concluded that the FHA supports disparate
impact claims. See 2922 Sherman Ave. Tenants' Ass'n v.
District of Columbia, 444 F3d 673, 679 (D.C. Cir. 2006)
(analyzing circuit holdings); Note, The Fair Housing Act
and Disparate Impact in Homeowners' Insurance, 104 Mich.
L. Rev. 1993, 2006-07 & n.117 (listing cases).
Furthermore, in Village of Arlington Heights v.
Metropolitan Housing Development Corp., the Supreme Court
affirmed summary judgment against the plaintiffs on all
claims requiring discriminatory intent, finding that the
plaintiffs had failed to prove such intent, but remanded
for consideration of an FHA claim, thus implying that
discriminatory intent was not necessary for an FHA claim.
Village of Arlington Heights v. Metropolitan Housing
Development Corp., 429 U.S. 252, 270-71 (1977).

 Indeed, the Ninth Circuit has recognized the
viability of disparate impact claims under the FHA after
Smith. See Affordable Housing Dev. Corp. v. City of
Fresno, 433 F.3d 1182, 1195-96 (9th Cir. 2006) (affirming

10

1 a judgment for the defendants but recognizing the

2 viability of such a claim).  The Sixth Circuit similarly

3 has recognized the continuing viability of ECOA disparate

4 impact claims.  See Golden v. City of Columbus, 404 F.3d

5 950, 964-65 (6th Cir. 2005) (same).  Accordingly, this

6 Court declines to hold that Smith overturned Ninth

7 Circuit precedent recognizing disparate impact claims

8 under the FHA and ECOA.

9

10 **B.  Disparate Impact**

11     In analyzing discrimination claims under the FHA,

12 courts have borrowed the analysis that they use in

13 assessing claims under Title VII.  Gamble, 104 F.3d at

14 304.  To establish discrimination through disparate

15 impact, a plaintiff must (1) identify a specific practice

16 of the Defendant; (2) identify a significant

17 discriminatory impact on the protected class of which the

18 plaintiff is a member; and (3) demonstrate that the

19 identified practice causes the identified discriminatory

20 impact.  Paige v. California, 291 F.3d 1141, 1144-45 (9th

21 Cir. 2002); Gamble, 104 F.3d at 304.  The causation

22 requirement may be inferred through statistical evidence

23 showing a sufficiently substantial disparity.  Id.

24

25     **1.  Specific Practice**

26     Defendants argue that Plaintiff fails to challenge a

27 sufficiently specific practice on the part of Defendants.

28

1  (Mot. at 6-10.)  To establish discrimination based on
2  disparate impact, a plaintiff must "isolate[e] and
3  identify[y] the *specific* . . . practices that are
4  allegedly responsible for any observed statistical
5  disparities."  <u>Smith</u>, 544 U.S. at 241 (emphasis in
6  original; citations omitted).  In <u>Smith</u>, plaintiffs
7  challenged a pay plan that granted proportionately
8  greater pay raises to employees with less than five years
9  of tenure, arguing that the plan had a discriminatory
10  impact on older employees.  <u>Id.</u> at 231.  The Supreme
11  Court held that the plaintiffs failed to identify the
12  specific practice being challenged, and that imposing
13  liability for the pay plan in general could "result in
14  employers being potentially liable for the myriad of
15  innocent causes that may lead to statistical imbalances."
16  <u>Id.</u> at 241.  Additionally, the Court stressed that the
17  plaintiffs could not successfully challenge the plan as a
18  whole because it "was based on reasonable factors other
19  than age."  <u>Id.</u>
20
21     The Ninth Circuit similarly has rejected challenges
22  to a defendant's overall processes.  In <u>Stout v. Potter</u>,
23  postal inspectors challenged the process by which a
24  review panel screened applicants for promotion.  <u>Stout v.</u>
25  <u>Potter</u>, 276 F.3d 1118, 1121 (9th Cir. 2002).  The Ninth
26  Circuit held that by merely attacking "the decision-
27  ///
28

1  making process" or "the process by which the [screening]

2  Panel evaluated applications," the plaintiffs failed

3  toidentify a "specific employment practice or selection

4  criterion." <u>Id.</u> at 1124. The court explained,

5          Plaintiffs generally cannot attack an
           overall decisionmaking process in the
6          disparate impact context, but must
           instead identify the particular element
7          or practice within the process that
           causes an adverse impact. A
8          decisionmaking process may be analyzed as
           a single employment practice if the
9          complaining party can demonstrate to the
           court that the elements of a respondent's
10         decisionmaking process are not capable of
           separation for analysis.
11
12  <u>Id.</u> In <u>Stout</u>, the court did not treat the decision-

13  making process as a single practice because the overall

14  process consisted of discrete elements and the plaintiffs

15  failed to argue that the various elements could not be

16  separated for analysis. <u>Id.</u> at 1124-25.

17

18      Similarly, the Ninth Circuit has frowned on a

19  challenge to a complex market-based process. In <u>AFSCME</u>

20  <u>v. State of Wash.</u>, the plaintiffs attacked the state's

21  practice of setting salaries based on biennial studies

22  assessing prevailing market rates for each position.

23  <u>AFSCME v. State of Wash.</u>, 770 F.2d 1401, 1403 (9th Cir.

24  1985.) The Ninth Circuit held that "the decision to base

25  compensation on the competitive market . . . involves the

26  assessment of a number of complex factors not easily

27  ascertainable, an assessment too multifaceted to be

28  appropriate for disparate impact analysis." <u>Id.</u> at 1406.

1    In contrast, challenges to subjective decision-making
2    practices are more likely to survive initial pleading
3    attacks.   In <u>Watson v. Fort Worth Bank and Trust</u>, the
4    plaintiff challenged her employer's practice of promoting
5    employees based on the "subjective judgment of
6    supervisors who were acquainted with the candidates and
7    with the nature of the jobs to be filled."  <u>Watson v.</u>
8    <u>Fort Worth Bank and Trust</u>, 487 U.S. 977, 982 (1988).  The
9    Court held that "subjective or discretionary employment
10   practices may be analyzed under the disparate impact
11   approach," but did not decide whether the plaintiff had
12   made out a *prima facie* claim for disparate impact
13   discrimination.   <u>Id.</u> at 991, 1000.

14

15   Here, Plaintiff challenges Defendants' practice of
16   authorizing and offering incentives to their loan
17   originators to charge discretionary, non-risk-based fees
18   in addition to the "par rate," including "yield spread"
19   or "broker premiums."  (Compl. ¶ 31.)  Like the practice
20   challenged in <u>Watson</u>, Defendants' practice allows
21   subjective decision-making that is alleged to result in a
22   discriminatory impact.  Unlike the practice challenged in
23   <u>Smith</u>, the challenged decision-making, is *not*, on its
24   face, based on objective factors other than prohibited
25   discrimination.  <u>See Smith</u>, 544 U.S. at 241 (stressing
26   that the challenged plan is based on reasonable factors
27   other than age).

28

1    Defendants argue that, like the practice challenged

2 in <u>AFSCME</u>, the practice attacked here is merely a "policy

3 of allowing pricing to be responsive to supply and demand

4 and other market forces." (Mot. at 9 (quotations

5 omitted).) Plaintiff, however, alleges that Defendants'

6 assessment of fees in addition to the "par rate" is *not*

7 based on market-based factors such as risk or

8 creditworthiness, and indeed is unrelated to legitimate

9 business necessity. (Compl. ¶ 25, 28-35.) From this, it

10 is reasonable to infer that the challenged practices do

11 not merely allow pricing to be responsive to market

12 forces. In the context of a motion to dismiss, the Court

13 takes as true these allegations and reasonable inferences

14 therefrom. <u>See Doe</u>, 419 F.3d at 1062.

15

16    Finally, unlike in <u>Stout</u>, Plaintiff does not

17 challenge the overall process by which Defendants

18 determine borrowers' rates and fees. Instead, Plaintiff

19 challenges only the practice of allowing and

20 incentivizing individual loan originators to assess

21 additional, non-risk-based fees. (Compl. ¶ 31.) In the

22 context of a  motion to dismiss, this is sufficient to

23 give Defendants "fair notice of what the plaintiff's

24 claim is and the grounds upon which it rests." <u>See</u>

25 <u>Conley</u>, 355 U.S. at 47; <u>Bell Atlantic</u>, 127 S. Ct. at

26 1964.

27 ///

28

15

## 2.   Significant Discriminatory Impact

To establish disparate impact discrimination, a plaintiff must demonstrate that there is a significant disparity in outcomes between minorities and similarly situated non-minorities.  See, e.g. Wards Cove, 490 U.S. at 651-53.  Here, Defendants argue that the nationwide statistics cited by Plaintiff "fail[] to allege a disparate impact because the cited data is not specific to Countrywide."  (Mot. at 10.)  As Plaintiff points out, however, he is not required at the pleading stage to produce statistical evidence proving a disparate impact on Defendants' customers -- all that is required is fair notice of the claims and the grounds upon which they rest, sufficient to raise a right to relief above the speculative level.  Bell Atlantic, 127 S. Ct. at 1964-65 (citations omitted); see also Swierkeiwicz v. Sorema, 534 U.S. 506, 514-15 (2002) (no heightened pleading standard to state a discrimination claim).  Here, Plaintiff does allege that Defendants' minority customers, specifically, pay disproportionately higher fees for mortgages than Defendants' nonminority customers.  (See Compl. ¶¶ 21, 22, 24, 35.)  Moreover, he provides statistical evidence of a nationwide disparate impact which, combined with an allegation that Defendants are "America's #1 home lender," is enough to raise above the speculative level Plaintiff's allegation that Defendants' minority buyers ///

16

1   pay disproportionately high fees.  (See Compl. ¶¶ 13-16,
2   19.)

3

4       Defendants also argue that Plaintiff fails to allege
5   that "the relevant groups of whites and Hispanics are
6   similarly-situated."  (Mot. at 10-11.)  The Complaint,
7   however, does allege that Defendants charge minorities
8   higher fees "even after controlling for borrowers'
9   gender, income, property location, and loan amount."
10  (Compl. ¶ 15.)  Moreover, Plaintiff alleges that
11  Defendants charge minorities higher fees than others with
12  the same "par-rate," a number which takes into account
13  numerous risk-related credit variables, including debt-
14  to-income ratios, loan-to-value ratios, credit bureau
15  histories, debt ratios, bankruptcies, automobile
16  repossessions, prior foreclosures, payment histories, and
17  credit scores.  (Id. ¶ 29.)  Finally, Plaintiff alleges
18  Defendants' use of yield spread premiums and other
19  discretionary fees disproportionately and adversely
20  affects minorities "relative to similarly situated non-
21  minorities."  (Id. ¶ 35.)  Accordingly, Plaintiff has
22  alleged that there is a significant disparate impact on
23  minorities compared to similarly situated non-minorities.

24

25      **3.  Causation**
26      To allege causation, Plaintiff must allege facts
27  sufficient to raise above a speculative level the
28

                            17

1  inference that, but for Defendants' challenged policy,
2  minorities would not receive higher-cost loans than
3  similarly situated non-minority borrowers.  See Bell
4  Atlantic, 127 S. Ct. at 1964-65.  Here, Plaintiff alleges
5  that Defendants' policy of allowing and offering
6  incentives to its loan originators to add fees in
7  addition to the "par rate" directly causes minorities to
8  receive home loans with higher interest rates and higher
9  fees and costs.  (Compl. ¶¶ 3, 21, 24, 35, 62, 80.)
10 Defendants argue that these allegations are conclusory
11 and that Plaintiff fails to "allege a set of facts from
12 which causation plausibly can be inferred."  (Mot. at
13 13.)

14

15      Defendants claim that the higher costs imposed on
16 minority borrowers could be explained by such borrowers'
17 lower average credit scores.  (Id.)  This explanation
18 ignores Plaintiff's allegation that Defendants impose the
19 challenged discretionary fees in addition to the "par
20 rate," which is calculated based on a borrower's credit
21 score.  (Compl. ¶¶ 15, 29.)  Indeed, Plaintiff alleges
22 that the higher costs imposed on minority borrowers
23 cannot be explained by any factor other than Defendants'
24 challenged policies.  (Compl. ¶ 15.)  These allegations
25 are sufficient to raise above a speculative level the
26 inference that, but for Defendants' policy of offering
27 incentives for discretionary fees, minorities would not
28

18

1  receive higher-cost loans than similarly situated non-
2  minority borrowers.  Accordingly, Plaintiff has stated a
3  claim for disparate impact discrimination.

4

5  **C.  Disparate Treatment**

6      To show disparate treatment based on race, a
7  plaintiff must establish that the defendant was *motivated*
8  to discriminate against the plaintiff on the basis of
9  race.  See AFSCME, 770 F.2d at 1406-07.  Where a
10 plaintiff challenges a defendant's policy, the plaintiff
11 must establish that the defendant implemented the policy
12 "because of, not merely in spite of," its adverse effects
13 on the protected group.  Personnel Adm'r of Massachusetts
14 v. Feeney, 442 U.S. 256, 279 (1979).

15

16     Here, Plaintiff alleges that Defendants have
17 intentionally discriminated against minority borrowers
18 through their policy of offering incentives for
19 discretionary loan fees, and that Defendants
20 intentionally designed this policy to discriminate
21 against minority borrowers.  (Compl. ¶¶ 21, 36.)
22 Plaintiff maintains that this policy perpetuates past
23 racial discrimination in mortgage lending.  (Id. at 12-
24 18.)

25

26     To state a claim for disparate treatment, Plaintiff
27 must provide more than mere conclusory allegations of
28

Defendants' intent to discriminate.  See Bell Atlantic,
127 S. Ct. at 1964-65.  Rather, the allegations in the
complaint "must be enough to raise a right to relief
above the speculative level."  Id. at 1965.  Here,
Plaintiff provides no factual allegations regarding
intent to discriminate beyond his bare assertion that
Defendants "intentionally discriminated" and that
Defendants' policy "by design discriminates against
minority borrowers."  (Compl. ¶¶ 21, 36.)  These
assertions are not enough to raise Plaintiff's right to
relief for disparate treatment above the speculative
level.  See Bell Atlantic, 127 S. Ct. at 1965.
Accordingly, Plaintiff has failed to state a claim for
disparate treatment.

**D.   Standing**

    To satisfy Article III's standing limitations, a
plaintiff must demonstrate that:  (1) he or she has
suffered an "'injury in fact' -- an invasion of a legally
protected interest which is (a) concrete and
particularized, and (b) actual or imminent, not
conjectural or hypothetical"; (2) there is a causal
connection between the injury and the conduct complained
of -- the injury is "fairly traceable" to the challenged
action of Defendants, and not the result of the
independent action of some third party not before the
court; and (3) it is "likely," as opposed to merely

1  "speculative," that the injury will be redressed by a

2  favorable judicial decision.  _Lujan v. Defenders of_

3  _Wildlife_, 504 U.S. 555, 560-561 (1992) (citations

4  omitted).  "In the class action context, Article III

5  standing simply requires that the class representatives

6  satisfy standing individually."  _In re Verisign, Inc._,

7  2005 WL 88969, *4 (N.D. Cal. 2005).

8

9       Defendants argue that Plaintiff cannot establish

10  standing to sue on behalf of potential class members of

11  minority groups other than Hispanics.  (Mot. at 19-20.)

12  To establish Article III standing, however, Plaintiff

13  must only show that he has standing to sue on his own

14  behalf.  _In re Verisign_, 2005 WL at *4.  Whether he may

15  represent the claims of the class is a separate inquiry,

16  governed by Federal Rule of Civil Procedure 23.  _Id._

17

18       Defendants do not argue that Plaintiff does not have

19  standing to sue on his own behalf.  Indeed, Plaintiff has

20  alleged he has suffered an actual injury that is fairly

21  traceable to Defendants' acts, and the type of injury he

22  alleges (discriminatory fees) is redressible by a federal

23  court.  (_See_ Compl. ¶¶ 39-41 (alleging that as a result

24  of Defendants' discriminatory credit pricing policies,

25  Plaintiff received a loan on worse terms with higher

26  costs than similarly situated non-minority borrowers).)

27  ///

28

                                21

1   Accordingly, Plaintiff has established Article III

2   standing.[1]

3

4   **E.   Liability of Defendant Countrywide Financial**

5         **Corporation, Inc.**

6         Plaintiff's Complaint does not distinguish between

7   the two named Defendants.  (Compl. ¶ 1.)  Nonetheless,

8   Defendants argue that Defendant Countrywide Financial

9   Corporation ("CFC") cannot be liable because Plaintiff

10  "states no factual allegations at all as to CFC."  (Mot.

11  at 21.)  The Complaint, however, alleges numerous acts by

12  CFC.  Every allegation of an act by Defendants is an

13  allegation of an act by both CFC and Countrywide Home

14  Loans, Inc.  (See Compl. passim.)  For instance, the

15  Complaint alleges Plaintiff obtained a residential loan

16  from "CONTRYWIDE," which he defines as Countrywide

17  Financial Corporation *and* Countywide Home Loans, Inc.

18  (See Compl. ¶¶ 1, 37-38.)  The Complaint also alleges

19

20  _____

21      [1]At the hearing on this matter, Defendants' counsel
    argued that Plaintiff lacks Article III standing to
22  represent minority groups of which he is not a part under
    the Ninth Circuit holding in Black Coalition v. Portland
23  School Dist. No. 1.  Black Coalition held that a
    plaintiff has no standing to challenge a policy or
    procedure which has not adversely affected that
24  individual plaintiff's interests.  Black Coalition v.
    Portland School Dist. No. 1., 484 F.2d 1040, 1042-43
25  (1973).  In contrast, Plaintiff here challenges a policy
    that he alleges directly and adversely affected him.
26  Moreover, while Black Coalition considered an appeal of a
    district court judgment in a class action, here a class
27  has not yet been certified, so the issue of whether
    Plaintiff may represent all members of the class is not
28  yet properly before the Court.

1   that Defendants collectively designed, implemented, and

2   oversee the allegedly discriminatory policy of allowing

3   loan officers to add discretionary fees to the

4   objectively determined "par rate." (Compl. ¶¶ 3, 21-25,

5   29-36.)

6

7      Defendant argues that these allegations are untrue

8   and cannot be proven as to CFC, but for the purposes of a

9   Motion to Dismiss, the Court takes Plaintiff's

10  allegations as true. <u>Doe</u>, 419 F.3d at 1062.

11  Accordingly, the Court declines to dismiss Defendant CFC.

12

13  **F.**   **Motion to Strike Allegations re Tolling of the**

14      **Statute of Limitations**

15      Under Federal Rule of Civil Procedure 12(f), a party

16  may ask the court to strike any "insufficient defense or

17  any redundant, immaterial, impertinent, or scandalous

18  matter." Fed. R. Civ. Proc. 12(f). "'Immaterial' matter

19  is that which has no essential or important relationship

20  to the claim for relief or the defenses being pleaded. .

21  . . 'Impertinent' matter consists of statements that do

22  not pertain, and are not necessary, to the issues in

23  question." <u>Fantasy, Inc. v. Fogerty</u>, 984 F.2d 1524, 1527

24  (9th Cir. 1993), <u>rev'd on other grounds by</u> <u>Fogerty v.</u>

25  <u>Fantasy, Inc.</u>, 510 U.S. 517 (1994).

26  ///

27  ///

28

1     "Motions to strike are generally regarded with
2  disfavor because of the limited importance of pleading in
3  federal practice, and because they are often used as a
4  delaying tactic." Cal. Dept. of Toxic Substances Control
5  v. Alco Pacific, Inc., 217 F. Supp. 2d 1028, 1033 (C.D.
6  Cal. 2002). Thus, "courts often require 'a showing of
7  prejudice by the moving party' before granting the
8  requested relief," and "[u]ltimately, whether to grant a
9  motion to strike lies within the sound discretion of the
10 district court." Id. (citing Fantasy, 984 F.2d at 1528).
11 A court should deny "[a] motion to strike under Rule
12 12(f) . . . unless it can be shown that no evidence in
13 support of the allegation would be admissible, or those
14 issues could have no possible bearing on the issues in
15 the litigation." Gay-Straight Alliance Network v.
16 Visalia Unified Sch. Dist., 262 F. Supp. 2d 1088, 1099
17 (E.D. Cal. 2001).

18

19    Defendant moves to strike the allegations in
20 paragraphs 51-58 of the Complaint. (Mot. 21-22.) These
21 paragraphs allege that class members' claims did not
22 accrue until shortly before the filing of the action,
23 that Defendants fraudulently concealed their
24 discriminatory practices, and that Defendants'
25 discriminatory conduct is continuing and recurrent.
26 (Compl. ¶¶ 51-55.) Accordingly, Plaintiff alleges that
27 "[t]he statute of limitations applicable to any claims
28

24

1  that Plaintiff or other class members have brought or

2  could bring as a result of the unlawful and fraudulent

3  concealment and course of conduct described herein, have

4  been tolled."  (Id. ¶ 58.)

5

6      Defendants argue that the allegations in paragraphs

7  51-58 of the Complaint are irrelevant because the named

8  Plaintiff filed his claim within all applicable statutes

9  of limitations.  (Mot. 21-22.)  This argument is

10 premature.  Until the Court has ruled on the issue of

11 class certification, it cannot be shown that the

12 allegations regarding other class members "could have no

13 possible bearing on the issues in the litigation."  See

14 Gay-Straight Alliance Network, 262 F. Supp. 2d at 1099.

15

16      Defendants further argue that the Court should strike

17 Plaintiff's allegations of fraudulent concealment because

18 Plaintiff failed to plead with particularity sufficient

19 facts showing fraudulent conduct.  (Mot. at 22-23.)

20 Indeed, one pleading fraudulent concealment "must plead

21 with particularity the facts which give rise to the

22 claim.  Conerly v. Westinghouse Elec. Corp., 623 F.2d

23 117, 120 (9th Cir. 1980); see also Fed. R. Civ. Proc.

24 9(b).  Here, Plaintiff merely alleges that Defendants

25 "took steps to conceal [their] fraudulent and unfair

26 conduct," but fails to allege what steps were taken, how

27 those steps were intended to mislead Plaintiff and class

28

1  members, or why those steps would lead a reasonable

2  person to be misled into believing that he did not have a

3  claim for relief.  See Conerly, 623 F.2d at 120.  In his

4  Opposition, Plaintiff does not contest that the Complaint

5  fails to plead fraudulent concealment properly.

6

7       Plaintiff has failed to plead fraudulent concealment

8  with sufficient particularity, and Plaintiff's

9  allegations regarding fraudulent concealment are

10  stricken.

11

12       Finally, Defendants argue that Plaintiff's

13  allegations of a continuing violation are insufficient as

14  a matter of law to justify tolling the statute of

15  limitations under the "continuing violation" doctrine.

16  (Mot. at 24-25.)  Defendants cite Ledbetter v. Goodyear

17  Tire & Rubber Co. Inc., which held that the statute of

18  limitations was not tolled when the alleged

19  discriminatory act was a pay decision that occurred

20  before the limitations period, even though the plaintiff

21  continued to receive lower pay during the limitations

22  period.  Ledbetter v. Goodyear Tire & Rubber Co. Inc.,

23  127 S. Ct. 2162, 2166-69 (2007).  The Court held that a

24  limitations period does not recommence "upon the

25  occurrence of subsequent nondiscriminatory acts that

26  entail adverse effects resulting from the past

27  discrimination."  Id. at 2169.

28

26

1    Unlike the plaintiff in <u>Ledbetter</u>, however, Plaintiff
2  here alleges a discriminatory act -— Defendants' sale to
3  him of an allegedly high-cost loan  —- which occurred
4  during the limitations period. (Compl. ¶ 37.)  Indeed,
5  in an FHA case similar to this one, the Supreme Court
6  tolled the statute of limitations under a "continuing
7  violation" theory.  <u>See</u> <u>Havens Realty Corp. v. Coleman</u>,
8  455 U.S. 363, 380 (1982).  In <u>Havens Realty</u>, the
9  plaintiffs alleged five specific incidents of alleged FHA
10  violations.  <u>Id.</u>  Only one of the incidents, involving
11  only one of the plaintiffs, occurred within the
12  limitations period.  <u>Id.</u>  Nevertheless, the Court tolled
13  the statute as to the other incidents involving the other
14  plaintiff.  <u>Id.</u>  The Court held, "where a plaintiff,
15  pursuant to the Fair Housing Act, challenges not just one
16  incident of conduct violative of the Act, but an unlawful
17  practice that continues into the limitations period, the
18  complaint is timely when it is filed within 180 days of
19  the last asserted occurrence of that practice."  <u>Id.</u> at
20  380-81.

21

22    Here, Plaintiff alleges an occurrence of Defendants'
23  allegedly discriminatory practice within the statute of
24  limitations.  (Compl. ¶ 37.)  Thus, his allegations
25  regarding a "continuing violation" as to other potential
26  class members are not irrelevant, redundant, or
27  scandalous, and are accordingly not stricken.

28

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss as to Plaintiff's claims of disparate treatment discrimination under the FHA, ECOA, and 42 U.S.C. §§ 1981 and 1982 with leave to amend, DENIES the Motion to Dismiss as to Plaintiff's claims of disparate impact discrimination, and STRIKES the allegations of fraudulent concealment in paragraphs 53, 57, and 58 of the Complaint.

Defendants shall answer or otherwise respond to the Complaint by January 23, 2008.


Dated: ___January 17, 2008___     _____
                                   VIRGINIA A. PHILLIPS
                                   United States District Judge

1  CHAVEZ & GERTLER, L.L.P.
   Mark A. Chavez (CA SBN 90858)
2  Nance F. Becker (CA SBN 99292)
   Dan Gildor (CA SBN 223027)
3  42 Miller Avenue
   Mill Valley, California 94941
4  Tel:      (415) 381-5599
   Fax:      (415) 381-5572
5  E-mail:   mark@chavezgertler.com
             nance@chavezgertler.com
6            dgildor@chavezgertler.com

7  RODDY KLEIN & RYAN
   Gary Klein (To be admitted Pro Hac Vice)
8  Shennan Kavanagh (To be admitted Pro Hac Vice)
   727 Atlantic Avenue
9  Boston, MA  02111-2810
   Tel:      (617) 357-5500, ext. 15
10 Fax:      (617) 357-5030

11 [*Additional counsel listed on signature page*]

12 Attorneys for Plaintiffs
   and the Proposed Class
13

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16                     SAN FRANCISCO DIVISION

17 ANA RAMIREZ and ISMAEL RAMIREZ, on )  No.  C 08-00369 TEH_
   behalf of themselves and all others similarly )
18 situated,                          )  **CLASS ACTION**
                                       )
19                                     )  **PROOF OF SERVICE**
                Plaintiffs,            )
20                                     )
                                       )
21        vs.                          )
                                       )
22                                     )
   GREENPOINT MORTGAGE FUNDING,        )
23 INC.,                               )
                                       )
24              Defendant.             )
                                       )
25                                     )
                                       )
26 _____ )

27

28

PROOF OF SERVICE                                    Case No. C08-00369 TEH

**PROOF OF SERVICE**

I am employed in the County of Marin, State of California.  I am over the age of 18 years and not a party to the within action; my business address is Chavez & Gertler LLP, 42 Miller Avenue, Mill Valley, CA  94941.

On April 25, 2008, I served the foregoing documents:

• **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed to each as follows:

Charles Delbaum
Stuart T. Rossman
National Consumer Law Center
77 Summer Street, 10th Floor
Boston, MA 02141

Marvin A. Miller
Lori A. Fanning
Miller Law LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603

Shennan Kavanagh
Roddy Klein & Ryan
727 Atlantic Avenue
Boston, MA 02111-2810

Anand S. Raman
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington DC 20005

**[X]    BY U.S. MAIL IN THE ORDINARY COURSE OF BUSINESS)**  I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service.  I know that the correspondence is deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business.  I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices, in the United States mail at Mill Valley, California.

Executed on April 25, 2008, at Mill Valley, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

/s/

_____

Moya B. Mulreany

PROOF OF SERVICE                                                    Case No. C08-00369 TEH

1   *Addidtional Counsel for Plaintiffs:*

2   MILLER LAW LLC                              NATIONAL CONSUMER LAW CENTER
    Marvin A. Miller (To be admitted Pro Hac   Stuart T. Rossman (To be admitted Pro Hac
3   Vice)                                       Vice)
    Lori A. Fanning  (To be admitted Pro Hac    Charles Delbaum (To be admitted Pro Hac
4   Vice)                                       Vice)
    115 South LaSalle Street, Suite 2910        77 Summer Street, 10th Flr.
5   Chicago, IL  60603                          Boston, MA  02141
    Tel:     (312) 332-3400                     Tel:     (617) 542-8010
6                                               Fax:     (617) 542-8028

7   HAGENS BERMAN SOBOL
     SHAPIRO LLP
8   Thomas M. Sobol (To be admitted Pro Hac
    Vice)
9   One Main Street, 4th Floor
    Boston, MA  02142
10  Tel:     (617) 475-1950
    Fax:     (617) 482-3003
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE                                              Case No. C08-00369 TEH