IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANA RAMIREZ, et al.,

                Plaintiffs,

      v.

GREENPOINT MORTGAGE
FUNDING, INC.,

                Defendant.

NO. C08-0369 TEH

ORDER GRANTING
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

United States District Court
For the Northern District of California

This matter came before the Court on June 28, 2010, on the motion for class certification filed by Plaintiffs Ana and Ismael Ramirez and Jorge Salazar (collectively, "Plaintiffs").  Plaintiffs allege that Defendant GreenPoint Mortgage Funding, Inc. ("GreenPoint") violated federal fair lending and housing laws by giving its authorized brokers discretion to mark up the price of wholesale mortgage loans, a policy that led minority borrowers to be charged disproportionately high rates compared to similarly situated whites.  They now ask the Court to certify a class of African-American and Hispanic borrowers who obtained wholesale mortgage loans through GreenPoint from 2004 through 2007.  For the reasons set forth below, Plaintiffs' motion is GRANTED.

**BACKGROUND**

Plaintiffs Ana and Ismael Ramirez and Jorge Salazar each used brokers to obtain wholesale mortgage loans from GreenPoint.  In this lawsuit, they challenge GreenPoint's policy for pricing such loans.  In 2005, the Ramirezes refinanced their home in Massachusetts, taking out a $469,000 loan with a 30-year term and a disclosed Annual Percentage Rate, or "APR," of 6.191 percent.  Salizar obtained a $475,000 loan, with a 30-year term and disclosed APR of 7.181 percent, by refinancing his home and rental

property in San Diego, California in 2006.  The Ramirezes were assisted by First Call Mortgage Company, and Salizar used the services of TLN Financial; both were mortgage brokers authorized to originate loans with GreenPoint.

In the wholesale market, independent mortgage brokers act as intermediaries between borrowers and wholesale mortgage lenders like GreenPoint.  A broker identifies prospective borrowers and facilitates the loan origination process, transmitting a borrower's application to a lender for a determination of whether or not to fund the loan.  Its reliance on brokers enabled GreenPoint to fund mortgages in areas where it had not established any brick-and-mortar retail presence of its own.  GreenPoint worked with tens of thousands of authorized brokers when it was in the wholesale mortgage business, which it exited in late 2007.  GreenPoint typically sold the wholesale mortgages it funded into secondary markets, where they were repackaged into mortgage-backed securities.  The company originated as much as 93 percent of its loans through wholesale brokers from 2004 to 2007, and was at one time the fifth largest originator of mortgage loans through the wholesale channel in the United States.

The pricing of GreenPoint's mortgage loans consisted of an objective and a subjective component.  GreenPoint relied on objective risk factors – such as FICO score, property value, and loan-to-value ratio – to determine credit parameters and set prices for its loan products.  This information was communicated to brokers on a rate sheet listing GreenPoint's "par" interest rate, which did not result in any broker compensation.  That objective component of loan pricing is not at issue here.

Plaintiffs' allegations relate to GreenPoint's *discretionary* pricing policy, which governed brokers' compensation for their services.  GreenPoint paid brokers a "yield spread premium" or "rebate" when they set the interest rate higher than par; brokers were also permitted to charge loan origination and processing fees.  GreenPoint did not set any objective criteria for the imposition of these higher rates and fees, which were set by the brokers according to their discretion.  Brokers were paid more for loans that cost more to the borrower, but their compensation was capped at 5 percent of the loan amount.  GreenPoint monitored the fees charged by its brokers to ensure they complied with its policies.

2

United States District Court

For the Northern District of California

Plaintiffs contend that the discretionary policy resulted in minority borrowers – defined here to include African Americans and Hispanics – receiving less favorable loan pricing than similarly situated whites.  Citing such disparities, Plaintiffs allege that GreenPoint engaged in discriminatory mortgage lending practices in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, and the Fair Housing Act ("FHA"), 42 U.S.C. § 3605.[1]  They bring these claims under a disparate impact theory, challenging "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (addressing disparate impact claims in Title VII employment context).[2]

Plaintiffs now move to certify a class under Federal Rule of Civil Procedure 23(b)(3).  GreenPoint opposes the motion.

**LEGAL STANDARD**

Plaintiffs, as the parties requesting class certification, must demonstrate that they have met all four requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one part of Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), amended by 273 F.3d 1266 (9th Cir. 2001).  Rule 23(a) allows a class to be certified

> only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to

---

[1] The ECOA makes it unlawful "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)."  15 U.S.C. § 1691(a).  The FHA makes it unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."  42 U.S.C. § 3605(a).

[2] This Court previously concluded, in denying GreenPoint's motion to dismiss, that disparate impact claims are cognizable under both the FHA and ECOA.  *See* Order Denying Mot. to Dismiss (Doc. 48) at 4-6; *see also Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (disparate impact claims allowable under FHA); *Miller v. Am. Express Co.*, 688 F.2d 1235, 1239-40 (9th Cir. 1982) (disparate impact claims allowable under ECOA).

1   the class; (3) the claims or defenses of the representative parties
2   are typical of the claims or defenses of the class; and (4) the
    representative parties will fairly and adequately protect the
3   interests of the class.

4   Fed. R. Civ. P. 23(a); *see also Zinser*, 253 F.3d at 1186.  That is, the class must satisfy the

5   requirements of numerosity, commonality, typicality, and adequacy.

6       Rule 23(b) provides for the maintenance of several different types of class actions.

7   Plaintiffs seek to certify the class under Rule 23(b)(3), which requires a showing "that the

8   questions of law or fact common to class members predominate over any questions affecting

9   only individual members, and that a class action is superior to other available methods for

10  fairly and efficiently adjudicating the controversy."

11      Before certifying a class, a district court must determine that the requirements of Rule

12  23 "are actually met, not simply presumed from the pleadings." *Dukes v. Wal-Mart Stores,*

13  *Inc.*, 603 F.3d 571, 582 (9th Cir. 2010) (en banc).  The Court must "perform a rigorous

14  analysis to ensure that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 581 (citing

15  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)).  Such analysis "will often,

16  though not always, require looking behind the pleadings to issues overlapping with the merits

17  of the underlying claims." *Id.* at 594.  However, the court may not consider whether the

18  party seeking class certification has stated a cause of action or is likely to prevail on the

19  merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).  If a district court concludes

20  that the moving party has met its burden of proof, then the court has broad discretion to

21  certify the class. *Zinser*, 253 F.3d at 1186.

22

23  **DISCUSSION**

24      Plaintiffs propose to represent a class defined as "[a]ll African-American or Hispanic

25  persons throughout the United States to whom GreenPoint originated a residential-secured

26  loan in GreenPoint's wholesale lending channel between January 1, 2004 and January 1,

27  2008." Pls.' Mot. at 11.  As they request certification under Rule 23(b)(3), Plaintiffs present

28  evidence showing the predominance of common issues and the superiority of a class action,

4

in addition to evidence going to Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy.

GreenPoint's challenges to the certification of such a class fall in two broad categories.  First, GreenPoint argues that the named Plaintiffs cannot satisfy the requirements of typicality and adequacy, because false statements in their loan applications cast doubt on their integrity and subject them to unique defenses.  Plaintiffs are also atypical because – according to GreenPoint – they suffered no injury and therefore have no standing, as their financing was superior to that obtained by similarly situated white borrowers.  Second, GreenPoint contends that Plaintiffs cannot show either the existence or predominance of common questions.  The disparity in loan terms is explained not by race, GreenPoint argues, but by other legitimate variables that Plaintiffs' expert was unable to account for, such as the amount of work each broker performed for a borrower.  Since the inquiry into those other factors would require the Court to examine the loans of each prospective class member, GreenPoint contends that proceeding as a class action would be inappropriate.

The Court begins by examining the four elements of Rule 23(a).  If Plaintiffs meet those requirements, the Court will move onto the predominance and superiority inquiries under Rule 23(b)(3).

**I.      Rule 23(a)**

**A.      Numerosity**

To satisfy Rule 23(a)(1), Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable."  From 2004 through 2007, GreenPoint made at least 94,000 loans to African-American and Hispanic borrowers across the United States.  GreenPoint does not dispute this figure or the impracticability of joinder, and the Court agrees with Plaintiffs that joinder of all class members would be impracticable.  The numerosity requirement is therefore satisfied.

//

//

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

**B.     Commonality**

To demonstrate commonality under Rule 23(a)(2), Plaintiffs must "establish common *questions* of law and fact." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 594 (9th Cir. 2010) (en banc) (emphasis in original). "[A]nswering those questions," on the other hand, "is the purpose of the merits inquiry, which can be addressed at trial and at summary judgment." *Id.* It is not necessary that members of the proposed class "share every fact in common or completely identical legal issues." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010). Rather, the "existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "The commonality test is 'qualitative rather than quantitative' – one significant issue common to the class may be sufficient to warrant certification." *Dukes*, 603 F.3d at 599. For a civil rights claim, commonality is satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). "[I]ndividual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Id.*

To make out a prima facie case of discrimination under the disparate impact theory, Plaintiffs would have to show "a significant disparate impact on a protected class caused by a specific, identified . . . practice or selection criterion." *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002).[3] Plaintiffs contend that the discretionary policy had a disparate impact on minority borrowers, causing them to receive less favorable loan pricing than similarly situated whites. Although Plaintiffs need not prove their claim at the class certification stage, they need to demonstrate that doing so will hinge on common questions of fact and law.

Plaintiffs make this showing through the expert report of Harvard Law School professor Howell E. Jackson ("Professor Jackson"), whose analysis of GreenPoint's mortgage data leads him to conclude that "minorities paid more for Greenpoint wholesale

---

[3] The Court relies in part on disparate impact case law under Title VII of the 1964 Civil Rights Act, because "Title VII discrimination analysis" is applied "in examining Fair Housing Act discrimination claims." *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).

6

United States District Court

For the Northern District of California

mortgage loans than whites with similar risk-characteristics." Jackson Report (Doc. 178) at 6. Relying on the annual percentage rate, or "APR," as a representation of loan costs, Professor Jackson compares the amount paid by white and minority borrowers for GreenPoint wholesale loans originated from 2004 to 2007. He finds that the mean APR for whites was 69.5 basis points lower than that of African Americans, and 56.5 basis points lower than that of Hispanics.[4] However, those raw figures do not account for legitimate factors that could explain such differences. To compare *similarly situated* whites and minorities, Professor Jackson performs regression analysis, a statistical method that allows him to control for legitimate underwriting characteristics that affect the cost of a loan.[5] Professor Jackson concludes that the APRs of African Americans are 9.4 basis points, and those of Hispanics 7.6 basis points, higher than those of similarly situated whites, a difference that cannot be explained by legitimate risk factors or valid business justifications. Critically for purposes of class certification, Professor Jackson's analysis relies on evidence common to the class and does not require any individualized inquiry.

Plaintiffs offer numerous questions of fact and law that are common to the class. The discretionary pricing strategy that they challenge was carried out uniformly, Plaintiffs contend, and its adverse effects were felt in the same way by Plaintiffs and all class members. Whether GreenPoint's policy resulted in a pricing disparity between white and minority borrowers, whether those disparities are justified by legitimate differences in creditworthiness, and whether less discriminatory alternatives exist are all questions common to the class, according to Plaintiffs. Furthermore, Professor Jackson's statistical analysis demonstrates that the pricing disparities are class-wide and attributable to GreenPoint's discretionary policy.

GreenPoint, however, disputes Plaintiffs' ability to establish their claims using common proof. Although Professor Jackson's analysis was based on GreenPoint's own data,

---

[4] A basis point is equal to 1/100th of a percentage point.

[5] Regression analysis allows Professor Jackson to compare the relationship between a "dependent variable" – here, the APR – and various "explanatory" variables.

GreenPoint contends that he would have to mine the data of the more than 27,000 brokers who originated the loans at issue here to properly evaluate Plaintiffs' claims.  This is because Professor Jackson cannot account for two key factors that may legitimately explain the price disparities between whites and minorities: the effort a broker exerted on a given borrower's loan, and the broker's "pull-through" rate (i.e. how frequently a broker's submitted loan applications result in funded loans).  GreenPoint's expert, Dr. Marsha J. Courchane ("Dr. Courchane"), asserts that the absence of such data makes it impossible to tell whether legitimate broker fee differentials explain the minority loan disparity.  Dr. Courchane, an economist with a Ph.D. from Northwestern University, states that she cannot find evidence of "any pattern of substantive or economically significant disparate impact" when using statistical techniques similar to those of Professor Jackson.  Courchane Report (Doc. 182-1) at 5.  She argues that the evidence of disparate impact drops to levels that are not "economically significant" when the regression analysis is conducted separately for individual categories of loans; by aggregating the loan products together, Professor Jackson overstates the effect of race and ethnicity.  She also demonstrates that minorities were disproportionately represented by brokers with lower pull-through rates, who therefore had to charge more per loan to cover their work on unsuccessful loan applications.  GreenPoint argues that these alleged flaws in Professor Jackson's analysis eviscerate Plaintiffs' common questions and necessitate inquiry into the individual factors that played into the pricing of each loan.  GreenPoint also relies on the expert report of Laura J. Borrelli, a mortgage litigation consultant, who opines that disparate treatment can only be proven by "an extensive, literal loan by loan review of each borrower's mortgage file," and not by Professor Jackson's proposed regression analysis.  Borrelli Report (Doc. 182-3) at 11.

Professor Jackson, in reply, stands by his conclusion that common methods and proof can be used to demonstrate the disparate impact of GreenPoint's pricing policies on class members.  He points out that the disparities identified by Dr. Courchane's analysis, while smaller than his own findings, are both statistically and economically significant: a disparity of five basis points would cost a typical African-American borrower $579 more than a

United States District Court
For the Northern District of California

typical white borrower, and a typical Hispanic borrower $705 more than a typical white borrower, over the first five years of a loan.  Three mortgage brokers deposed in this case testified that there was no correlation between the race of a borrower and the amount of work the broker had to perform, providing anecdotal evidence to refute GreenPoint's contention that the identified disparity could be explained by disparities in broker effort.  Having rerun his regressions with new variables to account for GreenPoint's arguments, Professor Jackson concludes that none of Dr. Courchane's arguments explain the disparity in mortgage prices for minority borrowers; race and ethnicity remain statistically significant.  Plaintiffs also offer rebuttal from Professor Patricia A. McCoy of the University of Connecticut School of Law, who argues that "policies and practices instituted by GreenPoint and a regulatory environment that together were common to the class allowed GreenPoint's mortgage brokers to overcharge customers in general and to charge even more to black and Hispanic borrowers."  McCoy Report (Doc. 204) at 8.

Plaintiffs' reliance on statistical evidence to fulfill the commonality requirement is well founded in Ninth Circuit precedent.  In its recent en banc ruling in *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010), the Ninth Circuit affirmed the certification of a class of female Wal-Mart employees with respect to allegations that women received lower pay – and fewer promotions – than their male colleagues in violation of Title VII of the 1964 Civil Rights Act.  In finding commonality, the court relied on factual evidence of a company-wide policy governing pay and promotion decisions and a strong corporate culture vulnerable to gender bias, as well as statistical evidence showing significant disparities between men and women in compensation and promotion that could "be explained only by gender discrimination."  *Id.* at 599-613.  The court observed that it is "well established that plaintiffs may demonstrate commonality by presenting statistical evidence, which survives a 'rigorous analysis,' sufficient to fairly raise a common question concerning whether there is class-wide discrimination."  *Id.* at 603-04.  The Ninth Circuit also recognized that "subjective decision making is a 'ready mechanism[] for discrimination' and that courts should scrutinize it carefully."  *Id.* at 612 (quoting *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1075

1   (9th Cir. 1986)) (alteration in original).  Subjective practices that operate to discriminate have

2   been found by courts across the country to "satisfy the commonality and typicality

3   requirements of Rule 23(a)."  *Id.* (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th

4   Cir. 1993)).

5          As in *Dukes*, Plaintiffs are challenging a subjective policy that applied to all of

6   GreenPoint's authorized brokers and, hence, every member of the proposed class – all of

7   whom negotiated their mortgages through brokers subject to the GreenPoint policy.  The

8   claims of all class members hinge on a common question: whether GreenPoint's

9   discretionary pricing policy had a disparate impact on minority borrowers.  Plaintiffs propose

10  to answer that question using statistical evidence that, according to Professor Jackson, shows

11  minorities paid more for their loans than similarly situated whites.  Plaintiffs' theory of

12  liability therefore stands on common questions of fact and law.  Although GreenPoint casts

13  doubt on the viability of that theory, the Court may not "decline to certify the class on the

14  basis of a mere potentiality" that  plaintiffs' theory of liability will not prevail.  *United Steel*

15  *Workers v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010).  "[I]t is the plaintiff's

16  *theory* that matters at the class certification stage, not whether the theory will ultimately

17  succeed on the merits."  *Dukes*, 603 F.3d at 587 (citing *United Steel Workers*, 593 F.3d at

18  809-10) (emphasis in original).

19         GreenPoint's arguments amount to an attack on the merits of Professor Jackson's

20  analysis, which is premature at this stage of litigation.  "[D]isputes over whose statistics are

21  more persuasive are often not disputes about whether the plaintiffs raise common issues or

22  questions, but are really arguments going to proof of the merits."  *Dukes*, 603 F.3d at 591.

23  Only an argument that one party's statistics are "unreliable or based on an unaccepted

24  method" would have to be resolved at the class certification stage, requiring the Court to

25  "determine whether the potentially problematic statistics [are] even capable of raising a

26  common question."  *Id.* at 591-92.  However, GreenPoint does not fault the reliability of

27  Professor Jackson's methodology; it simply purports to have a *better* way.  Such "statistical

28  disputes . . . encompass the basic merits inquiry and need not be proved to raise common

United States District Court

For the Northern District of California

1    questions and demonstrate the appropriateness of class resolution." *Id.* at 594.  The

2    commonality requirement is therefore satisfied.[6]

3

4    **C.    Typicality**

5    Under the "permissive standards" of Rule 23(a)(3), "representative claims are

6    'typical' if they are reasonably co-extensive with those of absent class members; they need

7    not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.

8    1998).  "The test of typicality is whether other members have the same or similar injury,

9    whether the action is based on conduct which is not unique to the named plaintiffs, and

10   whether other class members have been injured by the same course of conduct." *Hanon v.

11   Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation

12   omitted).  However, "a named plaintiff's motion for class certification should not be granted

13   if 'there is a danger that absent class members will suffer if their representative is

14   preoccupied with defenses unique to it.'" *Id.* (quoting *Gary Plastic Packaging Corp. v.

15   Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).  Although

16   typicality "tend[s] to merge" with the commonality requirement, *Gen. Tel. Co. of Sw. v.

17   Falcon*, 457 U.S. 147, 157 n.13 (1982), "each factor serves a discrete purpose," *Dukes*, 603

18   F.3d at 613 n.37.  "Commonality examines the relationship of facts and legal issues common

19   to class members, while typicality focuses on the relationship of facts and issues between the

20   class and its representatives." *Dukes*, 603 F.3d at 613 n.37.  Plaintiffs represent that their

21   claims are typical because they – like all prospective class members – were subject to and

22   affected by GreenPoint's discretionary pricing policy.  GreenPoint argues that the named

23

24       [6] GreenPoint argues that Plaintiffs' approach exhibits the same flaws that the Fourth
     Circuit identified when it decertified a class in *Broussard v. Meineke Discount Muffler
25   Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998).  The court found that the calculation of lost profits
     to the plaintiff Meineke franchisees, who were alleging the misallocation of advertising funds
26   by Meineke, was too "dependent upon consideration of the unique circumstances pertinent to
     each class member." *Id.* at 343 (quoting *Boley v. Brown*, 10 F.3d 218, 223 (4th Cir. 1993)).
27   However, the district court there erred by allowing "the jury to calculate lost profits without
     reference to any" of the many other factors affecting "the profitability of each Meineke
28   franchise." *Id.*  Here, by contrast, Professor Jackson has accounted for the other variables
     affecting APR.

11

Plaintiffs are not typical for two reasons:  they will be preoccupied by unique defenses based on false information included in their loan applications, and they lack standing because they were not harmed by GreenPoint's pricing policy.

**1.      Unique Defenses**

Ana and Ismael Ramirez both signed or initialed each page of their loan application, including a statement acknowledging the making of false statements to be a federal crime. According to the Ramirezes' deposition testimony, however, much of the information included in the application was false.  The application overstated their monthly income by thousands of dollars, represented Mr. Ramirez as being self-employed when he was unemployed, and listed a bank account balance approximately four times its actual level. Salazar's application, likewise, overstated his bank account balance by nearly $40,000, and gave an actual gross income one-and-a-half times what he actually earned.  Salazar, like the Ramirezes, signed each page of his application, which warns against making false statements.

However, there is also ample evidence suggesting Plaintiffs were unaware that misstatements were included in their applications.  English is a second language for all three Plaintiffs.  Mr. Ramirez can neither read nor write in English; Salazar does not speak English, but can read "a little."  The Ramirezes worked with Kathy Objio, a broker with First Call Mortgage Company, to whom they had given copies of their tax returns and bank statements, and who filled out their loan application over the telephone.  The Ramirezes did not read the application before signing it.  Salazar testified that he worked with a broker named Jimmy affiliated with TLN Financial, to whom he provided paycheck stubs, bank statements, and other documents.  Salazar did not fill out the application himself, and did not know who had.  Both Salazar and Mr. Ramirez expressed surprise during their depositions when shown the misinformation on their applications.  Salazar responded to the listed balance of his bank account by laughing and saying, "If I had that kind of money, I would be living in Tijuana," where he is from.  Salazar Depo. 11:16-23, 111:21-24.  Mr. Ramirez

1   expressed outrage at the misrepresentations, repeating, "Oh, my God," and asking of

2   GreenPoint's counsel, "Why do these people do this type of thing when they're not supposed

3   to do it? . . . Why do they say I have my own company, that I'm self-employed? . . . Because

4   this places you in a bad situation, it makes you look like a liar."  I. Ramirez Depo. 25:17-22,

5   28:4-11, 29:21-30:7.

6          GreenPoint argues that the false statements in Plaintiffs' loan applications subject

7   them to unique equitable defenses such as unclean hands, rendering them unable to satisfy

8   the typicality requirement.  Unclean hands is an equitable doctrine that "closes the doors of a

9   court of equity to one tainted with inequitableness or bad faith relative to the matter in which

10  he seeks relief, however improper may have been the behavior" of the other party.  *Ellenburg*

11  *v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985).  "'It is fundamental to [the]

12  operation of the doctrine that the alleged misconduct by the plaintiff relate directly to the

13  transaction concerning which the complaint is made.'"  *Dollar Systems, Inc. v. Avcar Leasing*

14  *Systems, Inc.*, 890 F.2d 165, 173 (9th Cir. 1989) (quoting *Arthur v. Davis*, 126 Cal. App. 3d

15  684, 693-94 (1981)) (alteration in original).

16         GreenPoint relies on two district court cases from outside the Ninth Circuit to

17  demonstrate the availability of an unclean hands defense for disparate impact claims under

18  the ECOA.  In *Riggs National Bank v. Linch*, a court in the Eastern District of Virginia

19  addressed whether guarantors of a promissory note could raise the ECOA as an affirmative

20  defense in an action to collect on the defaulted note.  829 F. Supp. 163 (E.D. Va. 1993).

21  After concluding that the ECOA could not be a basis for invalidating the underlying

22  guarantee, the court – in a footnote – addressed the plaintiff bank's argument that the

23  "unclean hands" doctrine barred any recovery by a defendant guarantor who had submitted a

24  false financial statement.  *Id.* at 169 n.7.  The court concluded that, since the guarantor's

25  "conduct was knowing and willful, . . . the doctrine of unclean hands would bar [him] from

26  any recovery, even if [the bank] had violated the ECOA."  *Id.*  A court in the Middle District

27  of Florida relied on *Riggs* in reaching the same conclusion.  *Beaulialice v. Federal Home*

28  *Loan Mortgage Corp.*, No. 8:04-cv-2316-T-24-EAJ, 2007 U.S. Dist. LEXIS 15846, at *31

United States District Court

For the Northern District of California

1   (M.D. Fla. Mar. 6, 2007) ("Defendant has shown that Plaintiff misrepresented facts on her

2   application in order to secure the loan, and this deception bars her claims.").

3          However, the Supreme Court ruled in 1995 that the equitable defense of employee

4   misconduct could not preclude employer liability for violating the Age Discrimination in

5   Employment Act ("ADEA").  In *McKennon v. Nashville Banner Publishing Co.*, the Court

6   overturned the Sixth Circuit's conclusion that the question of discrimination was rendered

7   "irrelevant" by after-acquired evidence of employee wrongdoing that would have, by itself,

8   resulted in her discharge.  513 U.S. 352, 356-57 (1995).  The Court observed that the unclean

9   hands defense "has not been applied where Congress authorizes broad equitable relief to

10  serve important national policies."  *Id.* at 360.  The ADEA reflects such a policy, the Court

11  concluded, bearing as its purpose "the elimination of discrimination in the workplace," and

12  carrying remedies meant to deter discrimination and to compensate those harmed by it.  *Id.* at

13  358.  Misconduct could, however, affect the availability of remedies; the employee's

14  wrongdoing was relevant "to take due account of the lawful prerogatives of the employer in

15  the usual course of its business and the corresponding equities that it has arising from the

16  employee's wrongdoing."  *Id.* at 361.

17         "The purpose of the ECOA," like that of the ADEA, "is to eradicate . . .

18  discrimination," only in the provision of credit rather than the workplace.  *United States v.*

19  *ITT Consumer Financial Corp.*, 816 F.2d 487, 489 (9th Cir. 1987).  The ECOA also allows

20  the district court to "grant such equitable and declaratory relief as is necessary to enforce the

21  requirements imposed" under the statute.  15 U.S.C. § 1691e(c).  The declaration of purpose

22  for the FHA is to "provide, within constitutional limitations, for fair housing throughout the

23  United States."  42 U.S.C. § 3601.  As for remedies, in addition to actual and punitive

24  damages, the FHA allows a court to "grant as relief, as the court deems appropriate, any

25  permanent or temporary injunction, temporary restraining order, or other order (including an

26  order enjoining the defendant from engaging in such practice or ordering such affirmative

27  action as may be appropriate)."  *Id.* § 3613(c)(1).  As the ECOA and FHA both represent

28  Congress's authorization of "broad equitable relief to serve important national policies,"

United States District Court

For the Northern District of California

1   *McKennon*, 513 U.S. at 360, the unclean hands defense should not be applicable here.

2   Indeed, the Fifth Circuit reached that very conclusion in *Moore v. U.S. Department of*

3   *Agriculture*, concluding that "after-acquired evidence of [plaintiffs'] poor credit history" –

4   which would have supplied an independent basis for denying the plaintiffs' application to

5   purchase a property – "cannot defeat [defendant's] liability" under the ECOA but "can aid

6   the court in assessing . . . damages."  55 F.3d 991, 995-96 (5th Cir. 1995) (citing *McKennon*

7   *v. Nashville Banner Publ'g Co.*, 115 S. Ct. 879, 883-87 (1995)).

8       However, GreenPoint relies on this Court's ruling in *Ganley v. County of San Mateo*,

9   No. C06-3923 TEH, 2007 U.S. Dist. LEXIS 26467 (N.D. Cal. Mar. 22, 2007), to argue that

10  *McKennon* does not foreclose the unclean hands defense.  In *Ganley*, the Court considered a

11  plaintiff's motion to strike 22 affirmative defenses raised in the defendant's answer to a

12  complaint alleging that the plaintiff had been removed from permanent public employment

13  without due process in violation of 42 U.S.C. § 1983.  While acknowledging that the

14  Supreme Court had refused to apply the unclean hands doctrine in the ADEA context, the

15  Court observed that "no available case law exists to suggest that the defense is inapplicable

16  in the context of § 1983 actions."  *Ganley*, 2007 U.S. Dist. LEXIS 26467, at *14.  In the

17  absence of "controlling or persuasive precedent to the contrary," the Court found it "prudent

18  to deny Plaintiff's motion to strike the defense of unclean hands."  *Id.* at *14-15.

19      This Court's ruling in *Ganley* is distinguishable, however.  A motion to strike is only

20  "proper when a defense is insufficient as a matter of law," which requires that the Court "be

21  convinced that there are no questions of fact, that any questions of law are clear and not in

22  dispute, and that under no set of circumstances could the defense succeed."  *Id.* at *3

23  (internal citations omitted).  Given that standard, the Court declined to strike a defense that

24  no court had explicitly held inapplicable to § 1983 actions.  The standard here is not nearly as

25  exacting: the Court is assessing whether Plaintiffs may be subject to unique defenses that

26  would diminish their ability to represent the interests of other class members.  The Court

27  need not be satisfied that the defense could succeed "under no set of circumstances," but

28

15

rather has to weigh the likelihood of such a defense rendering the named Plaintiffs inadequate class representatives.

The threat of an unclean hands defense will not defeat the adequacy of the named Plaintiffs. Whereas this Court in *Ganley* could find no authority applying *McKennon* in the § 1983 context, there is a strong basis for concluding that *McKennon* applies to ECOA. Although the Ninth Circuit has not addressed that question, the Fifth Circuit has – concluding that the unclean hands defense is unavailable. *Moore*, 55 F.3d at 996. Furthermore, this Court finds that the rationale of *McKennon* is clearly applicable to the ECOA and the FHA, which – like the ADEA – reflect Congress's authorization of "broad equitable relief to serve important national policies." *McKennon*, 513 U.S. at 360. The unclean hands defense is therefore inapplicable here, and the false statements in Plaintiffs' loan applications cannot defeat typicality.[7]

## 2. Standing

GreenPoint further argues that Plaintiffs cannot satisfy the typicality requirement because they lack standing to assert a disparate impact claim. Constitutional standing is comprised of three elements: (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood, rather than mere speculation, "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted). GreenPoint contends that Plaintiffs were not injured by its discretionary pricing policy because they received loans that were priced *more favorably* than similarly situated white borrowers, in contrast to their allegations that the policy resulted in less favorable terms for minorities. Since typicality requires that the named plaintiffs "have the same or similar injury" as other class members, *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992), GreenPoint insists that Plaintiffs are not typical of the class they seek to represent.

---

[7] Even if the defense were applicable, Plaintiffs' evidence suggests that they were unaware that false statements were included in their applications, in which case they would not have "unclean hands" in the first place.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

This question, like that of commonality, pits the parties' experts against one another. Plaintiffs' expert, Professor Jackson, argues that their claims are typical of the class because each "was subject to the same Discretionary Pricing Policy that disproportionately affected minority borrowers." Jackson Report at 43. However, GreenPoint notes that Professor Jackson only determines that minority borrowers *on average* paid higher APRs than white borrowers, not that *these Plaintiffs* did so. Relying on Professor Jackson's own model, Dr. Courchane found that the Ramirezes' actual APR of 6.19 percent was lower than that of similarly situated white borrowers (6.48 percent); Salazar's APR of 7.18 percent was likewise lower than that of comparable whites (7.82 percent). GreenPoint therefore argues that Plaintiffs cannot show that the discretionary policy actually affected them; absent any injury, they lack standing to bring these claims.

In reply, Professor Jackson defends his approach, in which "each member of the plaintiff class would be entitled to a measure of damages reflecting an estimate of the average loss to class members." Jackson Reply at 27. Professor Jackson points out that "there will always be some variation in actual APRs that result in some borrowers getting better loan terms than our models predict." *Id.* at 29. Although the named Plaintiffs may have obtained better rates than similarly situated whites, Professor Jackson contends that "absent discriminatory practices, they would likely have had an even lower rate." Jackson Depo. at 225:15-17. Since the named Plaintiffs were subject to the same policy as other class members, proof of the policy's disparate impact on the class establishes that Plaintiffs – as members of that class – were injured by that policy, according to Plaintiffs.

Determining what price a minority borrower would have paid in a "but for" world is no simple proposition. Although Professor Jackson's regression model, estimated over hundreds of thousands of observations, indicates that GreenPoint's policy had a disparate impact on a group of 94,000 minorities, how to predict what *any one* of those borrowers' rates would have been absent the discretionary policy is subject to debate. Professor Jackson would apply the average effect felt by all minorities to the individual, a methodology that shows injury to Plaintiffs. That approach is consistent with the theory that the individual's

17

APR, while lower than the predicted APR of a similarly situated white borrower, would have been even lower but for GreenPoint's discretionary policy.  Dr. Courchane would only compare the individual to the model's representation of a similarly situated white borrower, which reveals the named Plaintiffs to be better off than their white counterparts and suggests that they did not suffer the injury of which they complain.  Arguments about "whose statistics are more persuasive . . . are really arguments going to proof of the merits," but an argument that "the other party's statistics were unreliable or based on an unaccepted method . . . may be an issue the district court would have to resolve" on class certification.  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 591-92 (9th Cir. 2010).  As neither party argues that the other's methodology is inherently flawed, the Court need not and cannot choose between them at this stage.  Plaintiffs present a viable theory demonstrating that the named Plaintiffs suffered the same injury felt by the other members of the proposed class.

The Ninth Circuit confronted a similar typicality issue in *Dukes*, where it observed that "individual employees in different stores with different managers may have received different levels of pay or may have been denied promotion or promoted at different rates." *Dukes*, 603 F.3d at 613.  The court concluded, however, that the district court's finding of typicality was not an abuse of discretion, because "the discrimination they claim to have suffered occurred through alleged common practices – e.g., excessively subjective decision making in a corporate culture of uniformity and gender stereotyping."  *Id.*  Here, similarly, Plaintiffs attribute the alleged discrimination to the discretionary pricing policy, a common practice that governed the pricing of all class members' mortgages.  Since they were subject to that policy, and have advanced a viable theory showing the harm produced by that policy, Plaintiffs have satisfied the typicality requirement.

## D.    Adequacy

The legal adequacy of the class representatives is determined by the resolution of two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action

18

vigorously on behalf of the class?"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  GreenPoint contends that Plaintiffs are inadequate class representatives because the false statements in their mortgage applications call into question their integrity.  Relying on Second Circuit authority, GreenPoint stresses that "courts may consider the honesty and trustworthiness of the named plaintiff" on a motion for class certification.  *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998).

GreenPoint acknowledges that "the role of the brokers in perpetuating these falsehoods is not yet clear," but still insists that "there is ample evidence from which to infer that the Plaintiffs were willing participants in, if not the initiators of, this pattern of deception."  Opp'n at 11.  However, the Court cannot conclude on the record before it that Plaintiffs lack the integrity necessary to be adequate class representatives.  Plaintiffs' evidence demonstrates that they did not fill out the loan applications that contained the false information, and indeed did not even read the applications before signing them.  Professor Jackson has also offered authority showing the "proclivity of mortgage brokers to exploit the ignorance and misunderstandings of individual borrowers." Jackson Reply at 6.

The concerns about Plaintiffs' integrity raised by GreenPoint are insufficient to bar class certification.  The Court is satisfied by Plaintiffs' counsel's experience in prosecuting class actions, and has seen no evidence of any disqualifying conflicts of interest between Plaintiffs and other class members.  The Court therefore concludes that Plaintiffs are adequate class representatives, which means that all four requirements of Rule 23(a) have been met.

## II.     Rule 23(b)(3)

Since Plaintiffs have satisfied the four prongs of Rule 23(a), the Court now turns to the two requirements of Rule 23(b)(3): whether common questions predominate, and whether adjudicating the case as a class action is superior to other methods.  Both requirements were added to the Federal Rules "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly

situated, without sacrificing procedural fairness or bringing about other undesirable results.'"
*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3)
Adv. Comm. Notes to 1966 Amendment).

### A.    Predominance

Predominance, which "tests whether proposed classes are sufficiently cohesive to
warrant adjudication by representation," is a "far more demanding" standard than Rule
23(a)'s commonality requirement. *Amchem Prods.*, 521 U.S. at 623-24.  Rule 23(b)(3)
requires the Court to find "that the questions of law or fact common to class members
predominate over any questions affecting only individual members."  Whereas Rule 23(a)(2)
is satisfied by the presence of common questions, "Rule 23(b)(3) requires a district court to
formulate some prediction as to how specific issues will play out in order to determine
whether common or individual issues predominate in a given case." *Dukes v. Wal-Mart
Stores, Inc.*, 603 F.3d 571, 593 (9th Cir. 2010) (internal quotation marks and citation
omitted).

GreenPoint attacks predominance by resurrecting its arguments against commonality.
Here, however, Plaintiffs carry the higher burden of showing not only that common issues
exist, but that they *predominate*.  Since legitimate factors can explain the disparities between
the APRs of minority and white borrowers, GreenPoint contends that "the only way to
proceed here would be to examine each broker and each transaction."  Opp'n at 22.  Even if
Plaintiffs established a prima facie case of discrimination, "GreenPoint would be entitled to
(and would in fact) present evidence on a transaction-by-transaction basis to show that there
was not discrimination." *Id.*

Since the standard for assessing predominance is higher than that of commonality, the
Court's finding of common issues of fact and law does not dictate the result here.  Although
individualized issues cannot defeat commonality where common issues exist, they can
foreclose the conclusion that such issues predominate.  Assessing predominance therefore

United States District Court

For the Northern District of California

requires a closer examination of Plaintiffs' claims and how those claims are to be proven at trial.

A plaintiff bringing a disparate impact claim under the FHA or the ECOA must establish "'(1) the occurrence of certain outwardly neutral . . . practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices.'" *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118 (9th Cir. 2008) (quoting *Pfaff v. United States HUD*, 88 F.3d 739, 746 (9th Cir. 1996)). To make out a prima facie case, the plaintiff must "show at least that the defendant's [policy] had a discriminatory effect.'" *Pfaff*, 88 F.3d at 745 (quoting *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988)); *see also Budnick*, 518 F.3d at 1118 ("A plaintiff need not establish discriminatory intent but the discriminatory impact must be proven; an inference of discriminatory impact is not sufficient."). "Statistical analysis is admissible to establish disparate impact." *Budnick*, 518 F.3d at 1118. To rebut the prima facie case, a defendant must supply "a legally sufficient, nondiscriminatory reason" for the policy, *i.e.* a "compelling business necessity." *Pfaff*, 88 F.3d at 746-47. A defendant charged with discrimination may also "diffuse a prima facie case against him, and hence avoid the need to supply a legally sufficient, nondiscriminatory reason in rebuttal, by successfully challenging the statistical basis of this case." *Id.* at 746.

Plaintiffs' claim challenges GreenPoint's discretionary pricing policy, not the individual actions of its 27,000 authorized brokers. The key question is whether that policy had a disparate impact – whether it fell "more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). The relevant evidence, as with most disparate impact cases, will focus on "statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 987 (1988). Professor Jackson's analysis provides evidence of the disparate impact on a class-wide basis. Competing explanations for those disparities are examined by way of regression analyses that assess the effect of competing variables. GreenPoint can defend against Plaintiffs' case

United States District Court

For the Northern District of California

in two ways: by demonstrating that its discretionary policy had a valid business justification, and by challenging the statistical basis for Plaintiffs' claim.  *See Pfaff*, 88 F.3d at 746-47.  In either case, the defense applies across the class.  Common questions therefore appear to predominate.

However, GreenPoint contends that it will be entitled to present evidence on a broker-by-broker and transaction-by-transaction basis to demonstrate that disparities were based on legitimate, non-discriminatory factors.  The work performed by a broker can vary considerably from customer to customer, ranging from filling out a loan application and advising customers about the maximum mortgage they can afford to assisting borrowers in repairing damaged credit.  GreenPoint argues that the amount of work a broker expends on an application, and facts particular to each broker – like overhead costs – constitute legitimate variation that may account for the racial and ethnic disparities alleged by Plaintiffs.

GreenPoint appears to misapprehend the basis for Plaintiffs' claim.  The brokers are not being sued; GreenPoint is.  Plaintiffs identify GreenPoint's policy as the basis for the disparate impact.  Such claims are proven not by sifting through every incident and weighing anecdotal justifications for each, but by considering how a common policy collectively affects a group.  The inquiry will focus on "statistical disparities," not "specific incidents." *Watson*, 487 U.S. at 987.  Defending against this lawsuit will not require the kind of broker-by-broker assessment GreenPoint envisions.  Rather, it will require GreenPoint to demonstrate that its discretionary pricing policy was justified by valid business reasons, or that there was no disparate impact in the first place.

At hearing, GreenPoint directed the Court to cases outside the Ninth Circuit in which class certification was denied for claims similar to Plaintiffs' – alleging racial discrimination in the pricing of car loans – because they faltered at the predominance inquiry.  In *Rodriguez v. Ford Motor Credit Co.*, Judge Conlon of the Northern District of Illinois denied class certification with respect to allegations that "Ford Credit's finance charge policy allows the individual dealerships to impose a higher finance charge markup on Hispanic customers than

United States District Court

For the Northern District of California

other similarly situated non-Hispanic customers."  No. 01 C 8526, 2002 U.S. Dist. LEXIS 7280, at *4 (N.D. Ill. Apr. 18, 2002).  Although the *Rodriguez* plaintiffs intended to rely on statistical evidence to establish discrimination, Judge Conlon concluded that they failed to show that "legitimate consideration[s], such as creditworthiness, . . . did not play any role in the interest rate charged to Hispanic customers."  *Id.* at *15-16.  She therefore concluded that "a trial would require an individualized inquiry into the reasons for thousands of credit decisions."  *Id.* at *16.  Here, to the contrary, Professor Jackson's regression analysis controlled for legitimate factors and – if credited by the finder of fact – forecloses such explanations for minority borrowers' loan rates.

In oral argument, GreenPoint also cited – for the first time – *Coleman v. GMAC*, in which Judge Trauger of the Middle District of Tennessee denied certification under Rule 23(b)(3) after concluding that common issues did not predominate.[8]  196 F.R.D. 315 (M.D. Tenn. 2000).  The plaintiff in *Coleman* alleged that she and other African-American borrowers were charged a higher markup for car loans from GMAC than white borrowers. The GMAC pricing system at issue in *Coleman* was comprised, as here, of two components: an objective "risk-related rate" set by GMAC, as well as a "subjective non risk related markup" determined by the dealers.  *Id.* at 318.  Judge Trauger concluded that the plaintiff had failed to establish that individual factors – such as "negotiation skills, buyer preferences, and self-assessment of creditworthiness" – "played no role in whether a finance charge markup was charged and the amount of any such markup."  *Id.* at 322.  Common issues therefore did not predominate, and certification under Rule 23(b)(3) was inappropriate. Again, however, the court's decision hinged on the plaintiff's failure to show that legitimate factors did not explain the disparity in loan rates; here, Plaintiffs *have* made such a showing.

---

[8] GreenPoint's counsel did not specify which opinion he was citing:  the original district court decision certifying a class under Rule 23(b)(2) but denying Rule 23(b)(3) certification, *Coleman v. GMAC*, 196 F.R.D. 315 (M.D. Tenn. 2000); the Sixth Circuit's decision vacating the 23(b)(2) certification, 296 F.3d 443 (6th Cir. 2002); or the district court's grant of class certification under Rule 23(b)(2) on remand following amendment of the complaint, 220 F.R.D. 64 (M.D. Tenn. 2004).  Since counsel cited the decision for its denial of 23(b)(3) certification, the Court assumes he was referencing the first of those decisions.

1    Whether that showing will convince a trier of fact is a question that must await the merits

2    phase.

3          GreenPoint further contends, citing the Ninth Circuit's ruling in *Schuetz v. Banc One

4    Mortgage Corp.*, 292 F.3d 1004 (2002), that it is impermissible in the Ninth Circuit "to

5    certify a class where analysis of mortgage brokers' compensation is required."  Opp'n at 20.

6    However, *Schuetz* has no bearing on the Court's analysis here.  The plaintiff in *Schuetz*

7    argued that "yield spread premiums"[9] were unlawful kickbacks under the Real Estate

8    Settlement Procedures Act, and sought to certify "a class of borrowers whose loan

9    settlements included a yield spread premium payment."  *Schuetz*, 292 F.3d at 1008.  Once it

10   concluded that "[y]ield spread premiums are not illegal per se," the court found that "whether

11   they amount to a prohibited referral in any particular case depends upon the services

12   provided by the broker and the total compensation paid for those services."  *Id.* at 1014.  For

13   that reason, individual issues predominated and class certification was inappropriate.  *Schuetz*

14   does not support GreenPoint's sweeping conclusion that class certification is never

15   appropriate where broker compensation is at issue.

16         The issue here is not whether the compensation paid to individual brokers was

17   reasonable in individual cases.  Rather, the question that Plaintiffs raise is whether

18   GreenPoint's discretionary pricing policy had a disparate impact on a class of 94,000

19   minority borrowers.  Proof of disparate impact is based not on an examination of individual

20   claims, but on a statistical analysis of the class as a whole.  Plaintiffs have demonstrated their

21   ability to show – using classwide proof – that GreenPoint's discretionary pricing policy

22   caused higher rates to be charged to minority borrowers, and that legitimate factors are

23   unable to explain this disparity.  To rebut this prima facie case, GreenPoint will have to

24   attack Plaintiffs' statistical analysis or show a legitimate business justification for its

25   discretionary pricing policy, which will again call for classwide proof.  Plaintiffs have carried

26   their burden of showing the predominance of common questions.

27         [9] Yield spread premiums are "fees paid by mortgage lenders to mortgage brokers that
28   are based on the difference between the interest rate at which the broker originates the loan
     and the par, or market rate offered by the lender."  *Schuetz*, 292 F.3d at 1005.

**B.    Superiority**

The final requirement for certification is "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The superiority inquiry "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case," which "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998).  Among the pertinent factors in assessing superiority are "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).  The superiority inquiry focuses "on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).

GreenPoint contends that the class action format would be unmanageable because the Court will have to consider the individual circumstances of each broker and each loan.  The Court has already discredited that argument.  Plaintiffs demonstrate that a class action is superior for reasons of efficiency and manageability.  Professor Jackson calculated an average monetary recovery over five years per loan to be $1,093 for African-American borrowers, and $1,076 for Hispanic borrowers; those numbers decline to $579 and $705, respectively, when he alters his analysis to account for GreenPoint's critiques.  Such amounts are too low for class members to bring individual claims; recovery would only be feasible via class action.  The class action is manageable because liability will be determined based on common statistical proof, and remedies can be calculated on a class-wide basis.  A class action is therefore superior to other methods for adjudicating these claims.

**III.    Rule 23(g)**

Having determined that Plaintiffs have met Rule 23's requirements for class certification, the Court must also appoint class counsel.  *See* Fed. R. Civ. P. 23(g) ("[A] court

United States District Court

For the Northern District of California

1  that certifies a class must appoint class counsel.").  On May 19, 2008, the Court appointed

2  the law firms of Bonnett Fairbourn Friedman & Balint, P.C. ("Bonnett Fairbourn") and

3  Roddy Klein & Ryan ("Roddy Klein") to serve as Co-Lead Interim Class Counsel, and the

4  law firm of Chavez & Gertler to serve as Liaison Interim Class Counsel.  *See* Fed. R. Civ. P.

5  23(g)(3); Pre-Trial Order No. 1 (Doc. 53) at 1-2.  The Court, finding that these law firms

6  continue to satisfy the requirements of Rule 23(g)(1), appoints Bonnett Fairbourn and Roddy

7  Klein as Co-Lead Class Counsel, and Chavez & Gertler as Liaison Class Counsel.

8

9  **CONCLUSION**

10         For the reasons set forth above, Plaintiffs' motion for class certification is

11  GRANTED.  Plaintiffs have satisfied the four prongs of Rule 23(a), as well as the

12  predominance and superiority requirements of Rule 23(b)(3).  A class of "[a]ll African-

13  American or Hispanic persons throughout the United States to whom GreenPoint originated a

14  residential-secured loan in GreenPoint's wholesale lending channel between January 1, 2004

15  and January 1, 2008" is hereby certified.  Plaintiffs Ana Ramirez, Ismael Ramirez, and Jorge

16  Salazar are appointed class representatives.  The law firms of Bonnett Fairbourn and Roddy

17  Klein are appointed as Co-Lead Class Counsel, and Chavez & Gertler as Liaison Class

18  Counsel.

19         IT IS FURTHER ORDERED THAT the parties shall appear for a case management

20  conference on **Monday, August 30, 2010, at 1:30pm**.  The parties shall file a joint case

21  management statement no fewer than seven days prior to the conference.

22

23  **IT IS SO ORDERED.**

24

25  Dated: 7/20/10

26  THELTON E. HENDERSON, JUDGE
    UNITED STATES DISTRICT COURT

27

28